**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

**LIBERTARIAN PARTY OF CONNECTICUT**      **CA NO 3:20-cv-00467**
**HAROLD HARRIS**
**DANIEL REALE**

**VS**

**DENISE MERRILL, SECRETARY OF STATE**
**NED LAMONT, GOVERNOR OF CONNECTICUT**

**VERIFIED COMPLAINT**

**I. PARTIES AND JURISDICTION**

1. Plaintiff Harold Harris is a candidate for State Senate in District 4, and was duly nominated by The Libertarian Party of Connecticut for that office.

2. Plaintiff Libertarian Party of Connecticut ("LPCT") is a statewide recognized minor party in Connecticut pursuant to CGS §9-372(6). It is also a political party, the Libertarian Party. The purpose of a political party is to collectively associate and engage in First Amendment Activities in order to peaceably and lawfully alter or change government in accordance with its principles and philosophy by providing ballot access and resources to candidates.

3. Plaintiff Daniel Reale is a candidate for United States Congress in Connecticut's Second District, duly nominated to that office by LPCT. He is

1

also the Chair of the Libertarian Party of Connecticut, and has been involved in

building the Libertarian Party of Connecticut since late 2007. Plantiff Reale will

also be a placeholder candidate for State Senate (District 18) and

Representative in the General Assembly (District 45).

     4. The Defendant Denise Merrill, the State's chief elections officer, causes

petitions for the offices in which the Plaintiffs do not have ballot access for to issue

pursuant to CGS §§9-453 through 9-453u, inclusive ("Petitioning Laws").

     5. Defendant Ned Lamont, also a state actor, is the governor of Connecticut,

who has issued the numerous executive orders that also concern this Complaint.

     6. This Court has jurisdiction to hear this complaint as it concerns causes of

action under 42 USC §1983. This Complaint involves federal questions under

Federal Law and the United States Constitution, which 28 USC §1331 authorizes

and requires this Court to determine.

## II. General Allegations Common to All Counts

### A. The Undue Unconstitutional Burden Prior to the COVID-19 Outbreak

     7. The Libertarian Party of Connecticut has, on numerous occasions, as

have other minor parties, 'placeholder' candidates for petitioning purposes when

the final nominee has yet to be determined. The election laws of this State are

such that petition drives must be initiated as soon as possible due to the amount

of time and resources involved, usually prior to when the final nominee is not yet

known, and many times before the deadline on which ballot petitions may be

completed. The deadline to complete ballot petitioning was August 7, 2019.

8. The Plaintiffs turned in a sufficient number of signatures to qualify for the November 2019 ballot under the Party Designation "Libertarian", as they repeatedly have for other elections seasons for many other offices.

9. The Defendant's custom, habit and practice has been to withhold an official determination as to whether minor party and petitioning candidates have qualified for or will actually appear on the ballot until after the deadline of minor parties to nominate set by CGS §9-452. This leaves an inadequate amount of time for any deficiencies or inadequacies to be addressed in the event nominations occur much sooner, forcing minor parties and their candidates into a position where no functional redress of unfair denial of ballot access can be had, as was the case with Bob Barr in 2008 when the Libertarian Party of Connecticut proved then Secretary of State Bysciewicz unjustly disqualified too many signatures, but the Federal District Court ruled that October 23 was too late to place him on the ballot due to the impossibility of the task.

10. Virtually all minor party candidates do not receive formal notice from the Defendant's office until the second week of September that they will or will not appear on the ballot in the November election of any given year – even if they have obtained enough votes and are not required to circulate a petition. This leaves no practical opportunity for any recourse or corrective action prior to the deadline imposed by CGS §9-452, and thus operates to deprive minor parties such due

process of law otherwise afforded to them by the Uniform Administrative Procedure Act (UAPA) as set forth in CGS §§4-166 through 4-189, inclusive, wherein they might otherwise seek a hearing in a contested case per §4-177 or prosecute the same utilizing the tools, methods and procedures set forth in CGS §§4-177a, 4-177b and 4-177c. In a case where the Secretary of State's office has, in the past, been made known of a nominee by virtue of the Petitioning Laws well before 90 days prior to the deadline set forth in CGS §9-452 (and especially others who do not require a petition), it has failed to "...proceed with reasonable dispatch to conclude any matter pending before it..." for the purposes of CGS §4-180.

11. Plaintiffs LPCT and its candidates expended large sums of money for ballot access petition drives, which are, because of the state and the burden of the Petitioning Laws, their major financial activity in this State. They are required to apply for petitions for each and every office they don't have ballot access for. Each petition, with the exception of statewide offices, cannot include other offices. LPCT and LNC have not received their procedural due process under UAPA in disputed cases because, among other reasons, the Petitioning Laws would render it functionally impossible.

12. Plaintiff Daniel Reale, as a candidate, has been impaired by this process because it arbitrarily and capriciously taxes virtually all party resources, rendering it impossible to run on a ballot with a full slate of candidates and thus impairing the ability to have a 'party line' preference for which voters could develop the habit and

4

tendency to vote for, as they have for the Democratic and Republican party lines –
especially when the 'party line' cannot or is not actually declared by the Defendant's
Office for any purpose of finality until early October, with no formal notice or
opportunity to be heard, just changes its mind after issuing a letter granting ballot
access.

13. The burden of the Petitioning Laws alone in terms of the time frame on
when ballot access is formally determined, in and of itself, has made presidential
ballot access a 20-year task to finally achieve in all fifty (50) states, and the
Libertarian National Committee (LNC) is the only organization to have presently
accomplished it by way of ballot petitioning. Funding and time constraints are
further complicated because different states have different timeframes and different
effects on subsequent drives – and LNC and LPCT rely on the same pool of major
talent, and to the extent it involves ballot access, donors to achieve it. For example,
in 2011 - 2012, LPCT's fundraiser, Scott Kohlhaus, was also the same fundraiser
working on Oklahoma's ballot drive (Oklahoma being held behind on logistics and
cost overruns). While LPCT had a fundraising contract in place by January and was
ready to apply for petitions, the funding did not actually start moving sufficiently until
May of 2012.

