UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

**LIBERTARIAN PARTY OF CONNECTICUT**   CA NO 3:20-cv-00467
**HAROLD HARRIS**
**DANIEL REALE**

**VS**

**DENISE MERRILL, SECRETARY OF STATE**
**NED LAMONT, GOVERNOR OF CONNECTICUT**

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF TEMPORARY INJUNCTION**

### I. Preliminary Statement

The request for a temporary injunction was originally framed as a request for Temporary Restraining Order because, at the time, the State was no communicating any intent or position. This memorandum is being filed per order of the Court, and serves to supplement the record beyond the Operative Complaint and address an already wildly unconstitutionally burdensome ballot access scheme designed by Democrats and Republicans, using the levers of State power, to prevent any meaningful competition. Attached hereto are relevant exhibits demonstrating facts not already apparent on the record.

### II. Operative Facts

The genesis of this matter, factually, is set forth in the Plaintiffs' Verified Complaint, which is incorporated by reference. The Plaintiffs similarly incorporate by reference the law and facts established in their application for temporary injunction filed in State Court, which was to be heard March 16, 2020 had it not been for

1

Defendant Lamont's executive orders locking them out of state court (Exhibit A). Defendant Lamont took the unprecedented step of declaring a public health emergency on March 10, 2020 due to COVID-19's spread throughout the country, invoking powers he had claimed by operation of CGS §§19a-131a and 28-9 (Exhibit B). The previous is exclusively within the realm of the Commissioner of Public Health, and the latter is a scheme incorporated to loosen statutory requirements for state operations typically during mandmade disaster. Id. The emergency and the restrictions continue, indefinitely, until September 9, 2020, which is more than a month past the deadline to submit petition signatures (Exhibit B).

Despite the State's contentions at the May 4, 2020 status conference that Defendant Lamont had no power to waive or modify law, that is precisely what he has done – except, of course, for doing so in a manner to accomodate the very real safety concerns of COVID-19 *via-a-vis* the Plaintiffs' elderly candidates and petitioners. Defendant Lamont's orders also rendered the task of a ballot drive impossible and contrary to the safety concerns of his own public policy.

He unilaterally, contrary to General Statutes, moved the Democratic Primary to June, when he issued Executive Order 7G (Exhibit C). That Order also substantially modified superior court operations, closed barbershops, purported to suspend the right to speedy trial, waived the time requirements to serve process, and modified HIPPA (a federal law) by executive fiat, among other major statutory revisions, in addition to imposing brand new hardships and restrictions beyond his authority. Executive Order

2

7H rendered entire classes "non-essential", and rendered them working for home or unemployed overnight (Exhibit D).

Executive Order 7 (Exhibit E) began the death knell for any ballot petition drive – limiting all gatherings, the absolute life blood for any ballot access signature effort - to less than 250 people. Executive Order 7D (Exhibit F) followed, limiting it to 50, followed by 7N (Exhibit G), limiting even the basic assembly of a team sufficient to petition to five or less. The Court should note, in the affidavits attached in Exhibit A, the logistical process of conducting a ballot drive itself – this is necessarily a team effort in terms of not only circulating, but also validation, quality control checking and notarization.

The Executive Orders continued with 7bb (Exhibit H, postponing the Democratic Primary to August, and imposing the requirement of wearing masks in public), and 7R (Exhibit I, closing state parks and beaches), which cut off another important source of petition signatures.

In light of all of the above, even Defendant Merrill herself had adopted the position that minor parties such as the Libertarian Party ought to place on the ballot without having a signature requirement (Exhibit J).

Of course, the actual task of signature gathering was, by Executive Order, to become more logistically and nightmarishly impossible with the Safe Stores Executive Order and its guidlines (Exhibit K), which were eventually published at

https://portal.ct.gov/DECD/Content/Coronavirus-Business-Recovery/Essential-Safe-

Store-Rules Said rules require, but are not limited to, "Occupancy capped at 50% of store capacity. At entrance, staff will maintain a count of the number of customers entering and exiting stores." and "Clearly mark 6' spacing in lines on floor at checkout lines and other high-traffic areas and, as much as practicable, provide ways to encourage 6' spacing in lines outside the store.", meaning that the popular venue for signature gathering, grocery stores, are now entirely closed to the First Amendment activity of petitioning – of course on a form and in a manner prescribed by the Defendants.

