**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| LIBERTARIAN PARTY OF | : | No. 3:20-cv-00467 (JCH) |
| CONNECTICUT, ET AL. | : | |
|     *Plaintiffs*, | : | |
| | : | |
|   v. | : | |
| | : | |
| DENISE MERRILL, SECRETARY OF | : | |
| STATE, ET AL. | : | |
|     *Defendants*. | : | MAY 26, 2020 |

### DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF

## I.   INTRODUCTION

In this action, Plaintiffs, the Libertarian Party of Connecticut ("Libertarian Party") and two candidates affiliated with the Libertarian Party—Harold Harris and Daniel Reale—(collectively "Libertarian Party Plaintiffs") seek to enjoin enforcement of a provision of Connecticut's election statutes, and related statutes, that require candidates seeking to appear on the ballot for a general election, who are affiliated with a minor party that has not met the requirements for ballot access recognition for a particular office, to obtain the signatures of one percent of voters from the prior election for that office. *See* ECF No. 11, Plaintiffs' Verified Complaint ("LP Compl."), pp. 44-45; Conn. Gen. Stat. §§ 9-453a-9-453u. According to the Libertarian Party Plaintiffs, under the unique circumstances of the COVID-19 public health crisis, the petitioning laws are unconstitutionally burdensome as applied to them and the only adequate remedy is to allow them to place candidates on the ballot for all offices without the need to petition. In reality, the Libertarian Party Plaintiffs seek to leverage the public health crisis to gain the relief they have long

sought, namely the wholesale elimination of all ballot access laws that require them to make any effort to establish even a modicum of voter support for their candidates before they are placed on the ballot. Considering that goal, it is unsurprising that the Libertarian Party Plaintiffs provide this Court with no evidence that would support their claim that the current petitioning requirements impose a severe burden on their ability to gain ballot access.

Intervening Plaintiffs the Independent Party ("Independent Party") and Michael Telesca (collectively "Independent Party Plaintiffs") and Kyle Kopitke,[1] an unaffiliated candidate running for President, have joined this action, also asserting that the public health crisis makes any form of petitioning impossible for the 2020 election cycle. Contrary to Plaintiffs' contention, a remedy far less than wholesale abandonment of Connecticut's ballot access provisions would eliminate any additional burden on Plaintiffs while still facilitating orderly and fraud-free elections. The State has already provided such a remedy via executive order, reducing the number of signatures required for ballot access and permitting electronic circulation, collection, and submission of petitions by candidates.

Any assertion that the accommodations provided by the State are insufficient to provide meaningful ballot access are mere speculation—Plaintiffs have provided no evidence that they have attempted to gather a single signature using the additional methods now permitted. Indeed, the Independent Party has not even begun the petitioning process five months into the seven-month window to petition. The Libertarian Party began petitioning earlier this year for thirteen offices, but has not provided any information to Defendants, or this Court, on the number of signatures it has gathered or the attempts it has made to gather signatures. As such, the Court has no basis to

---

[1] Mr. Kopitke has not filed a brief in support of the motion for preliminary injunction. Therefore, this brief will be addressed to the other Plaintiffs' claims. The same petitioning requirements, however, apply to unaffiliated candidates, including Mr. Kopitke. Ex.1, Bromley Decl. ¶6.

conclude that a reasonably diligent candidate could not successfully petition for ballot access in Connecticut in 2020.

Beyond challenging the ballot access laws as applied under the current health crisis, the Libertarian Party Plaintiffs challenge the ballot access laws on their face, alleging that even without the current health crisis the laws impose an impermissible burden on minor parties in Connecticut. *See* LP Compl., pp. 44-45.  Although Libertarian Party Plaintiffs expound at great length on the steps they have been required to take to gain ballot access in prior elections, their allegations also evidence that much of the alleged burden on their access to the ballot is the result of their own choices regarding initiation and management of the petition process for particular offices.

The facts proffered by the Libertarian Party Plaintiffs demonstrate that the Libertarian Party has enjoyed consistent success in achieving ballot access in Connecticut over many election cycles.  There is no evidence before this Court to suggest one way or another whether the Libertarian Party's political success to date is commensurate with the degree of public support it enjoys among the Connecticut electorate and/or reflects the number of enrolled Libertarian Party members who are willing to act as standard bearers for the Party by standing for election in Connecticut for Connecticut offices.  The facts alleged in the Libertarian Party Plaintiffs' complaint indicate that, when they have acted diligently within a reasonable time period, the Libertarian Party has been capable of garnering the requisite number of elector signatures to satisfy Connecticut's 1% or 7,500 signature requirement. Conn. Gen. Stat. § 9-453d.

Given its history of actually attaining ballot access in Connecticut, the favorability of Connecticut's overall electoral scheme to minor parties generally and the absence of any contextual analysis for how Connecticut's statutes "severely" burden them, the Libertarian Party Plaintiffs have not established at this time that they are entitled to the extraordinary relief of an injunction

preventing the operation a provision of Connecticut's overall electoral scheme that facilitates orderly and fraud-free elections.

## II.    FACTUAL BACKGROUND

### a. *Connecticut's Overall Electoral Scheme Affords Minor Parties Easy Access to the Ballot.*

Connecticut affords minor parties access to the ballot and other party-building opportunities that are unique, not constitutionally mandated, and among the most generous in the nation.   Indeed, Connecticut's overall electoral scheme has for many years fostered the participation and growth of minor parties through liberal ballot access provisions and generous political association and endorsement statutes.   In all local, legislative, and statewide races, Connecticut maintains a uniquely open and flexible process promoting participation by minor party and unaffiliated candidates at all levels of state government.   Any non-major party, like the Libertarian Party, can access the ballot by gathering signatures equal to the amount of 1% of actual voters in the previous election for that office (not 1% of all registered voters) or 7,500, whichever is less. Conn. Gen. Stat. § 9-453d.   Moreover, minor party candidates who achieve 1% of the vote in the last election for a specific office are automatically eligible to be on the ballot for that office, without the need for further petitioning in the next election cycle.   Conn. Gen. Stat. §§ 9-372(6), 9-379.   Finally, Connecticut permits a generous seven-month timeframe for signature-gathering. Conn. Gen. Stat. §§ 9-453b, 9-453i.   None of these Connecticut provisions is constitutionally required.   In fact, the Second Circuit has recognized that Connecticut's "lenient" ballot access laws are well below the constitutional tolerance established by the Supreme Court. *LaRouche v. Kezer*, 990 F.2d 36, 39-40 (2d Cir. 1993) (Connecticut's petitioning requirement that minor party candidates garner signatures from 1% of the *prior vote total* well below threshold of 5% of *eligible voters* upheld by the Supreme Court).