14. Connecticut's General Assembly has 151 seats in the House of
Representatives and 36 in its Senate – all of which have two terms that expire on
evenly numbered years. Connecticut also has 169 municipalities, with at least a

dozen or so offices each, the terms of which expire on a staggering basis, on both evenly and odd numbered years. Connecticut's five Congressional districts have terms that expire on evenly numbered years and two US Senate Seats that have six year terms. Connecticut also has the Constitutional Offices of Governor, Lieutenant Governor, Secretary of State, Attorney General, Treasurer and Comptroller, which all expire every four years. To meaningfully grow as a party, and gain votes so that LPCT could engage in major activities *other* than hawk ballot petition signatures, it would have to manage each and every office's ballot drive and be able to prosecute each and every one as a potential contested case under UAPA if need be – something not even the Democratic Party of Connecticut could do were it somehow forced to start all over with no ballot access from day one. The Petitioning Laws force, as a matter of law, the Libertarian Party to sit at the back of the political bus. The process of managing a successful ballot drive requires:

(a) A volunteer component (with volunteer signatures only occuring at a rate of a handful, due to the nature of petitioning itself and asking personal information of strangers, who may or may not actually be registered to vote);

(b) A fundraiser component (which also includes a treasurer support component, all transactions needing to be reported – for example, 2012 imploded LPCT with some $80,000 raised, but an average donation of $50-$60 apiece without any software to help do it. In 2018, LPCT's treasurer fortunately had a software background, and was able to write a program to

6

help keep track of some $100,000+ in transactions);

(c) A validity checking component (LPCT had to write that software in house, too, which it calls "the Machine of Knowledge", powered by a database purchased from the Defendant's office); and

(d) A recordkeeping and serial number assigning component (in the unfortunate but too common event LPCT needs to litigate).

18. The Defendant cannot neither afford nor do the Petitioning Laws afford any meaningful notice or opportunity to be heard in terms of UAPA, let alone any sense of procedural or substantive due process. The Petitioning Laws are a superfluous and arbitrary extra requirement imposed on parties other the Democratic and Republican Parties, who are able to do outreach, campaigning and marketing only because they wrote Petitioning Laws that don't require them to hawk signatures for 184 General Assembly Offices (each requiring 100-900 raw signatures each), five congressional districts (each requiring 4000-6000 raw signatures each), a statewide petition for statewide offices (requiring a minimum of 13000 raw signatures each) and individual petitions for each individual municipal office in Connecticut's 169 towns (each office's individual petitioning having requirements that range from a few dozen each to thousands in larger cities). The task imposed by the Petitioning Laws to establish even the opportunity at an equal presence requires over half a million sheets of paper even before even the first TV,

radio or print ad has a functional purpose to run.

19. *To even apply for all the petitions contemplated by ¶¶17 and 18 would require a phone book's worth of paper*. Even though LPCT has voter enrollment privileges throughout the State and it always has at least one or two candidates on the ballot everywhere in the State during evenly numbered years, the Defendant requires, in districts where a Libertarian candidate has not yet run, a "Reservation of Party Designation" application – a petition required by the Defendant to get a ballot petition from the Defendant.

20. After tackling the sort of hurdles summarized in ¶¶17-19, signatures are individually checked by Town Clerks, after (and in some cases, whenever[1]) the Defendant's office transmits them to the Town Clerks and Registrars of Voters, who then use one of four codes to reject them: "A – Not a Registered Elector", "B – Name Illegible", "C – Voter signed petition twice", and "D – Other (indicate and explain in detail on reverse side)". There is no hearing. There is no opportunity to present evidence. LPCT and its candidates have spent (and lost) tens of thousands of dollars due to the over and misapplication of the B and D codes, the latter of which has rarely been sufficiently explained.  The LP and its candidates are burdened by the need to defend signatures from rejection before individual town clerks, even for a statewide or larger jurisdiction petition, and local officials apply the standard for the usage of the B and D rejection codes differently in each of Connecticut's 169 municipalities.

8

21. Plaintiffs were also aggrieved by this process, which is rendered further arbitrary in terms of time constraints, when Robert Lombardo was the nominee for United States Congress in the Fifth Congressional District, and he, with other Libertarians, arrived the day of the deadline in 2012 to turn in his many hundreds of pages of signatures at approximately 3:30PM, then directed to go out to the lobby in the Secretary of State's office to count the number of pages being submitted. He did, and by the time he reentered the office, the stamp machine used by the Secretary of State's designee made a clicking sound, indicating that the official time was 4:01PM that day, and therefore none of his signatures would be counted toward placing him on the ballot. In order to obtain Congressional ballot access, each district requires three to six thousand raw, unverified signatures in order to hit the target, which is why the Libertarian Party only has ballot access in the Second Congressional District (which it has maintained since successfully petitioning to get it in 2012). Not only were LPCT and Lombardo denied any due process or opportunity for a hearing under UAPA – they were locked out of ballot access by instructions given by the Defendant's of Office, and also locked out of the opportunity to receive a sufficient number of votes for Congressional District Five, for which the Plaintiffs would likely have retained as they have in District Two.

22. All the Plaintiffs have suffered as a consequence of the Petitioning Laws denying the fundamental Liberty Interest to change, alter or influence their government by running for office or being elected to office, and decisions being

made on whether that right gets to be exercised without a hearing under UAPA,
without a decision made with prompt and reasonable dispatch and within an
oppressive framework that, by its nature, cannot and does not afford timely decisions
being made regarding ballot access.

23. The process under which the Petitioning Laws create an undue, oppressive,
arbitrary, capricious and outright unconstitutional burden on both the Plaintiffs and
the public at large in the following ways not reasonably connected with the state's
*sole and only* interest in having a framework to determine how candidates are placed
on the ballot, and which also give arbitrary favoritism to the Democratic and
Republican Parties and their respective candidates, in the following ways:

a. They have been utilized by the Defendant to delay and deny recognition
of Libertarians organizing locally as a political party, which would help
facilitate party growth, funding and other activities the Democratic and
Republican Parties enjoy. Instead, the State has, on numerous occasion,
returned forms and filings of would be Libertarian Town Committees in
Meriden and in other places, only serving to disband would be activism by
sowing discord, confusion and outright fear and mistaken belief that it is
illegal for minor parties to have town committees, seriously impeding the
exercise of the right to associate for political purposes in a way major parties
are not.

b. The Petitioning Laws require, for each individual office for which ballot

10

access has not been obtained, from Governor down to each and every municipal inland wetlands committee, individual petition applications, nomination letters, placeholder candidates to start the ballot drive when there is no present nominee by the Libertarian Party, ballot drive, signature validation and recordkeeping – all in addition to separate SEEC requirements, seriously and arbitrarily impeding the exercise of the right to associate for political purposes in a way major parties are not.

c. The paper requirements of the Petitioning Laws are arcane and outdated in that not only can eligible citizens register as electors, but also in that: (1) the petitioning form cannot be completed similarly online; (2) the petitioning requirements seek what the public typically views as invasive and personal data; (3) the petitioning process requires double sided legal size paper that is unusual and cumbersome to all involved; (4) it imposes an arbitrary burden and cost on Town Clerks and even the Defendant's own personnel; (5) it introduces unnecessary and costly delays into all steps of the electoral process for no productive end; and (6) only electors from one town can sign on one page, requiring circulators to carry numerous pages and several clipboards when collecting signatures at large events (such as fairs and other events).