    The State's Data series published at https://portal.ct.gov/Coronavirus predominately shows the lion's share of fatalities in age groups over 60, of which Plaintiff Harold Harris is (at age 73). Consistent with that data series and the public policies elucidated by Defendant Lamont, Defendant Merrill released an official opinion (Exhibit L), allowing anyone who requests an absentee ballot for the August 11 primary (which is one week beyond the deadline for the Plaintiffs to have turned in ballot petitions), stating, "We are writing this opinion to ensure that voters are able to participate in the upcoming August 11, 2020 Republican and Democratic Primaries in the safest manner possible... the Centers for Disease Control have identified numerous pre-existing illnesses that put certain individuals at increased risk when exposed to the COVID-19 virus. These include, but are not limited to: (1) People of all ages with underlying medical conditions, particularly if not well controlled, including: People with chronic lung disease or moderate to severe asthma, People who have

4

serious heart conditions, People who are immunocompromised (Many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids or other immune weakening medications); (2) People with severe obesity (body mass index [BMI] of 40 or higher); (3) People with diabetes; (4) People with chronic kidney disease undergoing dialysis; (5) People with liver disease; and (6) Pregnant women.".. Given the reasoning set forth above and the guidance provided by the Centers of Disease Control, the Office of the Secretary of the State has determined that any registered voter who has apre-existing illness can vote by absentee ballot because that voter's illness would prevent them from appearing at their designed polling place safely because of the COVID 19 virus.In addition, individuals who may have been in contact with a COVID-19 infected individual such as healthcare workers, first responders, individuals who are caring for someone at increased risk, as well as those that feel ill or think they are ill because of the possibility of contact with the COVID-19 virus should also be included in the category of voters that would qualify as "ill" for the purposes of absentee voting." Basically, everyone who requests an absentee ballot gets one.

    Consistent with that policy, even the Department of Consumer Protection had deemed the act of requiring even one signature for wine deliveries and pickups unecessarily unsafe (Exhibit M). In fact, not even the signature cards have returned from either of the Defendants' offices or the Attorney General in when the Plaintiffs

notified them of this action by certified priority mail – yet the policy of the State is the Plaintiffs must collect far more than those three signatures.

Ballot petition efforts were necessarily halted by impossibility and safety. Those that have not started in fact now cannot start due to requirements to have petitions issued, and the candidates' elibility for office verified by their Town Clerks (whose offices are either closed or have no ability to function).

The official State policy is that Democrats and Republicans don't even have to leave home to participate in their government – but Libertarians do. The record and the Verified Complaint demonstrate that the Plaintiffs will suffer irreperable harm up to and beyond the deadline in which to complete ballot petition efforts absent an injunction being ordered by this Honorable Court.

**III. The Law Requires Injunctive Relief**

A. Standard of Review

"Temporary restraining orders and preliminary injunctions are extraordinary and drastic remedies, which are 'never awarded as of right,' or 'as a routine matter.' " Whitfield v. Lopez, No. 15-CV-4827 (DLI) (LB), 2015 WL 6128866, at *2 (E.D.N.Y. Oct. 16, 2015) (citations omitted). "In the Second Circuit, where a party seeks preliminary injunctive relief...courts apply the four-factor test set forth by the Supreme Court in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 390, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006)." *Mrs. U.S. Nat. Pageant, Inc. v. Miss U.S. Org., LLC*, 875 F.Supp.2d 211, 226 (W.D.N.Y. 2012). Under this test, a district court must determine that a plaintiff has

6

shown: (1) a likelihood of success on the merits; (2) that absent an injunction [the p]laintiff is likely to suffer irreparable injury that cannot be remedied with monetary damages; (3) that the balance of hardships tips in favor of [the p]laintiff; and (4) that "the public interest would not be disserved" by the issuance of an injunction.

B. Nature of the Injunction Sought

The Plaintiffs respectfully request that this Court issue an injunction requiring that they not have to circulate ballot petitions in order to place any of their candidates on the ballot for the simple reasons that: (1) it is impossible to do so; (2) the Executive Orders purport to make the actual organization, processes and in person activity illegal to do it (said necessary activity being described comprehensively in Exhibit A and its allied documents); (3) the State has repeatedly found and elucidated a consistent position that the activity of petitioning to get on the ballot is dangerous, and its failures to act have in fact wilfully exposed the Plaintiffs to what the Defendants purport to be dangerous; and (4) by the time the Executive Orders expire on September 9, 2020 the time in which to have applied for and circulated petitions would have expired.