4

Connecticut also fosters an inclusive electoral process by permitting minor parties to attain "minor party" status on an office-by-office basis, without demonstrating a requisite level of support statewide, which Connecticut could constitutionally demand. *American Party of Texas v. White*, 415 U.S. 767, 775 (1974). By permitting office-by-office minor party status, Connecticut enables minor parties an enhanced ability to associate with voters at the ballot box, the most potent form of political association in our democracy, and, potentially, gradually build support across the state to attain statewide "major party" status.

Moreover, Connecticut is among only a handful of states that permit minor parties to build party name recognition, grow their electoral support and expand political influence through "fusion" voting or cross endorsements. Conn. Gen. Stat. § 9-453t; *see also Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357, n.6 (1997) (noting states permitting fusion voting "has become the exception, not the rule" and 40 states prohibit it). This strategy, which the Supreme Court has held states are not constitutionally required to permit, *Timmons*, 520 U.S. at 363, is used by minor parties in Connecticut to nominate candidates who are also nominated by major parties, thereby garnering votes on their ballot line that otherwise go to that same candidate on the major party ballot line. *Republican Party of Connecticut v. Merrill*, 307 Conn. 470, 474 (2012) (noting 26,308 votes for major party candidate received on the Working Families Party ballot line). This favorable environment for minor parties is likely why Connecticut has over 30 minor parties. Bromley Decl. ¶¶ 3, 5.

The Libertarian Party's history of success in attaining ballot access despite having only 2,895 enrolled party members statewide, Bromley Decl. ¶12, is evidence that Connecticut's electoral scheme imposes a minimal burden on minor parties to attain ballot access. Notwithstanding its enrollment, under the current favorable electoral scheme, the Libertarian Party

has been able to attain ballot access for its Presidential nominee in Connecticut in six of the last seven cycles. Indeed, at present, the Libertarian Party has automatic ballot access for six different offices in Connecticut in 2020: President of the United States, the Second Congressional District,[2] the 9th Assembly, the 65th Assembly, the 83rd Assembly, and the 91st Assembly. *Id.* at ¶14. The Libertarian Party is relieved of any burden to petition in these elections, which Connecticut could constitutionally require it to do, due to an electoral scheme that, as discussed above, allows a minor party to attain "minor party" status on an office-by-office basis in Connecticut.

Although the Independent Party Plaintiffs do not challenge the ballot access provisions outside the current public health crisis, ECF No. 44, Independent Party Brief ("IPCT Br."), at 15, their history of ballot access is even stronger evidence that Connecticut ballot access laws easily afford minor parties ballot access and certainly do not severely burden them. The Independent Party has 29,706 enrolled party members statewide. Bromley Decl. ¶18. The Independent Party received more than 1% of the vote in the 2016 elections, and therefore has automatic ballot access for the Fourth Congressional District, the Fifth Congressional District, 28 of 36 state senate seats, and 84 of 151 Assembly seats.[3] ECF No. 44-1, Telesca Decl. ¶7. As such, the Independent Party has been able to attain ballot access, and garner enough support in the general election, to have automatic ballot access for the majority of offices in Connecticut. They often attain their ballot

---

[2] Plaintiff Daniel Reale was the Libertarian Party candidate for the Second Congressional District in 2012, 2014, 2016, and 2018, securing more than one percent of the votes in the general election in each of those years. If the Libertarian Party wishes to nominate Mr. Reale for that office again in 2020, neither the party nor Mr. Reale will be required to secure petition signatures to do so. Bromley Decl. ¶54.

[3] Although not at issue for the present election cycle, the Independent Party also has automatic ballot access for governor, secretary of the state, attorney general, comptroller, and treasurer in 2022. Bromley Decl., Ex. D.

access through cross endorsing other parties' candidates and garnering 1% of the vote or more for that candidate on the IPCT ballot line.  Bromley Decl. ¶18.

> **b.** *Governor Lamont's Executive Order Amending the Petitioning Process Adequately Addresses Any Burden Imposed on Minor Parties in Gaining Ballot Access Due to COVID-19*

Defendants do not dispute that the COVID-19 pandemic has had a profound impact on our nation and our state.  Indeed, they acknowledged as much in their first conference with the Court in this matter.  The virus, and the response necessary to combat spread of the virus, has impacted almost every aspect of our society and altered the ways in which we, as a community, interact with one another.  Nonetheless, the virus has not required cessation of all civic activities.  Both public and private entities are learning to adapt to the need to socially distance by engaging in forms of interaction other than face to face meetings, from tele-visits with doctors to town meetings conducted on video-meeting platforms.  *See, e.g.* Executive Order 7B, Mar. 14, 2020 (suspending in person open meeting requirements, permitting videoconferencing as alternative); Executive Order 7F, Mar. 18, 2020 (expanding Medicaid telehealth coverage to audio-only telephone).[4]  As in other areas, Connecticut should not simply abandon its long-standing regulation of ballot access in the face of the health crisis.

For the 2020 election cycle, as previously noted, the Libertarian Party has automatic ballot access for six offices, a number commensurate with what the Libertarian Party has run in recent years.  Bromley Decl. ¶14.  The Independent Party has automatic ballot access for 114 offices.  Telesca Decl. ¶7.  For any other office the Libertarian Party, the Independent Party, any other non-major party, or unaffiliated candidates such as Mr. Kopitke, must petition for ballot access.  The

---

[4] All Connecticut Executive Orders related to the emergency declaration can be found at https://portal.ct.gov/Coronavirus/Pages/Emergency-Orders-issued-by-the-Governor-and-State-Agencies.

first day the Secretary of the State could issue nominating petition forms was January 2, 2020 (first business day after first day of the calendar year). Conn. Gen. Stat. § 9-453b. The original deadline for submitting petitions for this election cycle was August 5, 2020. Bromley Decl. ¶¶6, 28. Petitioning parties may submit petitions at any time between January 2 and the deadline. *Id.* at ¶9. Therefore, petitioning parties, both those affiliated with a party and unaffiliated, have over seven months to request nominating petition forms, secure signatures, and submit the signed petitions.