d. The actual delay imposed on candidates and the Libertarian Party of Connecticut in navigating the Petitioning Laws and process delays, impedes

and obstructs: (1) press coverage; (2) access to debates, as it did to the Party's Gubernatorial Race in 2018; and (3) fundraising – all because it is unknown until mid-September whether or not a candidate has qualified for the ballot.

e. It denies, based on the delay imposed by the law alone and the time frame, legal remedy for error. For example, 2008 Libertarian Nominee Bob Barr successfully proved that the State of Connecticut erroneously disqualified over 500 signatures in federal court (which would have been more than adequate to put the Libertarian Party on the ballot.

f. The entirely arbitrary, useless process of ballot access and funding and organization necessary thereto in addition to the already cumbersome campaign finance burdens in other election law frameworks presents a permanent obstacle, the type and kind of which would have strangled the Democratic and Republican Parties in their infancies had such statutory frameworks existed during their origins. The Petitioning Laws are an ongoing civil rights violation that treats everyone but Democratic and Republican candidates in a grossly unfair manner designed to monopolize the levers of political power and enshrine their permanent status no matter their effectiveness or acts in office.

g. The Petitioning Laws have presented such a monumental barrier that compliance with them has become the number one expenditure to a

12

degree that has diverted resources from advertising, training, marketing and other activities the Democratic and Republican Parties enjoy because their initial growth was unburdened by such laws. At the time of their establishment, the Democratic and Republican Parties were not burdened by the Petitioning Laws in the way the Plaintiffs complain of herein.

h. The Petitioning Laws in Connecticut are oppressively burdensome and wasteful of the resources of Minor Parties, Town Clerks and Registrars of Voters to that of most of the States United States, which assume the signatures collected to be valid and only permit a challenge to a ballot drive when a private party with standing provides the resources to fund a challenge. The Petitioning Laws assume the signatures on petitions to be invalid until proven valid. This is so excessively impractical so as to stunt the growth of any new or minor political party and prevent any meaningful alternative to the Democratic or Republican Parties from arising.

i. The Petitioning Laws are even more grossly unfair to candidates who run without the endorsement of a Major or Minor Party, requiring that, even after they have won an election for a particular office, they are required to petition their way onto the ballot if they wish to run without the endorsement of a political party.

j. Despite having won a sufficient number of votes in statewide elections to be

13

a minor party with enrollment privileges, the Defendant still requires, under §9- 453b for some districts in which the Plaintiff Libertarian Party of Connecticut has not run a candidate before, "a reservation of such party designation", which involves a separate petition of 25 signatures from electors in order to actually get the petition to get on the ballot. It is a petition to get a petition.

k. The cumbersome nature of the Petitioning Laws is easily shown and demonstrated by numerous examples of their impracticality. For one example of many Robert Lombardo was the nominee for United States Congress in the Fifth Congressional District, and he, with other Libertarians, arrived the day of the deadline in 2012 to turn in his many hundreds of pages of signatures at approximately 3:30PM, then directed to go out to the lobby in the Secretary of State's office to count the number of pages being submitted. He did, and by the time he reentered the office, the stamp machine used by the Secretary of State's designee made a clicking sound, indicating that the official time was 4:01PM that day, and therefore none of his signatures would be counted toward placing him on the ballot. In order to obtain Congressional ballot access, each district requires three to six thousand raw, unverified signatures in order to hit the target, which is why the Libertarian Party only has ballot access in the Second Congressional District (which it has maintained since successfully petitioning to get it in 2012).

14

l. Petitioning for state representative and state senate districts (in a way similar to Congressional Districts) adds additional confusion where an elector is reasonably confused, as most districts divide towns. For example, Norwich and Manchester each include three state house districts. Plainfield includes two state representative districts (the 44th and 45th). Bethel, Bridgeport, Chesire, Hartford, Middletown, New Cannan, and Stamford, for examples, include two state senate districts. Glastonbury is in both the First and Second Congressional District. Middletown is in the First and the Third Congressional District. To accurately collect signatures, this has frequently required a map to determine which petition an elector can actually sign.

24. The Libertarian Party and other minor parties are afforded disparate treatment vis-a-vis the Republican and Democratic Parties in that:

a. Even when they exceed 1% of the vote for a statewide office, they must continue to run and petition to keep and maintain ballot access for each and every individual office, whereas the Republican and Democratic Parties do not have to run candidates for each and every office, and frequently choose not to.

b. Were the requirements of the Petitioning Laws imposed on the Democratic and Republican Parties, piecemeal as they are the Libertarian Party, they would drastically diminish or outright cease to function as organizations due

15

to the overhead costs staying on top of the tasks the Libertarian Party of

Connecticut must undertake as specified in ¶9a through f of this Count for

each and every office. Moreover, Democratic and Republican lawmakers

wrote, ratified and approved the Petitioning Laws from a position of strategic

advantage, and to such a degree that no competition could equally and fairly

emerge without substantial burden and oppression.

25. The entire framework of the Petitioning Laws, in the ways complained of,

does not provide a feasible opportunity for new political organizations and their

candidates to appear on the ballot long term, and thus fails to comply with basic

protections under the First and Fourteenth Amendments to the Constitution of

the United States.

26. The entire framework of the Petitioning Laws, in the ways complained of,

violate Article 1, §2 of the Connecticut constitution by overtly curtailing and denying

the people their "...undeniable and indefeasible right to alter their form of

government in such manner as they may think expedient...", by enshrining the

Democratic and Republican Parties, which are private organizations, in a permanent

place of official and institutional power. Said institutions, in turn, utilize public

resources, infrastructure and forms to conduct party business in the form of

primaries, a public benefit no minor party has or would ever have any foreseeable

hope of obtaining under the framework of the Petitioning Laws.

27. The Petitioning Laws curtail and restrain the liberty of speech in

16

violation of Connecticut Constitution Article I, §5 as complained of herein. They further violate Connecticut Constitution Article 1 §14 by curtailing, burdening and at many times outright denying the exercise of the right of the Plaintiffs to "in a peaceable manner, to assemble for their common good, and to apply to those invested with the powers of government, for redress of grievances, or other proper purposes, by petition, address or remonstrance.", as complained of herein.