C. Discussion

This matter concerns the classic and all too often practice of Democrats and Republicans in elected office purposefully restriction competition, free speech and other alternatives. Unfortunately, the instant Matter takes that practice to the extreme by making the activity and processes to petition onto the ballot illegal, while knowingly exposing thsoe doing it with health risks rendering them vulnerable to COVID-19

7

complications – then additionally forcing them to interact with members of the public in a manner that, in this climate of fear, would subject them to stigma and likely physical harm.

This Matter, alothough it involves core facts common to the Superior Court proceeding docketed as Misbach et al v Merrill, it involves the burdens imposed upon the Plaintiffs by COVID-19 in that they themselves are unconstitutionally undly burdensome. The Plaintiffs will briefly summarize the particulars of this case, the State's opposition and incorporate the underlying facts and travel of Exhibit A, in the interests of expediting this matter. Any additional clarification of resolving issues can be addressed in the Plaintiff's reply brief.

*1. The State's Claim as to the Need to "Regulate" Elections versus the People's Interest and a Right to Regulate by Means of Election*

The State, in elections matters, routinely purports the need to "regulate" elections. *Black's Law Dictionary* defines "regulation" as "the act or process of controlling by rule or restriction." Similarly, *The Oxford English Dictionary* defines "regulation" as "the action or fact of regulating," and "to regulate" as "to control, govern, or direct." Within the context of the First Amendment, which has widely been understood to extent to the States there is a requirement that no law shall be made "...abridging the freedom of speech... or of the people to peaceably assemble, and to petition the Government for redress of grievances." Defendant Lamont not only ended a ballot access suit challenging an already unconstitutional elections scheme – his intercession directly prevented the Superior Court from hearing an application for

8

temporary injunction challenging it. Prior to the COVID-19 Executive Orders, this was a profound consolidation of power, the type of which the United States Supreme Court expressly forbade in elections matters in *Williams v Rhodes*, 393 US 32 (1968) The Defendants' further acts to wilfully shield Democrats and Republicans from circumstances he deemed harmful while wilfully requiring Libertrians to continue to be exposed to them is a shocking and unsettling precedent.

      The State's job is to provide a path to the ballot to ensure that all who are on it qualify to hold the office and serve. For example, that task in the Election law is served when Town Clerks verify that candidates are in fact electors, and in fact do live in the district in which they would run. As an example to counter the too oft repeated argument that the ballot would be cluttered, Exhibit A includes a sample ballot from California when Arnold Schwarzenegger ran for governor – and it had dozens of candidates for the office. No one was confused. Rather than wastefully expend thousands of man hours checking and challenging many tens of thousands of signatures, the State could simply print a larger ballot if need be.

      Instead, the State routinely besets the Plaintiffs with the Sisyphean task of hawking signatures, abasing themselves before the public in front of supermarkets and never having enough time or energy left over to tackle the issues of the day or get out the vote. The State's scheme, on a normal day, picks and chooses winners and losers by picking and choosing who can arbitrarily expend enough resources in the election before the election known as a ballot drive. The State's scheme does not let

9

the voters decide. It hides from view candidates who otherwise meet the actual qualifications of office themselves.

The State, in response to COVID-19, took the opportunity to mete out further draconian disparate treatment by making the Libertarians' efforts illegal under color of law and dangerous to undertake. In turn, the State continues its unconstitutional, untenable and unjust position that it, not the people, may regulate their form of government by choosing their office holders in the General Election, as is their right – which the State has denied for decades.

Regulate, in this context, is to make uniform and equal – not install gatekeepers, challenges and hurdles beyond those parties already in power are not made to suffer. The Public Interest necessarily requires that it not be denied the option the Plaintiffs would put forward in all five Congressional Districts, 36 State Senate District and 151 House Assembly Districts. To adopt the State's position that injunctive relief not enter would usurp the right of the people to alter their very form of government as they deem fit.

*2. The State's Claim that the Governor Cannot Modify Law – as He is in fact doing it*

The Plaintiffs are somewhat perplexed by Defendant's counsel's assertions that the Defendant cannot merely rewrite law on a whim, as he sees fit, during the May 4, 2020 status conference. This is exactly and precisely what he has done – not only rewriting the law carte blanche, but imposing brand new orders with additional restrictions making the simple act of ballot petitioning impossible. For example,

10

Executive Orders 7, 7D, 7N, 7R and 7S shut down the Plaintiff's ballot drives, full stop.