According to the Center for Disease Control and Prevention ("CDC") the first reported case of COVID-19 in the United States was on January 24, 2020. *See* CDC, Cases in the U.S., https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited May 21, 2020). From that date through early March, reported case numbers for the United States remained low with fewer than ten reported cases per day. *Id.* On March 8, 2020, Governor Lamont announced that the first Connecticut resident had tested positive for COVID-19. Press Release: Governor Lamont Announces First Positive Case of Novel Coronavirus Involving a Connecticut Resident, Mar. 8, 2020, available at https://portal.ct.gov/Office-of-the-Governor/News/Press-Releases/2020/03-2020/Governor-Lamont-Announces-First-Positive-Case-of-Novel-Coronavirus-Involving-a-Connecticut-Resident. At the time of the first confirmed case of COVID-19 in Connecticut, over two months had elapsed during which petitioning parties could request petition forms, gather signatures, and submit petitions.

In response to the positive cases of COVID-19 in Connecticut, the high risk of infection, and the current understanding of the fatality rate, Governor Lamont issued a declaration of civil preparedness and public health emergency on March 10, 2020, which shall remain in effect until September 9, 2020 unless terminated earlier by the governor. Declaration of Civil Preparedness and Public Health Emergencies ("Emergency Declaration"), available at

https://portal.ct.gov/Coronavirus/Pages/Emergency-Orders-issued-by-the-Governor-and-State-Agencies.  The declaration itself did not impose any restrictions.  *Id.*  Since that date, Governor Lamont has issued numerous executive orders to protect the health of the state's residents based upon guidance from public health experts including the CDC.  Admittedly, to decrease virus spread, some of the orders seek to curtail activities that would not permit safe social distancing, as recommended by the CDC and other public health experts.  *See, e.g.* Executive Order 7, Mar. 12, 2020 (prohibiting social gatherings larger than 250 people).  Other orders, however, seek to permit time-sensitive or ongoing matters to safely proceed within the social distancing guidelines by eliminating or modifying certain statutory requirements.  *See, e.g.* Executive Order 7K, Mar. 23, 2020 (authorizing remote notarization).

On May 11, 2020, Governor Lamont issued Executive Order 7LL, which altered the petitioning process and associated deadlines.  As it relates to minor party and unaffiliated candidate ballot access, the order reduced the number of signatures required by thirty percent from 1% of voters in the previous election to .70% and decreased the maximum number of signatures required from 7,500 to 5,250, a threshold which only applies to presidential candidates in 2020.  The order extended the deadline to submit petitions from August 5th to August 7th.  The order also amended the signature collection process by eliminating the in person signature requirement, permitting a registered voter to mail a signed petition form to the candidate, and also permitting a registered voter to scan or otherwise photograph a signed petition form and email it to a candidate.

The petitioning requirements set forth in the Executive Order afford many more avenues of circulation than previously permitted by statute.  Bromley Decl. ¶¶35-43.  Although the statute governing nominating petition forms has not been amended, as made clear in guidance issued by the Secretary of the State, candidates may submit the petition application by mail or electronically

by email to the Secretary and the signatures of the candidate and the town clerk verifying the candidate may be completed on separate sheets and submitted in more than one file if necessary. *Id.* at ¶38. A petitioning candidate, therefore, can have a town clerk complete the verification without any in person contact, instead having the town clerk return the verified form to the candidate via mail or email. *Id.* Guidance also makes clear that a candidate may distribute petition forms to voters in a variety of ways that were previously not permitted: mailing petition forms to voters, emailing petition forms to voters, posting the petition form on a campaign website where voters can print the form, and posting the petition form on social media sites such as Facebook. *Id.* at ¶39. The candidate is not required to personally distribute the petition forms—other individuals may do so on the candidate's behalf. *Id.* at ¶40. Candidates are also able to seek signatures in person consistent with current social distancing requirements. *Id.* at ¶39.

Suspension of the in person signature requirement and addition of electronic means of distributing, signing, and returning petitions is consistent with the approach of other states during the health crisis that have modified but not eliminated the petitioning process. Pursuant to an order of the Supreme Judicial Court of Massachusetts, for primary petitions voters may sign and scan petitions or may sign petitions electronically with a stylus or mouse and email the petitions to a candidate. *Goldstein v. Secretary of the Commonwealth*, 484 Mass. 516 (Sup. Jud. Ct. Apr. 17, 2020). In contrast to Connecticut, candidates in Massachusetts must still submit petitions in hard copy to their local election official. Similarly, Illinois suspended the in person signature requirement and added an electronic signature option, requiring the voter to either insert an image of their actual signature or sign the electronic document using a stylus or mouse. *Libertarian Party of Illinois v. Pritzker*, No. 20-cv-2112, 2020 WL 1951687 (N.D. Ill. Apr. 23, 2020). Florida has made the same change to its signature requirements, requiring a scanned copy of the voter's

10

physical signature or an image of the voter's signature.  Florida Department of State, Division of Elections Emergency Rule Nos. 1SER20-1, 1SER20-2, available at https://dos.myflorida.com/elections (last visited May 21, 2020). Utah has suspended the in person signature requirement, but voters must still physically sign petitions and then return them to the candidate via mail, fax, or email.  Utah, Executive Order: *Suspending Certain Provisions of the Utah Election Code Regarding Signature Gathering*, Mar. 26, 2020, available at https://governor.utah.gov/2020/03/26/gov-herbert-suspends-sections-of-utah-statute-regarding-signature-gathering/ (last visited May 21, 2020).