28.  The Petitioning Laws, taken as a whole, are invidiously discriminatory and violate the Equal Protection Clause because they give the two old, established parties a decided advantage over new parties. The State laws here involved heavily burdening the right of individuals to associate for the advancement of political beliefs and the right of qualified voters to cast their votes effectively, and they arbitrarily, capriciously and unconstitutionally deny the Plaintiffs the equality of opportunity to which they are entitled by overtly slanting the outcome in favor of Democratic and Republican candidates because the laws stunt the growth and overburden the resources of new and minor parties to a degree where no fair contest can be had between them and the Democratic and Republican Parties in a General November Election.

29. The Petitioning Laws, repeatedly, and for every office, require the same task of repetitively demonstrating a modicum of support sufficient to warrant statewide ballot access, yet require Petitions to be pulled for lower offices throughout the state, which only serves to repeat and duplicate tasks and efforts for no legitimate state

purpose. Were an elector to desire to see the Libertarian Party designation on the ballot for every race on his or her ballot in most places in the State, he or she would have to sign a dozen or more different petitions. With each petition page only being specific to each town to the electors who sign it, this would require a circulator to physically carry thirty (30) or so different clipboards. Professional petitioners become burdened once they are circulating more than two different petitions, because it reduces the number of signatures they physically are able to collect for each petition. For example, a circulator would be asking an elector and perfect stranger in front of a grocery store to take the time to provide sensitive personal information on a dozen or so different documents.

30. The Petitioning Laws do not promote any valid state interest by requiring duplicate efforts to circulate multiple petitions, and doing so is an active and financially hostile deterrent and a direct threat to the Plaintiffs' political right to exist, organize and associate. The Petitioning Laws, in the ways complained of, are an unnecessary impairment on the Plaintiffs' Liberty interest to even attempt to participate in government by running for office and organizing as a political party.

31. In order to obtain ballot access in every race in this State, the Plaintiffs would need to raise and spend well over one million dollars ($1,000,000) on an annual basis and conduct a full time effort of over one thousand (1,000) people to do so during 2020, 2021 and 2022 – and that would be before the Plaintiffs could begin to contemplate the actual nuts and bolts of political campaigns in the form of

18

canvassing or advertising. The State, through the Citizens Election Program, gives well in excess of that to the Democratic and Republican Parties' candidates, who have no requirement to Petition their way on the ballot. Not even the Democratic and Republican Parties have that level of manpower or resources in order to conduct such an undertaking as the Petitioning Laws would require them to were they similarly situated as the Plaintiffs are. Moreover, the per signature cost fluctuates wildly and generally spikes from July into August depending on who enters the petitioning market (for example, Americans Elect in 2012, which spent over $35 million, only to fail to achieve national ballot access, drove the cost per signature up). In short, the Petitioning Laws impose a burden that not even the Democratic National Committee could financially or logistically meet, or at least imposes a burden a manner that would eclipse its ability to get out the vote. The Petitioning Laws force the Plaintiffs to sit in the back of the political bus and to drink from a different First Amendment water fountain than the Democratic and Republican Parties.

32. The Petitioning Laws are nonsensically arcane and burdensome in practice, scope and effect, and offer a multitude of foreseeable compounding effects, all of which are dehumanizing and which render the Plaintiffs second class political citizens, and demonstrate why the majority of ballot access drives of other Parties fail throughout the United States:

a. The actual task of collecting signatures sufficient to obtain ballot access

19

for every office cannot be accomplished through volunteer efforts alone.
At best, the average volunteer with no experience will generate ten
signatures an hour – on the high end with sufficient foot traffic.

b. Door to door petitioning is too time consuming and inefficient to
generate universal, statewide ballot access.

c. Petitioning requires locations with a sufficient volume of foot traffic –
only about a third of the public one would come into contact with would be
registered to vote, with a substantial amount less actually being in district
for state or local races.

d. The major task of finding locations with sufficient foot traffic is
burdensome in and of itself, and permission is required on private
property (such as grocery stores), and that permission tends to terminate
after the first person comes through that disagrees with the circulator's
political views.

e. The Plaintiffs have been run out of public parks and locations by police
and local authorities, First Amendment notwithstanding, requiring, in
recent years, legal action (as was the case when Plaintiff Daniel Reale
and Roger Misbach were ordered by the police at the direction of the
mayor of Meriden, out of Hubbard Park in 2018, Mayor Kevin Scarpati
remarking to the press of that order, arrogantly, "I just knew they didn't
have a right to be there. I felt there was no need to have someone at the

20

entrance to the park approaching people and their families."). The 2012 ballot drive involved eight police incidents, one of which required a phone call by Plaintiff Reale to the East Lyme police department because a DEEP was threatening to put a circulator in a cage normally used for bears, all for parking where the circulator was instructed to park. Also, during 2012, the Mayor of Danbury instructed corporation counsel to find a way to get petitioners removed from the front of City Hall – he called the police and described the folding table used as a "dangerous instrument". Plaintiff Reale, in 2010, was ordered by New London police that he could not collect signatures on a public sidewalk, during Sailfest. These types of incidents are known to be likely, are very foreseeable and are oft repeated during the process of engaging in the compelled speech commanded by the Petitioning Laws in order that the Plaintiffs be able to exercise their rights protected by the First Amendment.

f. The logistics of wind, rain, having to flip through pages and trying to obtain signatures quickly are obstacles in and of themselves. The best locations, grocery stores, usually involve people in a hurry. In order to do this efficiently, a circulator needs to carry at least two clipboards, with town specific pages to a given area ready to go for registered voters to sign. The highest producing circulator in 2012 on a given day, Michael Holman, carried five during Sailfest, utilizing a backpack.

21

g. Not all the signatures are accepted. Major ballot drives require professionals with petitioning experience, who generally have a validity rate above 80%. The area also changes the validity rate. For example, urban areas like Hartford and Bridgeport are exceptionally low, regardless of who is circulating.

h. The Presidential campaigns of Gary Johnson illustrate the burnout effect of petitioning drives, which are an all hands on deck to the exclusion of others efforts type of effort. Johnson was successfully placed on the ballot in 2012, however, the entire exercise left no room for actually getting the vote out, meaning he just barely fell short of the 1% required to retain ballot access. 2016 required a brand new effort, which cost over $80,000, and resulted in almost four percent of the vote – after petitioning burnout. The result was similar to the gubernatorial campaign of Rod Hanscomb. The petitioning drives all come at the expense of actual campaigning.

i. Americans Elect in 2012 was a prime example not only of how difficult national ballot access is to obtain (and it had 15 times the budget of the LNC to do it), but also of how the price per signature can easily spike, introducing a degree of financial chaos above and beyond the already absurd burden the Plaintiffs face. In 2012, Americans Elect started a bidding war that caused numerous drives to fail, siphoned off

22

desperately needed help and drove the price per signature in many places north of $6. The cost per signature is expected to rise dramatically in 2020 and exceed $8 per signature. A well funded candidate entering the presidential race (like a Ross Perot or Michael Bloomberg) would send the cost per signature closer to if not past $15 each due to the very limited size of the ballot petitioning market.