### 3. Health Risks

Defendant Merrill's writings in Exhibits J and L speak for themselves. They are documents authored by her, maintained by the State and used in the ordinary course of business. Exhibit J admits, expressly, what the Governor is requiring the Plaintiffs to do as wrong, dangerous and immoral. Merrill even notes that the Defendants received $1,076,346 from Congress expressly to take measures to make elections safer – which they have specifically adopted the policy of only doing for Democrats and Republicans. Absent injunctive relief, the State's decision to use that money to favor two parties over all others itself may warrant its own seperate action under the Federal False Claims Act.

Merrill was correct when she wrote, "As you know, there are processes in Title 9 for candidates to gather petition signatures in order to appear on the ballot for the primary and for the general election. Both of those processes require, by law, direct person to person contact in order to collect the signatures, the signatures to be delivered to registrars or town clerks in town halls that are now largely closed, verification by local election workers who are currently largely working from home, delivery to my office, and tabulation by workers in my office who are also largely working from home. Given the nature of the coronavirus, both petitioning processes present an opportunity for the virus to spread and are not feasible on the timeline required by statute. This is also a time-sensitive issue as petitioning candidates for the

11

November election have had access to petition papers, and have been circulating those petitions, since January, and petitions for potential candidates in the August primary will be available in May. My recommendation is to eliminate any path to ballot access via a petition process by executive order."

Governor Lamont has not only chosen to ignore that logic, reason and common sense, but to conveniently decide when and how he not only takes action he purports to further the public good, but also when it would actually reduce government burden and expense itself.

### 4. Public Fear

Defendant Lamont is well aware that the public is in a heightened state of fear, which the official response certainly does not help. In addition to the health risks and his own actions rendering a ballot drive functionally illegal and impossible, he has seen fit, for over sixty days as of this Court's ruling on the temporary injunction, to continue to expose petitioners to the physical consequences and stigma that fear would reasonably create. The State's position, as elucidated by Defendant Lamont's actions and inactions, is the Plaintiffs must risk or be perceived as risking the spread of COVID-19 just to be an option the ballot for the General Election.

This is far worse and far more cruel than having to carry the scarlet letter of ballot petitions. The idea of having to be pilloried as a spreader of deady disease in a manner prescribed by unconstitutional State law in order to participate in government shocks the conscience.

### IV. Conclusion

It is unmistakeably clear that the Defendants have afforded the Plaintiffs a status beneath second class citizens, and while having done so, elevated the Democratic and Republican Parties beyond any reasonable risk of competition.

The Defendants own writings, orders and public statements, as the proceedings of this case moving forward will only make more clear, establish a prima facie case that the Plaintiffs are more than likely to succeed on the merits because they have been subjected to the disparate treatment of physical danger to vulnerable candidates and to the very act of even daring to put forth candidates being rendered functionally illegal by Defendant Lamont.

An injunction should enter in favor of the Plaintiffs so that no signatures are required to place Libertarian candidates on the ballot, and the Libertarian Party need only nominate them for any office on the ballot in the 2020 November election.

Dated this 10th Day of May, at Plainfield

THE PLAINTIFFS:

| | |
|---|---|
| LIBERTARIAN PARTY OF CONNECTICUT<br>HAROLD HARRIS | DANIEL REALE |
| /s/ Edward Bona<br>Edward Bona<br>PO Box 13<br>Plainfield, CT 06374<br>(860) 889-5930<br>edward-bona@comcast.net | /s/ Dan Reale<br>Daniel Reale<br>20 Dougherty Ave<br>Plainfield, CT 06374<br>(860) 377-8047<br>headlinecopy@gmail.com |

CERTIFICATE OF SERVICE

      We hereby certify that a copy of the foregoing and its exhibits in support were transmitted, via ECF to counsel for the Defendants Maura Murphy Osborne via Maura.MurphyOsborne@ct.gov and Alma Nunley via Alma.Nunley@ct.gov upon its filing via PACER's ECF system.

      A copy of the foregoing was also transmitted via first class mail, postage prepaid, to:

Kyle Kenley Kopitke
1506N. Grand Traverse
Flint, MI 48503

/s/ Edward Bona                              /s/ Dan Reale
Edward Bona                                  Daniel Reale