Other states have also reduced the number of signatures necessary to gain ballot access. The wide range of reductions is attributable to a number of factors including: the percentage of the petitioning period that coincided with COVID-19 related restrictions, how difficult the original signature thresholds were to attain, and the amount of time remaining in the petitioning period. For example, by court order the Massachusetts signature requirements for primary petitions were reduced by 50% on April 17, 2020, and the deadline for submission of petitions to local election officials for state office was extended to May 5, 2020, to match the deadline for federal offices. *Goldstein,* 484 Mass. at 564.  The earliest date to begin collecting signatures for primary petitions in Massachusetts was February 11, 2020.  Therefore, on the date that the court issued its order, only eighteen days remained of the eighty-three day period for collecting signatures.  Further, during almost half of the eighty-three day period the state had been under a declared emergency due to COVID-19 and candidates would have been greatly impaired in their ability to secure in person signatures from voters.  Therefore, the fifty percent reduction was an appropriate response to the degree of impact the virus had on signature collection for primary petitions and the short window of time remaining to collect signatures before the deadline to file them.  In contrast, in

Connecticut the period of time when minor party and unaffiliated candidates may seek signatures is more than twice that for primary petitioners in Massachusetts, a full 213 (now 215) days; the time from the emergency declaration to the modification of the petition process and signature requirements was only one third of the total period; and the 88 days that were remaining to collect signatures after the modification is longer than the entire period of time primary petitioners have to collect signatures in Massachusetts.   In light of these differences, the reduced signature requirement in Connecticut is no more burdensome than the remedy crafted by the court in Massachusetts to address the burden arising from the COVID-19 pandemic.

From the first executive order restricting social gatherings (to under 250 people) to the executive order modifying the ballot access requirement, approximately two months elapsed. Therefore, assuming *arguendo* that candidates were unable to seek any signatures during that time period, the period during which candidates could seek signatures has been reduced by 30% for the 2020 election cycle.  The reduction in signatures necessary for a candidate is reduced by the same percentage.

As of May 11, the Independent Party and Mr. Kopitke have not requested petition forms for any office.  Bromley Decl. ¶19.  The Libertarian Party has received petitions forms for thirteen offices.  *Id*. at ¶15.  As a result Executive Order 7LL, for the thirteen offices that the Libertarian Party has already sought petition forms, the signatures necessary to secure ballot access range from as few as 26 signatures for a state assembly district to a high of 1,930 for a U.S. congressional district, with all but three now requiring fewer than 300 signatures.  *Id.* at ¶33.  For minor parties, including the Libertarian Party and Independent Party, wishing to field candidates for office via petition who had not secured the required signatures before May 11th, they had three months remaining to do so.  The same is true for unaffiliated candidates.  Bromley Decl. ¶9.

Thanks to the social distancing measures taken by Connecticut residents, and where necessary mandated by state executive order, the rate of infection and the number of hospitalizations due to COVID-19 has declined for the past several weeks. Executive Order 7PP, May 18, 2020 (noting decline in hospitalizations). Therefore, the state has begun the steps necessary to reduce the restrictions imposed to enforce social distancing measures. On May 20, 2020, many nonessential businesses were permitted to reopen with certain restrictions. *Id.* For example, in addition to delivery and take-away service, restaurants may now offer outside dining and nonessential retail businesses may open with reductions in maximum occupancy consistent with those already in place for essential retail. *Id.* If hospitalization rates and other measures related to the virus continue to track favorably, the State anticipates further reducing restrictions imposed to prevent spread of COVID-19.

Given the favorability of Connecticut's electoral scheme to fostering the growth of new or "non-major" political parties, like the Libertarian Party and the Independent Party, the Parties' track records of success in Connecticut, and the substantial modifications to the ballot access requirements made by the State in response to COVID-19, the facts, as alleged by the Plaintiffs, do not satisfy the high burden required for the type of extraordinary mandatory injunctive relief they seek.

## III.   STANDARD

A preliminary injunction is an "extraordinary remedy." *UBS Fin. Servs. V. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 648 (2d Cir. 2011), quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Sussman v. Crawford,* 488 F.3d 136, 139 (2d Cir. 2007) (describing preliminary injunction as "extraordinary and drastic remedy"). A movant must show, beyond "irreparable" harm or injury, a "likelihood of [ultimate] success" where, as here, the preliminary

injunction would affect "governmental action taken in the public interest pursuant to a statutory or regulatory scheme." *Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir. 2011). That "likelihood of success" standard is heightened further to a "clear" or "substantial" showing of such a likelihood of ultimate success where, as here, plaintiffs seek a mandatory preliminary injunction that would "alter, rather than maintain, the status quo." *Almontaser v. New York City Dep't of Educ.*, 519 F.3d 505, 508 (2d Cir. 2008). And that heightened standard of likelihood of ultimate success becomes even higher where, again, as here, the preliminary injunction "(1) would provide the plaintiff with 'all the relief that is sought and (2) could not be undone by a judgment favorable to defendants on the merits at trial." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (citations omitted). Finally, the preliminary injunction movant must also show "that the public's interest weighs in favor of granting an injunction." *Red Earth LLC*, 657 F.3d at 143. The decision to either grant or withhold equitable relief "rests in the sound discretion of the court." *Petrol. Expl., Inc. v. Pub. Serv. Comm'n of Ky.*, 304 U.S. 209, 218 (1938).

Plaintiffs' speculation as to how difficult it will be to gather signatures under the relaxed petitioning requirements of Executive Order 7LL and their failure to address the State's interest in ensuring fair and orderly elections fall far short of the heightened showing necessary for mandatory preliminary injunctive relief—a clear or substantial likelihood of ultimate success and proof that the public's interest requires the injunction. Nor is it even clear that denial of a preliminary injunction at this point will result in irreparable injury, with several months remaining for Plaintiffs to petition and months more after that to the general election. Further, in the absence of even a single attempt to gather a signature, it is remarkable that the Libertarian Party and the Independent Party come to this Court and claim that they have suffered an injury that is actual and imminent,

and not remote.  They clearly have failed to demonstrate anything beyond their own conjecture and speculation of what is likely to occur if they were to make an effort to comply.  *See Rodriguez ex. Rel. Rodriguez v. DeBuono,* 175 F.3d 227, 234 (2d Cir. 1999).