j. The very task of petitioning requires exceptional communication skills and an above superior ability to handle constant rejection and outright hostility. Efficient petitioners are a rarity.

k. The type of individual who could raise the money in order to make a ballot drive possible is even more rare, and that type of person has donors who have the primary motivation of funding ballot access. The average donation from these types of efforts is $50-60 per donor, with the fundraiser taking a very large percentage. Fundraisers themselves are, like petitioners, in short supply and high demand, meaning that state parties like LPCT cannot start until some other state's ballot drive has finished. LPCT draws from the same common ballot access and fundraising talent pool as LNC.

l. The 2018 gubernatorial petition drive required seven thousand five hundred (7,500) valid signatures per CGS §9-453d , meaning the target was 14,000 raw signatures. It involved six validation checkers. The one-

23

thousand eight-hundred fifty-seven (1,857) pages (well over a foot of
paper) for that one drive required a total of twenty (20) hours of
scanning. The pages were verified by three justices of the peace and an
attorney over the course of more than fifteen (15) hours. The drive
involved more than forty (40) hours of validation checking. Obtaining
ballot access for every office in Connecticut would require at least one-
hundred sixty-thousand five-hundred (161,500) signatures, involving over
twenty one-thousand four hundred and twenty-two (21,422) pages of
petition signatures, over three hundred (300) hours of scanning and
assignment of serial numbers, more than a five-hundred (500) hours of
validation checking and well over fifty (50) hours of circulators and
attorneys or justices of the peace validating the oath on the back of each
page – that is unless the Plaintiffs, after spending the millions of dollars
 to reach the end of such a drive, hire an extra few dozen justices of
the peace to speed that process up.

33. The burdensome and arbitrarily oppressive Petitioning Laws have also
prevented the Plaintiffs from establishing Town Committees. Paperwork to do so
was returned by the State Elections Enforcement Commission because, at the time
they submitted it, no one had run in Meriden and other towns as a Libertarian. This
functionally prevents anyone who would want to start a Libertarian Town Committee
from raising or spending over $1,000, or starting the  type of entity Democrats and

Republicans have and the average voter recognizes – all the time, every time. This is yet another way among many that the Petitioning Laws create a Catch-22 – in order to grow or thrive as a political party, one has to start where the Democrats and Republicans were when they wrote the Petitioning Laws. If Republicans had to deal with such laws when Abraham Lincoln was their nominee, their party would not exist and he never would have been President of the United States.

34. A Connecticut Party's history is illustrative of what a poison pill the framework of the Petitioning Laws has been and how the State treats parties other than the Democratic and Republican Parties differently, and forces other parties, as a matter of law, to drink from a different water fountain for the same liberty interest and toward the back of the political bus. It actually won the race for Governor with Lowell Weicker (a former Republican) in 1992 with over twenty percent (20%) of the vote, which has still failed to result in it being placed on the Voter Registration Forms ("Forms", *infra*, Count Four), and having over 20% of all registered voters is a requirement to not have to navigate through the ballot access obstacle course that is the Petitioning Laws. At its peak, A Connecticut Party started with over 100 nominated candidates (per its convention). By the late 1990s, the Petitioning Laws had rendered A Connecticut Party almost nonexistent.

35. The only way to functionally exist under the Petitioning Laws in any widespread manner is, contrary to the principles, conscience, bylaws and philosophy of the Libertarian Party, become a virtual subsidiary/cross endorser of

25

the Major Parties, as the Working Families Party has with the Democratic Party and the Independent Party has with the Republican Party. Still, even taking that path of not cultivating a Party's own candidates, the Independent and Working Families Parties sit in the back of the same ballot access bus, as a matter of law, with the Plaintiffs.

36. The Libertarian Party is America's third largest political party, and the Democrats and Republicans are America's first and second largest political parties. The reason this is so has nothing to do with candidates, positions, platforms, or money raised. This is specifically and expressly because of ballot access laws, of which the Petitioning Laws in Connecticut are of the most onerous in that they involve a state-funded challenge to each and every signatures (compare to Pennsylvania, Virginia and most other states, which require a private individual or entity to fund a challenge and where the loser of a petition drive challenge pays the winner – otherwise the signatures are assumed valid), and it would require at least 161,500 raw signatures to obtain ballot access for every office in this State and an elector desiring to see the Libertarian Party on every race on his or her ballot would need to sign five or more individual petitions, depending on the year.

37. The Whig Party, had the Petitioning Laws been in effect by 1850, would still exist in this State, as it would in every other State in the Union had the ballot access laws of sister states been so in existence as they are relevant to Connecticut. Similarly, the Republican Party would never have been able to achieve widespread

notoriety, organization or household name recognition – let alone the placement of Abraham Lincoln into the office of President of the United States. At best, it would have taken the Republican Party until well into the last century to achieve such goals as the White House, let alone any federal office.

38. The State's only compelling interest in the Petitioning Laws is to provide for a mechanism for individuals to be placed on the ballot. What the General Assembly provided was a nightmarish obstacle course, whose obstacles are not readily defined and constantly subject to 11th hour change. Individuals with no party designation are in the back of the back of the political bus, as they do not retain ballot access even if they win their office, forcing the Plaintiffs to have banded together as a political party in the first instance in order to effectuate political change and petition for redress of grievance, among other First Amendment activities.

39. *In toto*, the Petitioning Laws impose, for universal ballot access to every race, requirements the Democratic and Republican Parties could not go out and meet were they to start from day one – even if they had the same amount of money, the same number of volunteers and the same organizational structure were their ballot status reset to the state of the Libertarian Party – let alone to the state of a brand new party. Were such a reset of the affairs of the Major Parties  in terms of ballot access to occur, and were the Petitioning Laws allowed to stand as they are, there would be no Major Parties.

40. The United States Supreme Court has held, that such a framework

27

"...favors two particular parties the Republicans and the Democrat -- and, in effect, tends to give them a complete monopoly. There is, of course, no reason why two parties should retain a permanent monopoly on the right to have people vote for or against them. Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms. New parties struggling for their place must have the time and opportunity to organize in order to meet reasonable requirements for ballot position, just as the old parties have had in the past." *Williams v Rhodes*, 393 US 32 (1968). While the Defendant forces all minor parties to hawk paper signatures on legal sized, double sided individual petitions for each office and for each town, the Defendant publishes forms that frontload Democratic and Republican Party membership by allowing people to check a box on paper or online, discouraging enrollment in any minor party, and requiring the name of any such party to be written in under "other". Such a framework renders every party that is not the Democratic or Republican Parties as signature hawking parties whose full time, sole and only organization and financial function is to hawk signatures.