## IV.    DISCUSSION

The United States Constitution "provides that States may prescribe 'the Times, Places and Manner of holding Elections for Senators and Representatives,' U.S. Const. Art. I, § 4, cl. 1, and the Supreme Court therefore has recognized that States retain the power to regulate their own elections." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992); *see also, California Democratic Party v. Jones*, 530 U.S. 567, 572 (2000); *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2668, 192 L. Ed. 2d 704 (2015) (upholding state process for redistricting Congressional districts).  "[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974).  A state is constitutionally authorized to "[enact] comprehensive and sometimes complex election codes, [e]ach provision of [which]..., whether it governs the registration and qualification of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects – at least to some degree – the individual's right to vote and his right to associate with others for political ends."  *Anderson v. Celebrezze,* 460 U.S. 780, 788 (1983).  States also have an interest in establishing thresholds for placing the name of a candidate on the ballot that "require[e] some preliminary showing of a significant modicum of support" before printing a candidate's name on the ballot, so as to "avoid[ ] confusion, deception, and even frustration of the democratic process at the general election." *Jenness v. Fortson,* 403 U.S. 431, 442 (1971).

a. *Plaintiffs Have Not Demonstrated that General Statute § 9-453d, as modified by Executive Order 7LL, "As Applied" To Them Imposes A Severe Burden on Their First Amendment Rights*

Plaintiffs have not demonstrated that they are entitled to injunctive relief on their "as applied" challenge.  The degree of judicial scrutiny given to an election statute increases with the severity of the burden that the challenged measure imposes upon a First Amendment right. *Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 108 (2d Cir. 2008).  Pursuant to the *Anderson-Burdick* test, strict scrutiny applies to a state's law that severely burdens ballot access, but when a state election law provision imposes only "reasonable nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient" to justify the restrictions.  *Burdick v. Takushi*, 504 U.S. 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780 (1983).  When a state election law imposes a severe burden on individual's rights, "the regulation must be narrowly drawn to advance a state interest of compelling importance."  *Burdick v. Takushi*, 504 U.S. at 434 (quotation marks omitted).  When weighing the burden imposed by compliance with the ballot access statutes courts look to whether a "reasonably diligent" candidate could satisfy the requirements.  *Anderson v. Celebrezze*, 460 U.S. at 809; *see also Campbell v. Bysiewicz,* 242 F. Supp. 2d 164, 174 (D. Conn, Jan. 29, 2003).

Even assuming that a reasonably diligent candidate could not achieve ballot access under strict application of § 9-453d during the COVID-19 crisis, which is unclear, the accommodations made by Executive Order 7LL are sufficient for a reasonably diligent candidate to gain ballot access.  Indeed, the accommodations are entirely consistent with those imposed by courts on other states during this public health crisis.  Both the Northern District of Illinois and the Supreme Judicial Court of Massachusetts concluded that permitting electronic signatures made in substantially the same manner as permitted by Executive Order 7LL and electronic submission of

petition forms was a valid alternative to in person "wet" signatures for petitioning candidates. *Libertarian Party of Illinois, supra,* WL 1951687 at *4; *Goldstein, supra*, 484 Mass. at 564.

Reduction of the signature requirement by 30 percent is also consistent with the remedies crafted by other courts to address the reality of the public health crisis. Any reduction in signatures must not be viewed in isolation, but in the context of the overall ballot access requirements for a state. For example, the Northern District of Illinois reduced the signature requirement to 10% of the original requirement. *Libertarian Party of Illinois,* WL 1951687 at *4. Prior to the modification, however, petitioning candidates were required to secure signatures of 5% of voters who voted in the prior election—far greater than the 1% required in Connecticut.[5] 10 ILCS 5/10-2. Now, Illinois candidates must secure 0.5%, barely less than the 0.7% Connecticut requires. Further, the window to gather signatures Illinois is only ninety days—far shorter than in Connecticut—and did not begin until after Illinois declared a public health emergency. 10 ILCS 5/10-4 (limiting petition circulation to 90 days prior to last day to file, beginning on March 24, 2020 for this election); *see also Libertarian Party of Illinois,* WL 1951687 at *4.

Similarly, the Supreme Judicial Court's reduction of the signature requirement for primary candidates in Massachusetts by 50% still required a candidate for United States Senate to secure 5,000 signatures and for United States Congress 1,000 signatures. *Goldstein,* 484 Mass. at 519, 528. In Massachusetts, candidates had 83 days to collect signatures and the window from the date the Court ordered the reduction in signatures and permitted electronic signatures to the deadline to file petitions, candidates only had 18 days remaining to secure signatures. *Id.* at 520. In comparison, Connecticut candidates had seven months to secure signatures and 88 days remained

---

[5] Relevant only to Mr. Kopitke, under normal circumstances candidates for statewide office in Illinois must secure signatures of 1% of voters from the prior election or 25,000, whichever is lesser–far more than the 7,500 maximum required in Connecticut. 10 ILCS 5/10-3.

to secure signatures from the date Connecticut reduced modified its requirements—more than the total time Massachusetts primary candidates normally have to secure signatures.

Plaintiffs have adduced no evidence that would establish that Connecticut is so unique that its 30% reduction in signature requirements coupled with the addition of electronic signature gathering, when almost three months remained to gather signatures, relaxing an already generous threshold and petitioning window, somehow imposes a substantially greater burden than the remedies crafted by courts to address the burden created by COVID-19 in other states.

In this case, the Libertarian Party Plaintiffs have not adduced any facts to support a severe burden under the modified ballot access requirements.  Although the Libertarian Party Plaintiffs produce copies of many of the executive orders issued in response to the public health crisis, they fail to attach a single affidavit averring to how COVID-19 or any of the State's actions to combat spread of the virus have burdened their ability to gain ballot access.  Absent an affidavit, the representations made in their brief have no legal consequence.  The Court cannot rely on representations in the parties' briefs to decide a motion for a preliminary injunction or temporary restraining order." *Amato v. Elicker*, No. 3:20-cv-464(MPS), 2020 WL 2542788, *8 n.6 (May 19, 2020) (citing *Comptoir De L'Industrie Cotonniere, Establissments Boussac v. Alexanders Dep't Stores, Inc.*, 190 F. Supp. 594, 601 (S.D.N.Y. 1961), *aff'd*, 299 F.2d 33 (2d Cir. 1962)).  During an unprecedented public health crisis, public servants and private individuals across all sectors are dedicating countless hours and learning to adapt in order to fulfill their responsibilities while protecting the health of their community.  Aspiring to public office during this extremely challenging time, the Libertarian Party Plaintiffs cannot even put forth a modest effort to provide this Court with any evidentiary foundation for their self-serving claim that the petitioning

requirements are so burdensome they should not even need to try to satisfy them. This Court should reject such apathy on a matter of such great public importance.