    41. The Petitioning Laws decide who the people may vote for and arbitrarily burdens the political power of the Plaintiffs and the people. This is antithetical to the Connecticut Constitution, Article 1, §2, of which states: "All political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit; and they have at all times an

undeniable and indefeasible right to alter their form of government in such manner as they may think expedient." The Petitioning Laws make our government not free by their very burden and process. The Petitioning Laws deny the right to alter the people's form of government, openly, notoriously and arbitrarily so. Although Article 1 §5 states, "No law shall ever be passed to curtail or restrain the liberty of speech or of the press.", the General Assembly has in fact done so and engaged in a naked abuse of its power with the Petitioning Laws as written and as enforced, reaching beyond its responsibility to pass law to determine the process by which candidates are placed on the ballot by deciding for whom the people may vote for by encumbering that process with unnecessary, oppresive and burdensome obstacles as complained of herein. The State does not have the right to control the number of candidates or to decide who may not be a legitimate candidate by overburdening its own competition as the Petitioning Laws do. The State's only compelling interest is to facilitate the will of the people and participation with equal opportunity for all – not decide who may not participate and who must be overburdened.

42. The Petitioning Laws require the Plaintiffs, in order to exist as a political party, to solicit signatures from registered voters and ask for personal information in a manner that is regularly perceived as invasive, such as their full name, street address

and date of birth. One of the most common responses to this inquiry is a concern that those who may or may not sign is a concern that they will receive information in the mail or be marketed to in some manner as a consequence of having signed the petition.

43. The Petitioning Laws constitute compelled speech in a manner designed to cast the Plaintiffs in a negative and unfavorable light as a consequence of being forced to ask for the personal information of total strangers.

44. CGS §9-368c states, "(a) No person shall intentionally misrepresent the contents of a petition circulated under title 9. (b) Any person who violates any provision of this section shall be guilty of a class D felony.", which attaches a criminal penalty to misrepresenting the contents of a petition circulated under the Petitioning Laws, yet the Petitioning Laws require, by nature and logical extension, some discussion that would be permissible under fair comment and priviledge standards that would, to someone who reasonably disagreed, be taken as misrepresentation of the contents of a petition. For example, many would feel that signing a Petition would indicate support for stealing or somehow taking votes away from one Party and influencing a given election toward another.

45. The Petitioning Laws absolutely violate one's right to remain silent as protected by the Fifth Amendment to the United States Constitution, and absolutely require circulators to provide evidence that may be used in a criminal prosecution

under CGS §9-368c. The Petititioning Laws also compel speech in a manner likely to result in police interaction with very real risk of unlawful arrest, malicious prosecution, unlawful detention and compounding violations of the Plaintiffs' civil rights. For example:

> a. First Amendment notwithstanding, requiring, in recent years, legal action (as was the case when Plaintiff Daniel Reale and Roger Misbach were ordered by the police at the direction of the mayor of Meriden, out of Hubbard Park in 2018, Mayor Kevin Scarpati remarking to the press of that order, arrogantly, "I just knew they didn't have a right to be there. I felt there was no need to have someone at the entrance to the park approaching people and their families.").

> b.  The 2012 ballot drive involved eight police incidents, one of which required a phone call by Plaintiff Reale to the East Lyme police department because a DEEP was threatening to put a circulator in a cage normally used for bears, all for parking where the circulator was instructed to park.

> c. Also, during 2012, the Mayor of Danbury instructed corporation counsel to find a way to get petitioners removed from the front of City Hall – he called the police and described the folding table used as a "dangerous instrument".

31

d. Plaintiff Reale, in 2010, was ordered by New London police that he
could not collect signatures on a public sidewalk, during Sailfest.

46. The Petitioning Laws, serving no legitimate gatekeeping function to the
ballot in their present form, are designed as an obstacle course of self abasement,
humiliation and public shaming and designed to inform the public at large that the
Plaintiffs wear the scarlet letter of not being Democratic or Republican. The form of
compelled speech prescribed by the Defendant under the Petitioning Laws is known to
be inherently invasive in its collection of personal data and known to likely trigger
hostile words and animonisity among some members of the public, some of whom are
public officials and law enforcement with power that can and will be abused in a
manner known and likely to inflict suffering on the part of the Plaintiffs and those
similarly situated.

47. Individuals with no party designation are in the back of the back of the
political bus, as they do not retain ballot access even if they win their office, forcing
the Plaintiffs to have banded together as a political party in the first instance in order
to effectuate political change and petition for redress of grievance, among other First
Amendment activities. The result is compelled association in order to even have any
First Amendment expression, which is mandated in order to even participate in the
humiliating compelled speech required by the Petitioning Laws.

49. The Defendant is the chief elections officer in this State and charged
with enforcing an ensuring compliance with Election Law. Such duties include

32

prescribing forms for which eligible persons may register to vote pursuant to CGS §§9-20 and 9-23g(b), "Forms", which allow eligible persons to register in person, by mail or online.

50. The Forms specifically ask electors whether they would like to enroll in a political party, and then list their options as "Democratic", "Republican" and "Other", the last one requiring the enrolling elector to write in the "other" party name. This results in disparate treatment unfair to the Plaintiff and its members, impeding their right to associate and enjoy enrollment privileges even though the Plaintiff is a recognized Minor Party, and has continued to be so for decades with the right to enroll members via voter registration.

51. The Forms actively encourage and promote new voters to enroll in only the Democratic or Republican parties, and there is no legitimate State interest in the Defendant continuing to publish or require the use of such forms that promote two political parties over any other.

52. There is no compelling state interest in the Defendant having issued or relying on the use of such Forms frontloading the names of the established Democratic or Republican parties without naming any of the other alternatives.

53. Nowhere in statute is the Defendant actually required to list any specific names of any political party. Nowhere can the Defendant actually show that there is a compelling state interest in listing any specific names of any political

33

party on a voter registration form, and to do so at the exclusion of others is discriminatory.

54. Voters may register to vote as "Libertarian" in Connecticut because the Party continues to receive a sufficient percentage in statewide elections.

55. The Plaintiffs are aggrieved because they utilize and require voter information, specifically, the names, addresses and numbers of those who would otherwise belong to the Party had the Defendant not omitted the designation "Libertarian" from the Forms. In this way, the Plaintiffs are being denied their right to associate with others who share their beliefs, because the Defendant's actions outside the law to not allow voters a box to check conceals and hides from the Plaintiffs those who would otherwise have registered to vote Libertarian.