Even if the Court were to consider factual assertions made in their brief, which it should not, the Libertarian Party does not address the burden to ballot access for its candidates after the State's modifications to the signature requirements, despite issuance of Executive Order 7LL two days prior to the deadline for the Libertarian Party Plaintiffs to file their brief.[6] The Libertarian Party Plaintiffs failure to file a revised brief addressing Executive Order 7LL demonstrates that they do not intend to make the requisite showing required for mandatory injunctive relief enjoining an election statute in the middle of an election cycle. Notably, they have not explained to the Court the number of signatures Libertarian Party candidates, or place-holder candidates, who had already received petitioning forms had secured on petitions prior to the March 10th emergency declaration or prior to the executive orders it alleges limit their ability to gather in person signatures. Further, they have not identified any other offices for which they have candidates willing and able to run for office under the Libertarian Party banner and for which they intend to put forward a candidate so the Court could better understand the burdensomeness of the number of valid signatures the Libertarian Party must gather pursuant to the reduced signature requirement. At present, there is little factual basis to assess the severity of the burden imposed by Conn. Gen. Stat. § 9-453d and Executive Order 7LL on the Libertarian Party. The absence of evidence is troubling given the extraordinary relief the Libertarian Party seeks – the ability to place candidates on the ballot for every office in Connecticut regardless of whether they have ever attained ballot access for that

---

[6] Rather than provide a legal or factual basis for the extraordinary relief they seek, the Libertarian Party Plaintiffs make baseless accusations, alleging that the Connecticut Judicial Branch's temporary suspension of hearing in all civil matters to prevent spread of COVID-19 was really an attempt by Governor Lamont to "lock[] them out of state court." LP Br. p.2.

office or even attempted to do so. Further, it falls far short of the showing necessary to require heightened scrutiny of the challenged election provision.

There is a simple explanation for the Libertarian Party Plaintiffs' failure to provide evidence of a severe burden imposed on them by the modified petitioning requirements – the Libertarian Party itself is the cause of its failure to achieve ballot access. Connecticut's ballot access laws are generous to minor parties, resulting in more than 30 minor parties, of which 4 have attained sufficient success to permit statewide enrollment. Bromley Decl. ¶3. In contrast to the modest success of the Libertarian Party, the Independent Party has attained automatic ballot access for the majority of offices in this election year. The success of other minor parties leads to the inevitable conclusion that the failure of the Libertarian Party to achieve similar success is not due to "the Sisyphean task" of petitioning for ballot access. LP Br. p.9. Rather, it is due to their refusal to make even a minimal effort to attempt to attain petition signatures year after year. It is easy to understand why the Libertarian Party Plaintiffs wish this Court to believe that it is impossible to collect signatures, when they make clear that they believe asking voters to sign a petition is "abasing themselves before the public." *Id.* Instead of attempting to establish a party structure suited to Connecticut's ballot access electoral scheme, the Libertarian Party Plaintiffs continue to shift blame to the other people and circumstances. COVID-19 is simply the latest scapegoat for their lack of diligence.

The Independent Party Plaintiffs' claim fairs no better. From January 2 to May 22, no Independent Party candidate sought a petition form, not one. Bromley Decl. ¶19. This is hardly the behavior of a party determined to work diligently to attain ballot access in 2020. In his May 9, 2020 declaration, Michael Telesca avers that the Independent Party "had been anticipating starting petitioning for president, three congressional seats, some General Assembly seats, and a

20

few registrar of voter seats about two weeks ago."  Telesca Decl. ¶10.  No further information is provided on the specific offices the party wishes to attain ballot access.  In the two weeks since Executive Order 7LL, and during which the Independent Party anticipated starting petitioning, no Independent Party candidate has sought petitioning forms.  Bromley Decl. ¶19.  The Independent Party Plaintiffs allege that they normally wait to petition until "longer days and warmer weather." Telesca Decl. ¶ 10.  This approach is ridiculous, even in normal times, especially if you are really seeking to attain statewide ballot access.  Be that as it may, 145 days have elapsed during which the Independent Party could have sought petitioning forms—a full two-thirds of the petitioning window.

At its core, the Independent Party Plaintiffs' argument that they are severely burdened by § 9-453d as modified by Executive Order 7LL rests on two premises: (1) in person petitioning is impossible at this time, and (2) the alternate means of petitioning permitted by Executive Order 7LL are so expensive and novel that no petitioning party will be able achieve ballot access.  IPCT Br. at 19, 22-27.  Neither premise is support by the evidence before this Court.

The first premise is easily rejected.  Although in person petitioning may require different measures than in prior election cycles, none of the executive orders issued in response to COVID-19 prohibit in person petitioning.  The statement made by Secretary Merrill in her March 28, 2020 letter that at that time in person petitioning was "not feasible on the timeline required by statute," does not compel this Court to conclude that two months later, and pursuant to the modifications found in Executive Order 7LL, that is still the case.  In late March, the infection and hospitalization rates for COVID-19 in Connecticut were continuing to rise.  Since that time, Connecticut has "flattened the curve" and infection and hospitalization rates have been steadily declining for several weeks.  As a result, we have entered "Phase One" of reopening, permitting many non-

essential businesses to resume in person operations.  *See* Executive Order 7PP.  If infection and hospitalization rates continue to decline, the State will move on to additional phases of reopening, each reducing more and more restrictions that were previously necessary to limit the disease's spread.