56. The Plaintiffs are also aggrieved because one requirement to become a major party in Connecticut (and thus not have to petition for any office) is to have 20% of all registered voters, which is substantially impaired by the Defendant's actions to not publish Forms with the party designation "Libertarian" on them. Accordingly, the Plaintiffs are being denied any fair and full opportunity to reach the major party threshold because their designation is not listed on the Forms.

57. The Plaintiffs are further aggrieved because the Defendant's actions to not list the designation "Libertarian" on the forms costs the party donations, volunteers, treasurers and potential candidates. The voter registration data has been critical to the Plaintiffs' right to operate and exist, who, despite the Defendant's unconstitutional

efforts to the contrary, have had success in growing the Party.

58. The Forms as they exist are currently deceptive. First, they create an impression that one cannot register as anything but Democratic or Republican. Second, many people mistakenly write in the "other" category "independent", under the mistaken belief that they are remaining unaffiliated, but they are in fact registering as members of the Independent Party of Connecticut.

59. The Forms also give the Republican and Democratic Parties special treatment in that they won't lose a potential enrollee due to mispellings, misinformation or clerical errors of the sort. Conversely, one who would have adamantly written in "independent", thinking that he or she rocked the boat or made a political statement by remaining unaffiliated did not see the option "Libertarian" on the Forms, for which he or she could have availed him or herself. Similarly, the Democrats would not have lost an enrollee because there is a box to check and no risk of writing "Democrat", "Democrats" or "Democracy" instead.

60. The special treatment afforded to the Republican Party is necessary to its existence as a major party. As of October 2019, 486,911 voters were enrolled in it, of which 28,744 were inactive. Should the inactive voters drop, as law requires them to be dropped after a certain period of inactivity, the Republican Party would be below the 20% of registered voters requirement to be a Major Party. The only reason the Republican Party sustains (which, like the Democratic Party, does not have the

institutional resources to comply with the Petitioning Laws and retain ballot access in the manner the Plaintiffs are forced to) is because the Defendant lists the Republican Party as an option on the Forms.

61. The Forms are further discriminatory because the first thing someone must do in order to vote is complete them. The Forms used and caused to be published by the Defendant are the very first thing most new voters see when they are exposed to the process of civic engagement, and new voters see their options for party enrollment as "Democratic", "Republican" or "Other". The State does not have the right to promote one party over another, which it does by way of the Forms, which further prevent, discourage and disuade new voters from affiliating with the Plaintiffs.

62. As a consequence of the profoundly unjust and unconstitutional mistreatment of the Plaintiffs, legal recourse was sought through Hartford Superior Court in an action captioned Misbach et al v Merrill, HHD-CV19-6118097-S, assigned to the Complex Litigation Docket.

63. LPCT has since nominated the following candidates for the following offices: Howard Grayson (US Congress, District 1), Daniel Reale (US Congress, District 2), Rod Hanscomb (US Congress, District 4), Harold Harris (State Senate, District 4), Jonathan Johnson (State Senate, District 5), Matthew Long (General Assembly House District 32), Vincent Argumbau (General Assembly, House District 141) and Anthony Armetta (State Representative District 9).

36

. 64. LPCT and its volunteers have either pulled or have now been prevented from pulling due to actions of Defendant Ned Lamont, see infra: petitions for the following races: US Congressional Districts 1, 3, 4 and 5; State Representative Districts 5, 26,27, 45, 46, 82, 83, 123, 141; State Senate Districts 5, 25, 9, 27, 22, 19; and Registrar of Voters in Plainfield.

### B. The Covid-19 Outbreak

65.  Misbach et al v Merrill, HHD-CV19-6118097-S was scheduled for a hearing on the Plaintiff's application for temporary injunction March 16, 2020, which the State Defendants issued executive orders to prevent the Superior Court (Schuman, J) from hearing either in person or remotely, unconstitutionally and unnecessarily denying the Plaintiffs their right to petition for redress of their grievances relating to both State and Federal Elections matters are protected by the First Amendment of the United States Constitution. Said application for temporary injunction and affidavits and exhibits in support in Misbach et al v Merrill, HHD-CV19-6118097-S at Entry Nos 121.00 and 122.00.

66. Plaintiff Harris, like many of the LPCT's candidates and volunteers, is elderly and at enhanced health risk of complications from COVID-19. The State Defendants still require Harris and other Libertarians to circulate ballot petitions in order to obtain ballot access for the November 2020 general election, putting their health at known risk as Defendant Lamont has proclaimed to exist.

37

67. Plaintiff Reale, and counsel for LPCT, have repeatedly sought to ascertain the Defendants' position for resolving the matters in Misbach v Merrill, to which they and their subordinates have remained unresponsive and unwilling to communicate directly to them, if not agree to judgment allowing the Libertarians on the ballot without petitions and to list the Libertarian Party on the voter registration forms. Plaintiff Reale notified counsel for the Defendants, both Maura Murphy-Osborne and Attorney General William Tong of this pending federal action, and they have not taken a position on a temporary restraining order, being filed as simultaneously with this Complaint as practicable.

68. On March 28, 2020, Defendant Merrill circulated a letter to Defendant Lamont and chairs of various General Assembly Committees her opinion that the Defendant should issue an order allowing all Minor Parties to place on the ballot without having to petition, in order to stop spread of COVID-19 and to limit the health risks to their candidates, which Defendant Lamont has refused to do so.

69. After proclaiming a life and death public emergency, Defendant Lamont has refused to stop requiring the Libertarian Plaintiffs to petition to place on the ballot in order to have a say in their government. Contrary to such draconian orders, Defendant Lamont has issued other orders radically

38

inconsistent with such a lack of a public health emergency clearly imply. He has, by various and almost daily executive orders claiming powers heretofore unknown to the United States Constitution: (a) issued an order that even forbid the Honorable Carl Schuman from the act of scheduling a phone conference (which he initially granted) to resolve Misbach v Merrill; (b) suspended the right to speedy trial; (c) limited gatherings to five people or less; (d) suspended the requirement that civil process be served; (e) suspended the statutes of limitations that exist in the General Statutes; (f) prevented the People of this State from entering or having access to their own courthouses; (g) denied Libertarians and anyone who could sign their petitions from congregating or assembling in any manner whatsoever that would be necessary to circulating them; (h) closed to business the Town Clerks, whose signature is necessary to verify electors who would apply to Defendant Merrill for ballot petitions; and (g) slowed to a near halt all elections functions in this State and critically impairing any ability to even validate the individual signatures collected on the Petitions.

70. The power, scope and expansive nature of the Orders issued by Defendant Lamont have been heretofore unknown to any prior national crisis or emergency, including polio, HIV, smallpox, 9/11, the Cuban Missile Crisis and both World Wars. Defendant Lamont has, unilaterally, wielded the power to

39

indefinitely place this State and its courts under house arrest, with no ability to challenge or question the actions placing the health and safety of the Plaintiffs at risk of infection and threat of arrest and indefinite detention in such places likely to result in infection as the very price for participating in their own government.