Although individuals should still maintain a safe distance from one another, and wear a mask, there is nothing prohibiting candidates or volunteers from holding an in person conversation with voters.  Mr. Telesca's opinion that people will not be receptive to a masked individual has no evidentiary basis since no Independent Party candidate has even secured a petition form to engage with voters for purposes of ballot access and after several months of the health crisis masks are neither novel or rare.  Besides, so long as a single petitioner signs their name to a petition form, the normal requirements for circulators to personally witness the signature and attest to that fact do not apply.  Thus, a candidate or volunteer is no longer required to be in close proximity to the voter when he or she signs a petition form.  Presumably, there are any number of ways in which an individual could make available petition forms to voters and the voter could return the form, without physically passing the form back and forth.  For example, forms could be available at a table with a box with a slot in the lid to place the completed form in, with the circulator sanitizing the table and pens after each signature.  The mere fact that the in person interaction would look different than in prior years is not evidence that it would be ineffective.  This Court should not blindly accept Plaintiffs' "no we can't" attitude.

The second premise also lacks merit and is based entirely on conjecture by Mr. Telesca and others about the hypothetical burden of attaining signatures.  Concededly, electronic circulation and collection of signatures has not been common within the context of ballot access petitions prior to 2020.  However, the use of mail, email, websites, and social media by political

parties is far from novel. Even the United States Census may be completed online. *See* my2020census.gov. Households may also respond to the Census by mailing back the questionnaire sent to each home or by phone. *See* https://www.2020census.gov/en/ways-to-respond/responding-by-mail.html.

Mr. Telesca's estimation of the effort required to secure ballot access for president, the only office for which the full 5,250 signatures will be required this election cycle, ventures on hyperbole. He makes no attempt to explain the burden imposed on candidates for any of the other offices on the ballot this fall, all of which require far fewer signatures. Indeed, for a State Assembly district, the number of signatures required ranges from a high of 91 to a low of 7 signatures, with 45 districts requiring fewer than 50 signatures. Bromley Decl. ¶32. The only other offices to require more than 400 signatures are United States Congressional Districts, with the three for which the Independent Party does not have automatic ballot access ranging from 1,893 to 2,025 signatures. Bromley Decl. ¶30.

Looking at Mr. Telesca's representations in the context of the number of votes requires for the entire range of offices, his assumptions lack any foundation. First, he assumes that the Independent Party has no existing support in Connecticut among voters. On the contrary, there are 29,706 voters enrolled with the Independent Party in Connecticut. Bromley Decl. ¶18. Lists of registered voters are readily available to the Independent Party from the Secretary of the State, registrars of voters, and private companies. Bromley Dec. ¶48. Presumably individuals enrolled with the party would not be skeptical if they received mail or email from Independent Party candidates seeking petition signatures. A letter or email from a political party of which an individual is an enrolled member seeking support is a far cry from an unsolicited commercial advertisement, and years-old statistical data on consumer responses to such advertising have

extremely limited value in determining response rates for targeted political mailings. *Id.* at ¶¶51-53.

Second, he treats mail and email as an "either or option." It is not. A reasonably diligent candidate would use as many options as possible to secure signatures. Particularly for offices with low petitioning thresholds, it is perfectly reasonable to assume that a diligent candidate would attempt to contact enrolled party members in the relevant district in as many ways as possible. Candidates have 88 days since the issuance of Executive Order 7LL to the deadline to secure petition signatures and are not limited by the practical constraints of in person circulating. Bromley Decl. ¶55. Candidates, and volunteers on their behalf, may send mail, email, or engage in online outreach during at any hour of the day or night from any location. *Id.*

Third, he ignores the ability of candidates and volunteers to reach out to voters personally known to them to solicit support. A volunteer could provide the petition form to the voter in a number of ways after speaking with them: directing them to a website where they might download the petition, mailing the form to them, or even leaving the form at the voter's door. The volunteer could also follow up if the form is not returned. There is no limit on the number of volunteers a candidate may use and without the in person requirement volunteers do not even need to be in Connecticut to reach out to voters. Bromley Decl. ¶49. Even for offices with higher thresholds, a small number of volunteers could easily divide the labor and attain sufficient signatures. *Id.* at ¶56. It strains credulity that the Independent Party lacks a single volunteer comfortable with using social media.

In essence, Plaintiffs cannot meet their high burden to demonstrate that even if they exercised reasonable diligence they could not secure the reduced number of petition signatures using the additional circulation methods authorized by Executive Order 7LL because they have

not even attempted to comply with the requirements.  In their speculative opinion, any attempt to gain signatures is doomed to fail, so why try?  The answer is simple, and this Court should follow it—it is beyond dispute that states may "restrict to some degree the right to be on a ballot," *Campbell v. Bysiewicz*, 242 F. Supp. 2d at 172, to establish a violation of the First or Fourteenth Amendments Plaintiffs bear the burden of establishing that the challenged provision is so burdensome that it would prevent even a "reasonably diligent" candidate from attaining ballot access.  *Anderson v. Celebrezze*, 460 U.S. at 809.  For that to mean anything, Plaintiffs must be required to do more than speculate on the negative response of voters to attempts to secure signatures using the newly permitted methods they envision.  Plaintiffs' speculation falls well short of a demonstration of "a severe burden" on their rights and therefore the State's important regulatory interests are sufficient to justify the restrictions. *Burdick v. Takushi*, 504 U.S. at 434. Having failed to satisfy the *Anderson-Burdick* standard, Plaintiffs also fail to carry their burden of showing a substantial likelihood of success on the merits necessary for a mandatory preliminary injunction.  *Almontaser v. New York City Dep't of Educ.*, 519 F.3d at 508.

      "Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections" to ensure they are "fair and honest" and that they are orderly "rather than chaos." *Burdick v. Takushi*, 504 U.S. at 433 (quoting *Storer v. Brown*, 415 U.S. at 730).  Connecticut has, even during a public health crisis, a compelling interest in ensuring that its elections are "orderly, fair and transparent" and regulating the ballot is a central means to advancing that interest.  Bromley Decl. ¶27.  In seeking an order waiving the petitioning requirements in their entirety, Plaintiffs ask this Court to ignore "common sense" and prohibit the State from the "active role" that it must have in its own election process.  Executive Order 7LL was a reasonable response to the challenges posed by COVID-19 on the petitioning process for

2020 and evidences the State's concern for individual's First Amendment Rights, which encompass ballot access and the ability of individuals to associate with candidates of their choosing at the polls.