71. Defendant Lamont's Executive Orders issued throughout the Month of March, as published on https://portal.ct.gov/Coronavirus/Pages/Emergency-Orders-issued-by-the-Governor-and-State-Agencies are set to expire September 1, 2020, past the deadline for which Petition Signatures may be either collected or submitted for validation. Such Orders are voluminous, meticulous and avoid any apparent mention of the ballot petitioning requirements the Plaintiffs have been unconstitutionally and unfairly subjected to. Notwithstanding that purposeful omission, the Orders otherwise drastically rewrite, alter and amend numerous portions of the General Statutes pertaining to all sort of matters and functions to a degree where the political business, speech and association of the Plaintiffs has been rendered meaningless. Such orders go so far as to limiting anyone from coming within six feet of anyone else – which renders the act of even obtaining one petition signature impossible.

40

### III. Specific Counts

### COUNT ONE: DENIAL OF SUBSTANTIVE AND PROCEDURAL DUE PROCESS OF LAW, 42 USC 1983

72. By acting in the ways complained of, the Defendants, in violation of 42 USC §1983, have denied the Plaintiffs due process of law as could reasonably have been facilitated by the State Court System remotely, and which was absolutely crucial to the adjudication of elections matters affecting the election of candidates to the United States House of Representatives and other offices as protected by the Fifth and Fourteenth Amendments to the United States Constitution. No adequate remedy exists in law or equity other than this Court, as a direct consequence of actions taken and not taken by the Defendants have complained of, and for which irreparable harm continues to be inflicted upon the Plaintiffs. Defendant Lamont has specifically and emphatically ordered that the Plaintiffs have no access to the State Courts, indefinitely.

### COUNT TWO: UNCONSTITUTIONAL UNDUE BURDEN, AS FORBIDDEN BY 42 USC §1983

73. The Acts of the Defendants have permanently and irrevocably denied any meaningful ability to even contemplate undertaking the already extraordinary and unconstitutional burden imposed by the Petitioning Laws, in violation of the First, Fifth and Fourteenth Amendments to the United States

41

Constitution in the following ways: (a) the Orders prevent any political assembly or petitioning; (b) the Orders have irrevocably denied the Plaintiffs their right to petition for redress of grievances by burdening them with threat of infection or indefinite arrest and detention; (c) the orders have effectively suspended Habeas Corpus without the prerequisite conditions of invasion or rebellion necessary to do so and as forbidden by Article I §9 of the United States Constitution; (d) the Orders have radically impaired the Obligation of Contracts in this State, which have obliterated any economic means of organizing or conducting a petition drive; and (e) have radically and functionally abolished the very Republican Form of Government guaranteed to the Plaintiffs (and their right to participate in it) as protected by Article IV §4 of the United States Constitution. No adequate remedy exists in law or equity other than this Court, as a direct consequence of actions taken and not taken by the Defendants have complained of, and for which irreparable harm continues to be inflicted upon the Plaintiffs. Defendant Lamont has specifically and emphatically ordered that the Plaintiffs have no access to the State Courts, indefinitely.

74. The Orders of the Defendants have amounted to a profane denial of the Plaintiffs any meaningful or functional right and liberty interest in or to political speech and association as protected by the First Amendment, and

accomplished that end by imposing additionally impossible and cumulative

burdens to those which have already preexisted the COVID-19 outbreak. No

adequate remedy exists in law or equity other than this Court, as a direct

consequence of actions taken and not taken by the Defendants have

complained of, and for which irreparable harm continues to be inflicted upon the

Plaintiffs. Defendant Lamont has specifically and emphatically ordered that the

Plaintiffs have no access to the State Courts, indefinitely.

### COUNT THREE: FOR UNEQUAL TREATMENT UNDER THE LAW, IN VIOLATION OF 42 USC §1983

75. The Orders, as the Petitioning Laws already had, prefer the actual

and now functional monopoly of the Democratic and Republican Parties, and

render them impervious to any political challenge as a matter of overt

preference. The Order afford the Democratic and Republican Parties all the

preexisting ballot access they entered into the COVID-19 outbreak with and no

ability for the Libertarians or anyone else to obtain it – by Order and Official

Decree of Defendant Lamont.

76. Defendant Lamont and other public officials have impressed in the

public such real terror and fear, that, in the event the Plaintiffs do petition, they

will be mocked, shamed, humiliated and likely arrested. The very act of

Petitioning will require the Plaintiffs to be regarded as bearers of a plague.

77. Defendant Lamont has even issued orders preventing any State court action so as to prevent the Plaintiffs from having their grievances redressed, an act most favorable to him, an elected Democrat. No adequate remedy exists in law or equity other than this Court, as a direct consequence of actions taken and not taken by the Defendants have complained of, and for which irreparable harm continues to be inflicted upon the Plaintiffs. Defendant Lamont has specifically and emphatically ordered that the Plaintiffs have no access to the State Courts, indefinitely.

WHEREFORE, the Plaintiffs humbly, respectfully and sincerely pray to this Court for the issuance of the following relief, necessary for equity, justice and Constitutional Order:

A. A temporary restraining order, temporary injunction and permanent injunction allowing the Libertarian Party to place any candidate it nominates on the ballot they should so choose to nominate.

B. Declaratory and Injunctive Relief to the above effect, pursuant to 42 USC §1983

C. Declaratory relief that the Orders and the Petitioning Laws, in the

respects complained of, are unconstitutional in the ways complained

of.

D. Costs and Attorney's Fees

E. Other relief the court deems appropriate

Dated this 3rd Day of April, at Plainfield

THE PLAINTIFFS:

LIBERTARIAN PARTY OF CONNECTICUT          DANIEL REALE
HAROLD HARRIS


/s/ 411570                                              /s/ Dan Reale
Edward Bona                                          Daniel Reale
PO Box 13                                            20 Dougherty Ave
Plainfield, CT 06374                                 Plainfield, CT 06374
(860) 889-5930                                      (860) 377-8047
edward-bona@comcast.net                  headlinecopy@gmail.com

45

The foregoing, I attest to under penalty of perjury or false statement, as facts known to me and reasonably believed by me, as the case may be.

Daniel Reale

## VERIFICATION

STATE OF CONNECTICUT

s.s    NORWICH

COUNTY OF NEW LONDON

Daniel Reale, known to me, made oath to the foregoing, before me, this 4th day of April, 2020:

Edward Bona
Commissioner of the Superior Court
Juris #411570