This Court should be particularly sensitive to Connecticut's compelling state interest of requiring at least a minimal showing of support for a candidate because of the broader implication of petitioning onto the ballot in Connecticut.  In Connecticut, the petitioning process is used to not only attain ballot access but also to become eligible to receive large public financing grants.  *Green Party of Connecticut v. Garfield*, 616 F.3d 213, 238 (2d Cir. 2010) (Upholding Connecticut's public financing program because that program's "statewide qualification criteria can hardly be said to harm the political opportunity of minor-party candidates…").  Connecticut's overall electoral scheme operates as an integrated regulatory scheme and its provisions cannot be properly understood or their burden assessed in isolation.

Connecticut has both reduced the threshold necessary to gain ballot access for petitioning candidates and afforded candidates additional avenues to seek petition signatures.  Plaintiffs must do more than speculate about the effectiveness of these measures in order to justify the removal of Connecticut from the regulation of its own elections.  They do not even aver that they have attempted to collect a single signature using the methods permitted by Executive Order 7LL.  As such, they fall far short of meeting their burden to establish that they are likely to prevail on the merits of their claims.

**b.   *To the Extent that the Libertarian Party Plaintiffs Bring a Facial Challenge to the Ballot Access Requirements, They Have Not Established the High Standard for A Facial Challenge to Connecticut General Statute § 9-453d.***

To establish their facial constitutional claim, the Libertarian Party Plaintiffs must demonstrate that the challenged statute, in this case § 9-453d, cannot be applied constitutionally and that it lacks a plainly legitimate sweep.  *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 455, 457 (2008).  Plaintiff cannot do so.

It is well settled that states are the natural architects and monitors of their own election processes and are imbued with broad discretion to regulate these processes. *Burdick v. Takushi*, 504 U.S. at 433-34; *California Democratic Party v. Jones*, 530 U.S. 567, 572 (2000); *Nader v. Shaffer*, 417 F. Supp. 837, 850 (D. Conn.) (three judge court), *summarily aff'd,* 429 U.S. 989 (1976) (quoting *Tansley v. Grasso,* 315 F. Supp. 513, 519 (D. Conn. 1970) (three judge court)). This Court's deference to Connecticut's control of its own election processes serves not only federalism principles but also the real world consideration that election officials must balance a number of competing interests when crafting an overall electoral scheme that advances the State's interest in conducting orderly and transparent elections and access to the ballot for non-major party and petitioning candidates is only one important consideration.  Connecticut has a compelling interest in ensuring that its elections are "fair and honest" and that there exists "some sort of order, rather than chaos" during the democratic process.  *Burdick v. Takushi*, 504 U.S. at 433 (quoting *Storer v. Brown*, 415 U.S. at 730).

States may impose different requirements on smaller political parties as those imposed on larger ones to attain ballot access so long as "what is demanded [is] not so excessive or impractical as to be in reality a mere device to always, or almost always exclude parties with significant support from the ballot." *American Party of Texas v. White*, 415 U.S. at 783.  In other words, requirements imposed on political parties are valid if they provide access to that is "real, not merely theoretical." *Id.*  "It is the totality of the restriction imposed that determines impermissibility of the burden on

the right to ballot access." *Campbell v. Byziewicz*, 242 F.Supp.2d. at 174 (looking to the lack of primaries as evidence of a severe burden on access for primary challengers). The Supreme Court has upheld ballot access requirements far more stringent than Connecticut's requirement of at most 7,500 signatures attained over a seven-month span, finding constitutional a Texas requirement of attaining 22,000 signatures in the span of 55 days. *American Party of Texas v. White*, 415 U.S. at 787.

The Libertarian Party's history of gaining ballot access in Connecticut alone makes clear that General Statute § 9-453d provides far more than a "merely theoretical" path to ballot access. Other minor parties, such as the Independent Party, also have consistently attained ballot access. Connecticut has over 30 minor parties. Bromley Decl. ¶3. Four, including the Libertarian Party and the Independent Party, have satisfied the requirements to enroll members statewide. *Id.*

The Libertarian Party Plaintiffs ask this Court to grant them automatic ballot access in isolation, without allowing the Court to consider the impact such a change would have on the totality of Connecticut's election laws in 2020 and beyond. The Libertarian Party is not entitled to preferential treatment over other political parties. If this Court were to enjoin enforcement of the petitioning requirement, it would apply to all non-major parties in Connecticut. A newly formed party would be able to field candidates for every office in the State without any showing whatsoever of meaningful and sustained voter support. Indeed, under Plaintiffs' formulation, even an unaffiliated candidate would be able to appear on the ballot with no in-state support whatsoever. The State's determination that such a scheme would, over time, result in party splintering and a crowded and confusing the ballot is not unreasonable and is entitled to deference under the *Anderson-Burdick* standard.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a temporary restraining order and preliminary injunction enjoining the application of Conn. Gen. Stat. § 9-453d, and related statutes, should be denied.

Respectfully Submitted,

DEFENDANTS
DENISE MERRILL,
SECRETARY OF THE STATE

NED LAMONT,
GOVERNOR OF CONNECTICUT

WILLIAM TONG
ATTORNEY GENERAL

BY: s/ Maura Murphy Osborne
Maura Murphy Osborne
Federal Bar No. ct19987
Alma R. Nunley
Federal Bar No. ct30610
Assistant Attorneys General
165 Capitol Ave., 5th Floor
Hartford, CT  06106
Tel: (860) 808-5020
Fax: (860) 808-5347
Maura.MurphyOsborne@ct.gov
Alma.Nunley@ct.gov

## CERTIFICATION

I hereby certify that on May 26th, 2020, a copy of the foregoing Memorandum in Opposition was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  A copy of the foregoing was also emailed and mailed, via first class mail to Intervening Plaintiff Kyle Kenley Koptike at the below address. Parties may access this filing through the Court's system.

Kyle Kenley Kopitke
1506 N. Grand Traverse
Flint, MI 48503
kylekopitke@gmail.com

/s/ Maura Murphy Osborne
Assistant Attorney General