# EXHIBIT 1

# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LIBERTARIAN PARTY OF | : | No. 3:20-cv-00467 (JCH) |
| CONNECTICUT, ET AL. | : | |
|     *Plaintiffs*, | : | |
| | : | |
|     v. | : | |
| | : | |
| DENISE MERRILL, SECRETARY OF | : | |
| STATE, ET AL. | : | |
|     *Defendants*. | : | MAY 26, 2020 |

## DECLARATION OF THEODORE E. BROMLEY

I, Theodore E. Bromley, hereby declare as follows:

1.     I submit this Declaration in support of Defendants Secretary of the State Denise Merrill ("the Secretary") and Governor Ned Lamont ("the Governor") in *Libertarian Party of Connecticut v. Merrill*, No. 3:20-cv-00467 (D. Conn.).  I have compiled the information in the statements below through personal knowledge, the Connecticut Secretary of the State ("SOTS") personnel who assisted me in gathering the information from our agency, or on the basis of documents I have reviewed.  I also have familiarized myself with the allegations in Plaintiffs' Verified Complaints and Motions for Temporary Injunction in this case in order to understand them and how the relief sought by Plaintiffs will impact SOTS, voters, candidates and other election officials in the administration of the 2020 elections.  *See* ECF Nos. 1, 2, 30, 41 and 44.

2.     I am the Director of Elections at SOTS.  The Secretary is the chief election official for the State of Connecticut.  SOTS is the lead agency for administering and overseeing elections in Connecticut.  I have worked at SOTS since 2001 in the Legislative, Elections Administration Division, which administers statewide elections in Connecticut and advises local election officials on election matters.  I was promoted to Director of Elections in August 2019, in which capacity I manage a staff of thirteen.

-1-

I.      Overview of Connecticut's System of Ballot Access for Minor Party Candidates During Ordinary Times

3.      Contrary to the Independent Party of Connecticut's ("IPCT's") statement in its brief, ECF No. 44 at 2, there currently are 34 minor parties in Connecticut.  Only 4 of those parties have statewide enrollment privileges: the Green Party, the IPCT, the Libertarian Party of Connecticut ("LPCT") and the Working Families Party.  Enrollment privileges are distinct from ballot access; they simply mean that because of the minor parties' attaining 1% of the vote for a statewide office, and therefore having automatic ballot access for an office that will appear on the ballot in every town, voters in every town can register as a party member for that party.  Some minor parties only exist in one town and therefore do not have statewide enrollment privileges.

4.      Connecticut law permits minor parties and independent candidates to get on the ballot by gathering signatures equal to 1% of the vote total in the most recent election for the office they are seeking.  Conn. Gen. Stat. § 9-453.  It also permits minor parties to retain ballot access for the next election by achieving only 1% of the vote.  Conn. Gen. Stat. § 9-372.  This 1% threshold for ballot access is less than what many other states and local jurisdictions require.

5.      Connecticut has many minor parties who are able to run candidates for office because the 1% threshold is so low.  *See, e.g.,* https://portal.ct.gov/SOTS/Election-Services/Election-Results/Election-Results (last viewed March 5, 2020).  Connecticut also permits minor parties to gain ballot access by cross endorsing major party candidates.  Conn. Gen. Stat. § 9-453t.  The use of cross endorsement or fusion voting is a way for minor parties to associate with voters and retain ballot access by getting 1% of the vote for the major party candidate on their ballot line.  Cross endorsement or fusion voting is not permitted in most states. *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 363 (1997); *see also,* https://ballotpedia.org/Fusion_voting#cite_note-caseopinion-5 (last viewed May 20, 2020).

## II. <u>How Petitions Are Circulated and Reviewed In Ordinary Times.</u>

6.      Any elector or party can take out nominating petitions for office as early as the first business day of an election year, which in 2020 was January 2nd.  Conn. Gen. Stat.  § 9-453b.  Candidates can begin gathering signatures immediately, and may continue to do so for the next 7 months until the August deadline for submitting petitions.  Conn. Gen. Stat. § 9-453i.  SOTS informs candidates how many signatures they need to obtain and includes the number on the form.

7.      Only registered voters can sign a petition in Connecticut.  Conn. Gen. Stat. § 9-453d.  Local election officials who maintain the actual voting lists in Connecticut are the officials who then verify the signatures on the petition.  Conn. Gen. Stat.  § 9-453i.  Once the local election official verifies the signature and tallies the number of valid signatures, that information is sent to SOTS, which then determines whether the candidate or party has gathered enough valid signatures to get on the ballot.

8.      The signature verification process can be done on a rolling basis, so there is no need for a candidate or a party to wait until the deadline, or even close to the deadline, to submit their petition pages.  Rather, candidates and parties can start as early as January 2nd and have the process completed well before the August deadline.  This obviates the need to rush before the deadline to correct any inadvertent mistakes or get more signatures if a large number of signatures are invalidated for some reason.  Conn. Gen. Stat. § 9-453i.  In my experience, candidates regularly obtain petition forms early in the process and begin collecting signatures immediately so that they can avoid having to rush and risk not being able to get enough signatures later in the process.

9.      The LPCT and IPCT both could, if they chose to, submit their petition signatures to SOTS any time after January 2nd. Of course, to do so both parties would have to actually know at that time what offices they intend to run for and who their candidates are. My experience with both parties is that they often do not know who their candidates will be until quite late in the election cycle for some offices.

10.      Nevertheless, even though the LPCT and IPCT often do not have individuals willing to run under their banner during the early signature gathering period, Connecticut law accounts for that and provides a lot of flexibility to minor parties to seek ballot access even while they try to identify viable candidates. In particular, minor parties can identify a "place holder" candidate to gain ballot access for any office they wish to contest, and can begin collecting signatures for that office as early as January 2nd. Conn. Gen. Stat. § 9-460. The LPCT admits in its Verified Complaint that it has utilized place holder candidates on numerous occasions, both in 2020 and in past elections. *E.g.,* ECF No. 1, ¶¶ 3, 7. When the parties eventually identify their desired candidate, the LPCT and IPCT can simply swap in their desired candidate for the place holder candidate, nominate their desired candidate and submit that person's name to SOTS by the applicable deadline, this year September 2, 2020. Conn. Gen. Stat. § 9-452.

11.      In addition, SOTS makes the petitioning process easier for parties and candidates by routinely allowing them to cure defects in petition documents they have submitted so long as the deadline has not passed. Once the deadline is past, SOTS does not typically allow curing without a court order because the Secretary interprets her duties to be mostly mandatory and not discretionary. Conn. Gen. Stat. § 9-453o. I can think of literally hundreds of times we have allowed a party or candidate to come back into the office to fix a mistake on a form so long as there was more time left before the deadline.

-4-

### III.   Libertarian Party of Connecticut's Recent Ballot Access

12.     The LPCT currently only has 2,895 enrolled members statewide out of 2,196,610 registered voters, or .001% of voters.  Despite that low number of enrolled members, it has achieved success in getting on the ballot in Connecticut both by petitioning and by garnering 1% of the vote in an election.  But it has not consistently maintained a level of support among voters equal to 1% of the vote, and has therefore sometimes lost it minor party status for some offices.

13.     The LPCT had 5 candidates that obtained ballot access in 2016.  The LPCT had 10 candidates that obtained ballot access in 2018, including for the following statewide and Congressional offices: Governor, U.S. Senate, Secretary of the State, Treasurer, Comptroller and 2nd Congressional District.  It failed to attain 1% of the vote in all but two of those offices. Table 3, attached as Exhibit C, illustrates the LPCT's recent history of electoral success.

14.     For the 2020 election, the LPCT has automatic ballot access for 6 offices: Second Congressional District, 9th assembly district, 65th assembly district, 83th assembly district, 91th assembly district, and President of the United States.  Under Connecticut's low ballot access threshold of 1%, this means that the LPCT does not have to gather any signatures to nominate a candidate to run for those offices in the 2020 election, and instead simply has to submit a "certificate of nomination" under Conn. Gen. Stat. § 9-452.  Even if none of the LPCT's petitioning candidates succeed in obtaining ballot access in 2020, the number of LPCT candidates that will appear on the 2020 ballot is commensurate with the LPCT's ballot access in 2016 and 2018.

15.     For the 2020 election, LPCT candidates, including place holder candidates, have taken out petitioning forms for only 13 offices, i.e. offices for which they do not have automatic ballot access.  *See* Table 2, attached hereto as Exhibit B.  These 13 offices are the only offices that LPCT is permitted to petition for at this time.

16.     As reflected in Table 2, SOTS issued petition forms to LPCT candidates as early as January 21, 2020, and all but three of the LPCT petitioning candidates had their forms by February 27, 2020.  All of those candidates could begin collecting signatures as soon as they received their forms.  If they were diligent, therefore, it is possible that some or all of those candidates could have collected a substantial number of signatures already.  LPCT candidates have not informed SOTS how many signatures they have collected thus far for any office, and to my knowledge they have not provided that information to the Court either.

17.     The LPCT has claimed in a pending state court case that achieving ballot access in Connecticut is too difficult and that the process is antiquated and relies too much on paper petition forms.  *See Misbach v. Merrill.* No. HHD-CV-19-6118097-S (Conn Super. 2019), Amended Complaint, p. 13.  The LPCT specifically claimed that Connecticut's statutes should be modernized to permit electronic petition gathering, that implementing such a system would alleviate the burden on the party, and sought injunctive relief for the 2020 election.  They contended in that case that "[t]he paper requirements of the Petitioning Laws are arcane and outdated… in that: (1) the petitioning form cannot be completed similarly online." *Id.*  The State has now temporarily implemented precisely such an electronic system to mitigate the effects of COVID-19.  Ironically, however, the LPCT now claims that the very kind of electronic system it requested in *Misbach* is unconstitutional, and does not appear to have any notion of how to implement the injunctive relief it has sought since 2019 in *Misbach*.

## IV.     Independent Party of Connecticut's Recent Ballot Access

18.     The IPCT has a much broader base of support than the LPCT, with 29,706 enrolled members statewide.  In contrast to the LPCT, the IPCT has obtained and sustained ballot access for a large number of offices in recent years.  As Mr. Telesca's declaration makes clear, that is due in

-6-

large part to Connecticut's generous fusion voting provisions, which frequently obviate the need for IPCT candidates to petition at all.  The IPCT's recent history of success at obtaining and maintaining ballot access is illustrated in Table 4, attached hereto as Exhibit D.

19.    Also in contrast to the LPCT, the IPCT has not yet started the petitioning process for offices that it does not have automatic ballot access.  It is therefore impossible to know which offices IPCT candidates will seek nominating petitions for in 2020.  Mr. Telesca has represented to this Court that IPCT candidates previously intended to seek nominating petitions for "president, three congressional seats, some General Assembly seats and a few registrars of voters seats," but does not identify which specific districts those seats are from or who the party's anticipated candidates are.  ECF No. 44-1 at 4, ¶ 10.  I therefore do not know how many signatures IPCT candidates would have to collect in the event they ever choose to take out nominating petitions.

20.    I also do not know why the IPCT has chosen to delay starting the petitioning process until this late in the cycle.  Like all other minor parties, the IPCT has been free to begin seeking nominating forms—whether for its chosen candidate or for a place holder candidate—since January 2, 2020.  By declining to even begin the signature gathering process, which it still has not begun as of the date of this declaration, the IPCT has voluntarily chosen to forego 144 days of signature gathering—which is approximately five sevenths of the entire petitioning period—without collecting a single signature.  Regardless of why the IPCT has done so, nobody forced it to make this choice, which carries significant risks that easily could have been avoided or mitigated had the IPCT simply begun the process sooner.

21.    In its papers filed with the Court, the IPCT has proffered explanations for why it has not started the process yet, but none of them seem sensible to me.  For example, Mr. Telesca suggests that the party has not taken out petitioning forms because it was waiting to see who the

party would endorse for president and vice-president.  ECF No. 44-1 at 4, ¶ 10.  There was no need to delay for that purpose, as the IPCT could have simply identified place holder candidates early in the process and then swapped in the party's desired candidates after they were endorsed.

22.     Mr. Telesca also suggests that they were "waiting for longer days and warmer weather when petitioning is most effective and door-to-door petitioning can be accomplished during daylight."  *Id.*  This is a particularly poor excuse.  In my experience, many diligent candidates prudently choose to begin the process early—including when it is cold and dark during the winter months—precisely so that they can avoid any unforeseen difficulties in the petitioning process and give themselves the best chance to collect the required signatures.  There is no reason why IPCT candidates could not have done the same.  Indeed, this past winter was unseasonably warm, and the weather should not have been a hindrance.  Moreover, we are now at the end of May and it is light and warm out, and yet IPCT candidates still have not taken out a single petitioning form or made any effort to collect signatures.

**V.      The COVID-19 Pandemic and its Impact on the 2020 Elections**

23.     As discussed above, the Secretary was able to issue petition forms on January 2, 2020, and diligent candidates were free as of that date to engage in unrestricted signature gathering using the normal procedures.  However, many LPCT candidates and place holder candidates waited weeks, and in some cases months, to obtain petition forms from SOTS.  *See* Table 2.  And IPCT candidates still have not taken out any petition forms.  Thus, all of these candidates voluntarily chose not to utilize valuable time that they could have spent gathering signatures.

24.     Although candidates had more than 2 months of unrestricted signature gathering under the normal procedures, the Governor declared a public health emergency on March 10, 2020.  Since that time, the Governor, the Secretary and other government officials involved in

the election process have taken a number of steps to mitigate the impacts of COVID-19 and ensure that the 2020 elections are conducted in a proper and fair manner that maximizes the ability of voters and candidates to participate in the electoral process.

25.     For example, in an effort "to protect the health and safety of voters, poll workers, and the most vulnerable members of our population," the Governor modified General Statutes § 9-464 and postponed the Presidential primary until August 11, 2020.  He also modified General Statutes § 9-135 and other statutes to permit voters to vote by absentee ballot if they are unable to appear at a polling place because of the COVID-19 sickness.  *See* Executive Orders 7G, 7BB and 7QQ, available at https://portal.ct.gov/Office-of-the-Governor/Governors-Actions/Executive-Orders/Governor-Lamonts-Executive-Orders (last viewed May 21, 2020).

26.     The Secretary similarly has taken steps to protect the electoral process during the pandemic.  For example, the Secretary released and is implementing a comprehensive plan to ensure that the 2020 elections will be conducted in a manner that is safe, secure and accessible for all voters.  *See* https://authoring.ct.gov/-/media/SOTS/ElectionServices/2020-Voting-Plan-FINAL-DRAFT-May-2-715-PM.pdf?la=en (last visited May 20, 2020).  She also recently issued an opinion about the meaning of General Statutes § 9-135 that will ensure that those individuals with a preexisting illness that may be adversely impacted by COVID-19 can vote by absentee ballot.  *See* https://portal.ct.gov/SOTS/Press-Releases/2020-Press-Releases/Secretary-of-the-State-Denise-Merrill-on-her-Official-Interpretation-of-Absentee-Ballot-Statute (last visited May 20, 2020); *see also* ECF No. 30-12.

27.     In addition to all of these steps, the Governor recently issued Executive Order 7LL ("the Order"), ECF No. 31-1, which substantially modifies the petitioning process.  In doing so, the Governor acknowledged that COVID-19—and some of the social distancing measures that have

been implemented to combat it—will adversely impact the ability of some candidates to collect the number of signatures that ordinarily would be required.  At the same time, the Governor also recognized that "the process of qualifying for ballot access through in-person petitioning as required under Title 9 of the General Statutes is a basic and vital requirement of our state constitution and our election laws, the purpose of which is to ensure that voters have the opportunity to choose among viable candidates who have qualified for the ballot based on a minimum threshold of support, and to promote an election that is orderly, fair and transparent."  The Order seeks to achieve that state interest while at the same time making it easier for candidates to comply with the petitioning requirements.  It does so primarily in three ways.

28.     First, the Order extends the deadline for candidates to submit the required signatures by two days, until August 7, 2020.

29.     Second, the Order reduces by 30% the number of signatures a petitioning candidate or a candidate petitioning using a party designation must collect to obtain ballot access.  Table 1, attached hereto as Exhibit A, identifies the number of signatures a candidate must collect for certain federal and state offices, both before and after this 30% reduction is taken into account.

30.     As Table 1 reflects, other than for President, the highest number of signatures that a candidate will have to collect to appear on the ballot are for the Congressional Districts, which require between 1,893 and 2,025 signatures.

31.     For the office of State Senator, the number of required signatures is significantly lower, ranging from only 52 in Senate District 6 to at most 370 in Senate District 26.  There are three Senate Districts that require 68 or fewer signatures; five more that require less than 200 signatures; and 16 more that require less than 300 signatures.

32.     The required number of signatures for the office of State Representative is even less. The highest number of signatures required for that office is just 91 for Assembly Districts 16, 23, 31, 36 and 136.   There are forty-five Assembly Districts that require 50 signatures or less, and Assembly District 130 only requires a total of 7 signatures.

33.     The IPCT has not identified what offices its candidates will petition for, and I therefore do not know the modified signature requirements for any IPCT candidate.   The modified signature requirements for the offices to which an LPCT candidate currently is seeking ballot access are as follows:

     a.   1893 signatures for the 3rd Congressional District

     b.   1930 signatures for the 4th Congressional District

     c.   301 signatures for the 4th Senate District

     d.   294 signatures for the 9th Senate District

     e.   268 signatures for the 18th Senate District

     f.   241 signatures for the 27th Senate District

     g.   310 signatures for the 36th Senate District

     h.   77 signatures for the 27th Assembly District

     i.   62 signatures for the 45th Assembly District

     j.   26 signatures for the 84th Assembly District

     k.   59 signatures for the 141st Assembly District

     l.   75 signatures for the 147th Assembly District

     m.   33 signatures for the Plainfield Registrar of Voters

34.     I do not know how many of these required signatures LPCT candidates already have collected for these offices.  However, most of them have had their petitioning forms for some time now, and it is therefore possible that they already have collected a substantial number of signatures.

35.     Third, in addition to reducing the number of required signatures, the Order also makes it significantly easier for candidates to obtain those signatures.  It does so first by eliminating the requirement that petitions must be circulated, and that signatures must be collected, submitted and attested to, by an eligible circulator under General Statutes § 9-453e.  Under the Order, registered voters may now send the signed petition forms directly to the candidate without the need for a circulator, and the candidate can then compile all signatures and send them directly to the town clerk by the August 7 deadline.

36.     The Order also provides that "a petitioning signature shall be accepted as valid" if it: (1) is mailed to the candidate and then to the town clerk or SOTS by the applicable deadline; or (2) it is "scanned or photographed electronically, and returned to the candidate by electronic mail and later to the town clerk of the municipality or the Secretary of the State by the applicable deadline along with a copy of the email demonstrating the electronic transmission of the petition by the registered voter."  This latter change is significant, as it permits electronic signature gathering that does not require any in person interaction whatsoever, and makes it much easier for candidates to gather the required signatures.  The Order further provides that these changes are in addition to, and not in lieu of, the procedures that already exist, which candidates may continue to use in accordance with any social distancing measures that may exist between now and the August 7 petitioning deadline.

37.    The Secretary has issued Guidance about how the petitioning process will work after the Order, which is available online at https://portal.ct.gov/SOTS/Election-Services/Nominating-Petitions/Nominating-Petitions (last visited May 20, 2020); *see also* ECF No. 44-6.

38.    As reflected in the Guidance, each candidate can obtain the application for petition forms online, fill it out and sign electronically, and return it electronically or by mail to SOTS or the town clerk.  The contact information for both SOTS and the town clerks is specifically identified in the Guidance. ECF No. 44-6 at 3. The town clerk or SOTS will promptly review all applications received and send the petition forms directly to the candidate, also by mail or electronically.

39.    Once candidates receive the petition forms, they no longer need to rely on circulators to send the forms to prospective registered voters, or to collect and verify the signatures.  Rather, candidates can send the forms directly to registered voters through a variety of means, including by: (1) regular mail; (2) email; (3) online through the campaign's website; (4) online through social media websites such as Facebook, Twitter or other such social media services; or (5) in person consistent with whatever social distancing protocols may be in place at the time.

40.    Candidates can still rely on supporters to help with this electronic outreach to voters, and need not do it all themselves.

41.    Once a registered voter receives the petition form through any of the methods described above, he or she has numerous options for signing and returning it to the candidate. For example, the voter may:

      a.    Sign the petition in ink and return the signed original signature to the candidate via regular mail;

      b.    Sign the petition by printing the petition page, signing in ink and re-scanning to return to the candidate by electronic mail;

-13-

    c.  Sign the petition by inserting an electronic image of the voter's actual signature on an electronic copy of the petition page where a voter signature is intended to be placed and return to the candidate, either by mail or electronically; or

    d.  Sign the petition by using a stylus or other similar device to insert an electronic image of a voter's actual signature on an electronic copy of the petition page where a voter signature is intended to be placed and return to the candidate, again either by mail or electronically.

42.    Remote notarizations also can now be used to the extent a petition must be notarized because it is signed by more than one registered voter.

43.    Once a candidate has collected the required number of signatures in the manner described above, the candidate then compiles all signatures received via electronic or regular mail and can submit them directly to the town clerk, either by regular or electronic mail.

44.    Given all of the above, it should not be difficult for LPCT and IPCT candidates to obtain the required number of signatures.  Again, the LPCT's signature requirements are extremely modest, ranging from between just 26 and 77 for State Representative, between 241 and 310 for State Senate, and 1893 and 1930 for the two Congressional seats for which a LPCT candidate is seeking ballot access.  Candidates have had since January 2, 2020, to begin collecting these signatures, and could have done so from that time using a place holder candidate even if the LPCT or IPCT did not immediately know which candidate it ultimately intended to nominate.

45.    Further, even if candidates did not use the early signature gathering period to their benefit, they still have approximately two and a half months to collect any remaining signatures under the more generous procedures authorized by the Order.  Those procedures do not require candidates or circulators to stand outside of public places or go knocking on doors, although

candidates still may do so as long as they comply with the social distancing requirements in place at the time.  For example, LPCT and IPCT candidates could, if they so choose, go door to door with an IPad with cellular service, knock and stand an appropriate distance back, and ask the person to sign a petition form that the candidate will leave at the residence without any in person contact. Or if such an approach concerns some voters, the candidate could ask to email the voter a petition form to be signed and returned later.  The candidate would then have the voter's email address and could follow up with the voter if they do not send in a signed petition page.

46.     Plaintiffs speculate that voters will not be willing to participate in these traditional petitioning methods given the COVID-19 pandemic and social distancing measures in place.  But I am not aware of anything to suggest that Plaintiffs or their candidates have even attempted to collect signatures under these conditions, and their fears are therefore just that: speculation and conjecture.  Nobody knows how voters will respond to traditional petition gathering methods in these times if candidates are careful and take appropriate precautions.

47.     Even if Plaintiffs are correct that in person signature gathering will not be possible in this climate, that is not their only option.  Rather, candidates can now quickly and easily reach a much larger number of prospective registered voters—in a much shorter amount of time and with significantly less effort, funding and volunteer resources—by skipping the door knocking and simply posting the petition forms on the candidate's or the party's website, posting them on the candidate's or the party's various social media pages, by sending emails to the party's own list of enrolled members, or by emailing a broader distribution list of registered voters that the party or candidate may obtain from other sources.

48.     Alternatively, candidates can obtain a list of registered voters for the district and towns for which they are seeking office from a variety of sources, including SOTS, the registrars of

voters, and private companies, which lists contain the voter's name and address. Candidates can then use those lists to mail voters the petition forms directly. Further, if the party has candidates seeking ballot access for more than one office that a particular voter is eligible to sign petitions for, the party can save money on mailing costs by placing all petition forms in the same envelope and mailing them to the voter together.

49. Candidates can enlist unlimited volunteers to assist with all of these activities, including volunteers or paid consultants with experience on social media and other electronic platforms. Those volunteers can be of any age and can come from any location within or outside the State. These are significantly easier methods of petitioning than existed before, and there is no reason why a reasonably diligent LPCT or IPCT candidate with even a modicum of support could not collect the small number of signatures required for the offices for which they seek ballot access.

50. Both the IPCT and the LPCT complain in their papers that the more generous signature gathering mechanisms provided by the Order still are not workable. But again, they admit that they have not even tried to implement the new procedures, and that "[t]here is no Connecticut experience with petitioning by mail or electronically." ECF No. 44-1 at 6, ¶ 14. As a result, their complaints about the feasibility of electronic signature gathering also are based on nothing more than conjecture and pessimistic speculation. I do not understand how Plaintiffs can credibly claim that the procedures impose too severe a burden on their rights when they have not even attempted or planned to comply with them.

51. Nevertheless, even taking Plaintiffs' complaints at face value, they do not stand up to scrutiny. For example, Mr. Telesca asserts in his declaration that "[d]irect mail to highly motivated voters seeking contributions has an abysmal return favorable response rate," and that it carries "an average response rate of 4.4% . . . ." *Id.* at 6, ¶ 15. He also asserts that the response

rate for emails is 0.12%.  *Id.* at 7, ¶ 19.  I do not know what basis or personal knowledge Mr. Telesca has to make these statements, and he does not identify any in his declaration other than a reference to unsubstantiated findings by "[t]he Direct Mail Association."  I have never heard of the Direct Mail Association, and Mr. Telesca does not provide any information about it, does not provide a link to or copy of the study, and does not describe how the study determined the numbers that Mr. Telesca quotes in his declaration.

52.     However, a google search for "direct mail association" reveals an article from 8 years ago discussing a study from a different organization—the "Direct Marketing Association"—in which that organization apparently determined the numbers that Mr. Telesca quotes in the context of a study about consumer behavior in response to mailed and emailed advertisements.     *See*     https://www.dmnews.com/marketing-channels/direct-mail/news/13059655/dma-direct-mail-response-rates-beat-digital (last visited May 20, 2020).  I have no idea how that study was conducted, whether it considers or is tailored to the specific context of political mailings and emails like those at issue here, whether it considers or takes into account the more targeted and grass roots types of mailings and communications that political campaigns can conduct with voters, or whether it is in any way reliable even within its own context.

53.     In any event, consumer behavior in response to consumer advertising is not the same as political communications between candidates and voters.  Even assuming that emailed advertisements only generate a 0.12% response rate from consumers, I would fully expect that a grassroots effort with engaged campaign volunteers emailing petition forms to friends, family and other personal contacts in the district, which contacts could then pass on the petition forms to their own friends, family and contacts at no additional cost or effort to the candidate or the party,

could generate a much higher response rate with very little effort or cost.  Further, some of the parties' candidates have a history of running for office, and therefore presumably longer term relationships with some supporters and voters.  And that does not even begin to account for other grassroots petition efforts that candidates and parties can now engage in through social media and direct mailing.  Indeed, candidates are supposed to have a significant base of support among voters to get on the ballot in the first instance.  Otherwise, our ballots would become overcrowded, confusing and difficult to administer in just a few election cycles.

54.     Even for the Second Congressional District, which requires the most signatures of any Connecticut office and for which the LPCT already has automatic ballot access, the number of required signatures would not be unduly burdensome even if Plaintiff Reale had been required to collect them (which he is not).

55.     Specifically, there were 131 days between when candidates could request petitioning forms and begin collecting signatures and when the Governor issued the Order.  Even assuming that a candidate sat on his or her hands and imprudently decided not to begin collecting signatures during that entire 131 day period, there still are an additional 88 days between the date of the Order and the petitioning deadline on August 7, during which candidates can collect signatures using the procedures authorized by the Order and the Secretary's Guidance.  Those 88 days are not limited by the practical limitations of in person circulating.  A diligent person can engage in online outreach during nearly every hour of the day and from any location.  The same cannot be said of in person circulating.

56.     If you divide the 2,025 signatures that are now required for the Second Congressional District by 88, that means that the candidate would only be required to collect 23 signatures a day.  If the candidate had 10 people helping him or her get signatures—whether in

person, by emailing friends, family and other contacts, or through any of the other electronic and social media methods discussed above—that would mean that each helper would only have to acquire 2 signatures a day.  There are 342,397 registered voters in the Second Congressional District, all of whom would be eligible to sign a petition.  A candidate with a modicum of support among voters should be able to acquire 2 or more signatures a day with the assistance of each of those 10 helpers.

57.     In fact, I am aware of testimony from a former LPCT official and candidate, Andrew Rule, in prior litigation challenging Connecticut's election laws in which he testified that individuals with experience circulating petitions can collect about 8 to 10 signatures *per hour* using the more burdensome and time consuming in person collection methods.  That being the case, there is no reason why a candidate should not be able to collect at least that much using the easier electronic methods authorized by the Order and the Secretary's Guidance.

**VI.     Comparing the Order and Guidance To Other States' Responses To The COVID-19 Pandemic**

58.     To the best of my knowledge, many states have not meaningfully modified their nomination process in response to the COVID-19 pandemic.  Even for those states that have modified their processes—whether voluntarily or by court order—the process established by the Order and the Secretary's Guidance are in many respects easier for candidates to comply with than the modified process in some of those states.  Massachusetts is instructive.

59.     On April 17, 2020, the Massachusetts Supreme Judicial Court ordered the State of Massachusetts to reduce its petition signature requirements by 50% and to permit electronic signature gathering.  *See generally Goldstein v. Sec'y of Commonwealth*, 484 Mass. 516 (2020).  Connecticut's post-Order petitioning scheme is easier for candidates to comply with than the Massachusetts scheme, even accounting for the modifications that the Court ordered in *Goldstein*.

60.     As an initial matter, in normal times candidates in Massachusetts must collect 300 signatures for all State Senate offices and 150 signatures for all State Representative offices.  After the 50% reduction ordered in *Goldstein*, Massachusetts candidates still must collect at least 150 signatures for all State Senate districts, and 75 signatures for all State Representative offices.  Those reduced signature requirements are comparable to or higher than what LPCT candidates must collect for the State Representative offices for which they are seeking ballot access, and in one instance are three times higher.  *See supra*, ¶ 33.  Further, although LPCT candidates who are seeking ballot access for State Senate must seek more signatures than candidates for that office in Massachusetts, the difference is not substantial, ranging from only 118 to 160 more signatures depending on the district.  *See id.*

61.     Further, and more importantly, candidates in Massachusetts had far less time to collect the required signatures than Connecticut candidates have.  For example, nominating papers were issued in Massachusetts on February 11, and the Court in *Goldstein* ordered that the deadline for submitting completed papers was extended to May 5.  Thus, Massachusetts candidates had a total of only 84 days—less than 3 months—within which to complete the petitioning process.  By contrast, Connecticut candidates have over 7 months to collect their signatures, more than double the time that Massachusetts allows.

62.     More specific to the impacts of COVID-19, Massachusetts candidates only had 41 days of unrestricted signature gathering between when nomination forms were issued on February 11 and when the first significant COVID-19 restrictions went into effect in Massachusetts on March 23.  *Goldstein*, 484 Mass. at 529.  By contrast, Connecticut candidates had 68 days of unrestricted petitioning gathering before the Governor declared a public health emergency on March 10, 2020, and longer than that before the Governor implemented the social distancing

measures that the LPCT claims hinder its candidates' ability to collect signatures in the normal course. Similarly, after the Court issued its decision in *Goldstein* Massachusetts candidates only had about two and a half weeks—from April 17 to May 5—to collect signatures using the electronic procedures that the Court ordered. *Id.* By contrast, Connecticut candidates will have 88 days—almost three months in total, and approximately five times longer than Massachusetts candidates had—to collect signatures using electronic methods.

63. Thus, whether you look at it in terms of the total amount of time to collect signatures, the time for collection using traditional methods, or the time for collecting electronically, Connecticut candidates will have far more time to collect signatures than the Court found to be permissible for Massachusetts candidates in *Goldstein*. And for many offices they will have to collect less signatures even after the 50% reduction from *Goldstein* is taken into account.

64. In addition, the manner in which Connecticut candidates can collect those signatures is easier in some respects than the process in Massachusetts after *Goldstein*. Most notably, Massachusetts candidates still cannot submit their collected signature to election officials electronically, and must instead reduce all pages of the signed nomination papers to a single, double-sided sheet of paper and submit it to local election officials in a double-sided, hard copy paper format. *See* https://www.sec.state.ma.us/ele/covid-19/nomination-paper-advisory.htm (last visited May 20, 2020). Connecticut candidates, by contrast can do everything electronically.

65. Ultimately, given the reduced number of signatures that candidates must collect, the time in which they have to collect them and the electronic signature gathering procedures that candidates may use, there is no reason why a candidate with a modicum of support should not be able to meet the current requirements. As always, SOTS remains available to assist candidates and parties with their compliance with the ballot access process and the Order.

Pursuant to 28 U.S.C. § 1746, I, Theodore Bromley, state under penalty of perjury that the

foregoing declaration is true and accurate to the best of my knowledge, information and belief.

Executed: _May 26_, 2020

Theodore Bromley
Director of Elections,
Office of Secretary of the State

-22-

# EXHIBIT A

# TABLE 1

## Petitioning Candidate
## Ballot Access Requirements under Executive Order No. 7LL

### Table 1.A

| Federal Office | Current Law: 7500 or 1% of Prior Vote Total | Signature Requirements After 30% Reduction From EO 7LL |
|---|---|---|
| United States President | 7500 | 5250 |
| 1st CD - | 2742 | 1920 |
| 2nd CD - | 2892 | 2025 |
| 3rd CD - | 2703 | 1893 |
| 4th CD - | 2757 | 1930 |
| 5th CD - | 2707 | 1895 |

**Table 1.B**

| State Senate Office | Current Law: 7500 or 1% of Prior Vote Total | Signature Requirements After 30% Reduction From EO 7LL |
|---|---|---|
| 1st SD | 212 | 149 |
| 2nd SD | 266 | 187 |
| 3rd SD | 81 | 57 |
| 4th SD | 429 | 301 |
| 5th SD | 96 | 68 |
| 6th SD | 74 | 52 |
| 7th SD | 405 | 284 |
| 8th SD | 466 | 327 |
| 9th SD | 420 | 294 |
| 10th SD | 230 | 161 |

| | | |
|---|---|---|
| **11th SD** | 306 | 215 |
| **12th SD** | 492 | 345 |
| **13th SD** | 373 | 262 |
| **14th SD** | 429 | 301 |
| **15th SD** | 194 | 136 |
| **16th SD** | 424 | 297 |
| **17th SD** | 370 | 259 |
| **18th SD** | 382 | 268 |
| **19th SD** | 370 | 259 |
| **20th SD** | 400 | 280 |
| **21st SD** | 434 | 304 |
| **22nd SD** | 336 | 236 |

| | | |
|---|---|---|
| **23rd SD** | 167 | 117 |
| **24th SD** | 319 | 224 |
| **25th SD** | 388 | 272 |
| **26th SD** | 528 | 370 |
| **27th SD** | 343 | 241 |
| **28th SD** | 487 | 341 |
| **29th SD** | 336 | 236 |
| **30th SD** | 432 | 303 |
| **31st SD** | 382 | 268 |
| **32nd SD** | 451 | 316 |
| **33rd SD** | 505 | 354 |
| **34th SD** | 408 | 286 |

| | | |
|---|---|---|
| **35th SD** | 448 | 314 |
| **36Th SD** | 442 | 310 |

**Table 1.C**

| General Assembly Office | Current Law: 7500 or 1% of Prior Vote Total | Signature Requirements After 30% Reduction From EO 7LL |
|---|---|---|
| **1st AD** | 45 | 32 |
| **2nd AD** | 104 | 73 |
| **3rd AD** | 30 | 21 |
| **4th AD** | 35 | 25 |
| **5th AD** | 77 | 54 |
| **6th AD** | 43 | 31 |
| **7th AD** | 44 | 31 |

| | | |
|---|---|---|
| **8th AD** | 123 | 87 |
| **9th AD** | 69 | 49 |
| **10th AD** | 53 | 38 |
| **11th AD** | 46 | 33 |
| **12th AD** | 91 | 64 |
| **13th AD** | 104 | 73 |
| **14th AD** | 115 | 81 |
| **15th AD** | 97 | 68 |
| **16th AD** | 129 | 91 |
| **17th AD** | 125 | 88 |
| **18th AD** | 106 | 75 |
| **19th AD** | 38 | 27 |

| | | |
|---|---|---|
| **20th AD** | 73 | 52 |
| **21st AD** | 118 | 83 |
| **22nd AD** | 88 | 62 |
| **23rd AD** | 130 | 91 |
| **24th AD** | 70 | 49 |
| **25th AD** | 34 | 24 |
| **26th AD** | 53 | 38 |
| **27th AD** | 110 | 77 |
| **28th AD** | 115 | 81 |
| **29th AD** | 105 | 74 |
| **30th AD** | 118 | 83 |
| **31st AD** | 130 | 91 |

| | | |
|---|---|---|
| **32nd AD** | 116 | 82 |
| **33rd AD** | 115 | 81 |
| **34th AD** | 119 | 84 |
| **35th AD** | 130 | 91 |
| **36th AD** | 130 | 91 |
| **37th AD** | 113 | 80 |
| **38th AD** | 111 | 78 |
| **39th AD** | 19 | 14 |
| **40th AD** | 66 | 47 |
| **41st AD** | 90 | 63 |
| **42nd AD** | 90 | 63 |
| **43rd AD** | 116 | 82 |

| | | |
|---|---|---|
| **44th AD** | 78 | 55 |
| **45th AD** | 88 | 62 |
| **46th AD** | 57 | 40 |
| **47th AD** | 109 | 77 |
| **48th AD** | 47 | 33 |
| **49th AD** | 50 | 35 |
| **50th AD** | 100 | 70 |
| **51st AD** | 84 | 59 |
| **52nd AD** | 94 | 66 |
| **53rd AD** | 113 | 80 |
| **54th AD** | 65 | 46 |
| **55th AD** | 122 | 86 |

| | | |
|---|---|---|
| **56th AD** | 90 | 63 |
| **57th AD** | 106 | 75 |
| **58th AD** | 80 | 56 |
| **59th AD** | 85 | 60 |
| **60th AD** | 104 | 73 |
| **61st AD** | 103 | 73 |
| **62nd AD** | 126 | 89 |
| **63rd AD** | 96 | 68 |
| **64th AD** | 117 | 82 |
| **65th AD** | 72 | 51 |
| **66th AD** | 126 | 89 |
| **67th AD** | 99 | 70 |

| | | |
|---|---|---|
| **68th AD** | 106 | 75 |
| **69th AD** | 119 | 84 |
| **70th AD** | 60 | 42 |
| **71st AD** | 86 | 61 |
| **72nd AD** | 46 | 33 |
| **73rd AD** | 71 | 50 |
| **74th Ad** | 63 | 45 |
| **75th AD** | 28 | 20 |
| **76th AD** | 119 | 84 |
| **77th AD** | 93 | 66 |
| **78th AD** | 90 | 63 |
| **79th AD** | 73 | 52 |

| | | |
|---|---|---|
| **80th AD** | 108 | 76 |
| **81st AD** | 104 | 73 |
| **82nd AD** | 91 | 64 |
| **83rd AD** | 94 | 66 |
| **84th AD** | 36 | 26 |
| **85th AD** | 92 | 65 |
| **86th AD** | 110 | 77 |
| **87th AD** | 121 | 85 |
| **88th AD** | 94 | 66 |
| **89th AD** | 120 | 84 |
| **90th AD** | 111 | 78 |
| **91st AD** | 86 | 61 |

| | | |
|---|---|---|
| **92nd AD** | 73 | 52 |
| **93rd AD** | 51 | 36 |
| **94th AD** | 70 | 49 |
| **95th AD** | 36 | 26 |
| **96th AD** | 83 | 59 |
| **97th AD** | 61 | 43 |
| **98th AD** | 95 | 67 |
| **99th AD** | 31 | 22 |
| **100th AD** | 91 | 64 |
| **101st AD** | 125 | 88 |
| **102nd AD** | 111 | 78 |
| **103rd AD** | 101 | 71 |

| | | |
|---|---|---|
| **104th AD** | 73 | 52 |
| **105th AD** | 104 | 73 |
| **106th AD** | 113 | 80 |
| **107th AD** | 117 | 82 |
| **108th AD** | 64 | 45 |
| **109th AD** | 60 | 42 |
| **110th AD** | 35 | 25 |
| **111th AD** | 123 | 87 |
| **112th AD** | 80 | 56 |
| **113th AD** | 96 | 68 |
| **114th AD** | 115 | 81 |
| **115th AD** | 72 | 51 |

| | | |
|---|---|---|
| **116th AD** | 51 | 36 |
| **117th AD** | 109 | 77 |
| **118th AD** | 102 | 72 |
| **119th AD** | 114 | 80 |
| **120th AD** | 104 | 73 |
| **121st AD** | 77 | 54 |
| **122nd AD** | 115 | 81 |
| **123rd AD** | 110 | 77 |
| **124th AD** | 45 | 32 |
| **125th AD** | 115 | 81 |
| **126th AD** | 64 | 45 |
| **127th AD** | 55 | 39 |

| | | |
|---|---|---|
| **128th AD** | 27 | 19 |
| **129th AD** | 55 | 39 |
| **130th AD** | 10 | 7 |
| **131st AD** | 105 | 74 |
| **132nd AD** | 49 | 35 |
| **133rd AD** | 96 | 68 |
| **134th AD** | 110 | 77 |
| **135th AD** | 123 | 87 |
| **136th AD** | 130 | 91 |
| **137th AD** | 92 | 65 |
| **138th AD** | 95 | 67 |
| **139th AD** | 80 | 56 |

| | | |
|---|---|---|
| **140th AD** | 55 | 39 |
| **141st AD** | 84 | 59 |
| **142nd AD** | 110 | 77 |
| **143rd AD** | 119 | 84 |
| **144th AD** | 73 | 52 |
| **145th AD** | 56 | 40 |
| **146th AD** | 82 | 58 |
| **147th AD** | 106 | 75 |
| **148th AD** | 67 | 47 |
| **149th AD** | 70 | 49 |
| **150th AD** | 94 | 66 |
| **151st AD** | 44 | 31 |

# EXHIBIT B

**Table 2**

**Libertarian Party of Connecticut**
**Petitioning Candidates (Including Placeholder Candidates) In 2020**

| Name of Candidate | Office | Date Petition Forms Issued |
|---|---|---|
| Aaron J. Freeman | 3rd Cong. Dist. | 1/21/20 |
| Vincent C. Arguimbau, III | 4th Cong. Dist. | 1/29/20 |
| Vincent C. Arguimbau, III | 27th Sen. Dist. | 1/29/20 |
| Vincent C. Arguimbau, III | 141st Ass. Dist. | 1/29/20 |
| Daniel J. Reale | 45th Ass. Dist. | 2/10/20 |
| Daniel J. Reale | 18th Sen. Dist. | 2/10/20 |
| Daniel J. Reale | ROV Plainfield | 2/10/20 |
| Richard N. Cordero | 84th Ass. Dist. | 2/11/20 |
| Justin E. Perry | 27th Ass. Dist. | 2/27/20 |
| Justin E. Perry | 9th Sen. Dist. | 2/27/20 |
| David Chesler | 36th Sen. Dist. | 3/17/20 |
| David Chesler | 147th Ass. Dist. | 3/17/20 |
| Harold S. Harris | 4th Sen. Dist. | 4/29/20 |

# EXHIBIT C

**Table 3**

**Libertarian Party of Connecticut**
**Candidates in 2016 and 2018**

| 2018 Candidates | Office | Method of Ballot Access | Percentage of Vote Received |
|---|---|---|---|
| Hanscomb & Thibeault | Governor & Lt. Governor | Petitioned | 0.43% |
| Richard Lion | US Senate | Status 2016 | 0.64% |
| Daniel Reale | Congressional District 2 | Status 2016 | 1.14% |
| Aaron Freeman | Senate District 10 | Petitioned didn't qualify | |
| William Russell | Senate District 19 | Petitioned didn't qualify | |
| Nicholas Constant | Senate District 33 | Petitioned didn't qualify | |
| Anthony Ametta | Assembly District 9 | Status 2016 | 11.96% |
| Jonathan Johnson | Assembly District 26 | Petitioned didn't qualify | |
| No Endorsement | Assembly District 35 | Status 2016 | |
| Robyn Jakubiec | Assembly District 48 | Petitioned didn't qualify | |
| Kent Johnson | Assembly District 65 | Petitioned | 1.20% |
| Roger P. Misbach | Assembly District 83 | Status 2016 | 1.25% |
| Gary J. Walsh | Assembly District 91 | Status 2016 | 7.86% |
| Heather Gwynn | Secretary of State | Petitioned | 0.76% |
| Jesse Brohinsky | Treasurer | Petitioned | 1.14% |
| Paul Passarelli | Comptroller | Petitioned | 0.97% |

| 2016 Candidates | Office | Method of Ballot Access | Percentage of Vote Received |
|---|---|---|---|
| Johnson and Weld | President | Petitioned | 2.96% |
| Richard Lion | U.S. Senate (2012) | Status 2012 | 1.14% |
| Daniel Reale | Congressional District 2 | Status 2014 | 1.50% |
| Andrew Rule | Congressional Distrct 3 | Petitioned didn't qualify | |
| Aaron Freeman | Senate District 10 | Petitioned didn't qualify | |
| Richard Lion | Assembly District 9 | Status 2014 | 12.90% |
| Austin B. Coco | Assembly District 35 | Petitioned | 1.51% |

# EXHIBIT D

**TABLE 4**

**Independent Party Candidates in 2016 and 2018**

| 2018 Candidates | Office | Petition or Status | Qualified | % of Vote |
|---|---|---|---|---|
| Bob Stefanowski & Joe Markley | Governor (2014) | Status | Yes | 1.80% |
| Susan Chapman | Secretary of the State (2014) | Status | Yes | 1.69% |
| Thad Gray | Treasurer (2014) | Status | Yes | 1.70% |
| Kurt Miller | Comptroller (2014) | Status | Yes | 1.65% |
| Sue Hatfield | Attorney General (2014) | Status | Yes | 2.04% |
| Harry Arora | Congressional District 4 | Status | Yes | 1.36% |
| Manny Santos | Congressional District 5 | Status | Yes | 1.58% |
| Jennifer Lovett | Senatorial District 3 | Status | Yes | 2.19% |
| Mark Tweedie | Senatorial District 4 | Status | Yes | 2.38% |
| Phillip Chabot | Senatorial District 5 | Status | Yes | 1.53% |
| John Kissel | Senatorial District 7 | Status | Yes | 2.30% |
| Kevin Witkos | Senatorial District 8 | Status | Yes | 2.53% |
| Adam Greenberg | Senatorial District 12 | Status | Yes | 1.96% |
| Len Suzio | Senatorial District 13 | Status | Yes | 2.26% |
| James Maroney | Senatorial District 14 | Status | Yes | 1.33% |

| James Russell | Senatorial District 15 | Status | Yes | 15.28% |
|---|---|---|---|---|
| Rob Sampson | Senatorial District 16 | Status | Yes | 2.10% |
| George Logan | Senatorial District 17 | Status | Yes | 2.67% |
| Heather Somers | Senatorial District 18 | Status | Yes | 3.41% |
| Mark Lounsbury | Senatorial District 19 | Status | Yes | 2.03% |
| Paul Formica | Senatorial District 20 | Status | Yes | 2.88% |
| Rich Deecken | Senatorial District 22 | Status | Yes | 1.66% |
| Casimir Mizera | Senatorial District 23 | Petitioned Didn't Qualify | | |
| Michael McLachlan | Senatorial District 24 | Status | Yes | 1.82% |
| Marc D'Amelio | Senatorial District 25 | Status | Yes | 1.64% |
| Toni Boucher | Senatorial District 26 | Petitioned | Yes | 1.99% |
| Jerry Bosak | Senatorial District 27 | Status | Yes | 1.60% |
| Tony Hwang | Senatorial District 28 | Status | Yes | 2.41% |
| David Coderre | Senatorial District 29 | Status | Yes | 2.90% |
| Craig Miner | Senatorial District 30 | Status | Yes | 2.44% |
| Henri Martin | Senatorial District 31 | Status | Yes | 2.75% |
| Melissa Ziobron | Senatorial District 33 | Status | Yes | 2.55% |
| Len Fasano | Senatorial District 34 | Status | Yes | 2.52% |
| John Perrier | Senatorial District 35 | Petitioned | Yes | 1.95% |
| Alexandra Bergstein & Leroy Frantz | Senatorial District 36 | Petitioned Didn't Qualify | | |
| William Duff | Assembly District 2 | Status | Yes | 2.31% |
| No Candidate | Assembly District 12 | Lost Status | | |

| | | | | |
|---|---|---|---|---|
| Jennifer Fiereck | Assembly District 13 | Status | Yes | 2.47% |
| Tom Delnicki | Assembly District 14 | Status | Yes | 2.97% |
| Tim Walczak | Assembly District 16 | Status | Yes | 1.70% |
| Leslee Hill | Assembly District 17 | Petitioned | Yes | 2.20% |
| Mary Fay | Assembly District 18 | Status | Yes | 1.83% |
| No Candidate | Assembly District 19 | Lost Status | | |
| Chris Forster | Assembly District 21 | Status | Yes | 1.60% |
| William A. Petit, Jr. | Assembly District 22 | Status | Yes | 5.05% |
| Devin Carney | Assembly District 23 | Status | Yes | 2.39% |
| Gary Byron | Assembly District 27 | Status | Yes | 2.33% |
| Mike Hurley | Assembly District 28 | Status | Yes | 1.53% |
| Andrew Lanciotto | Assembly District 29 | Petitoned Didn't Qualify | | |
| Lillian Tanski | Assembly District 31 | Status | Yes | 1.87% |
| Christie Carpino | Assembly District 32 | Status | Yes | 2.49% |
| Linda Szynkowicz | Assembly District 33 | Status | Yes | 2.02% |
| Irene Haines | Assembly District 34 | Status | Yes | 2.67% |
| Jesse McLachlan | Assembly District 35 | Status | Yes | 2.20% |
| Robert Siegrist | Assembly District 36 | Status | Yes | 2.18% |
| Holly Cheeseman | Assembly District 37 | Status | Yes | 2.61% |
| Kathleen McCarty | Assembly District 38 | Status | Yes | 3.07% |
| John Scott | Assembly District 40 | Status | Yes | 2.49% |
| Kenn Richards III | Assembly District 41 | Status | Yes | 1.62% |
| Mike France | Assembly District 42 | Status | Yes | 3.07% |

| | | | | |
|---|---|---|---|---|
| Shaun Mastroianni | Assembly District 43 | Petitioned | Yes | 2.65% |
| Anne Dubay Dauphinais | Assembly District 44 | Status | Yes | 3.91% |
| Brian Lanoue | Assembly District 45 | Status | Yes | 3.50% |
| Andrew Lockwood | Assembly District 46 | Status | Yes | 2.57% |
| Doug Dubitsky | Assembly District 47 | Status | Yes | 3.03% |
| Mark DeCaprio | Assembly District 48 | Petitioned | Yes | 2.62% |
| No Candidate | Assembly District 49 | Lost Status | | |
| Ricky Hayes | Assembly District 51 | Petitioned | Yes | 3.83% |
| Kurt Vail | Assembly District 52 | Status | Yes | 2.65% |
| Sam Belsito | Assembly District 53 | Status | Yes | 2.30% |
| No Candidate | Assembly District 54 | Lost Status | | |
| Laura Bush | Assembly District 56 | Status | Yes | 2.28% |
| Greg stokes | Assembly District 58 | Status | Yes | 2.92% |
| Carol Hall | Assembly District 59 | Status | Yes | 2.86% |
| Scott Storms | Assembly District 60 | Status | Yes | 2.49% |
| Tami Zawistowski | Assembly District 61 | Status | Yes | 2.78% |
| Bill Simanski | Assembly District 62 | Petitioned | Yes | 2.17% |
| Jay Case | Assembly District 63 | Status | Yes | 2.95% |
| Brian Ohler | Assembly District 64 | Status | Yes | 2.85% |
| Molly Spino | Assembly District 65 | Petitioned | Yes | 2.01% |
| David Wilson | Assembly District 66 | Petitioned | Yes | 2.02% |
| William Buckbee | Assembly District 67 | Status | Yes | 3.69% |
| Jeffrey Desmarais | Assembly District 68 | Petitioned | Yes | 1.41% |
| Danielle Albert | Assembly District 71 | Status | Yes | 3.92% |

| Michael Cervellino | Assembly District 72 | Status | Yes | 2.29% |
|---|---|---|---|---|
| Steven Giacomi | Assembly District 73 | Status | Yes | 2.01% |
| Stephanie Cummings | Assembly District 74 | Status | Yes | 3.83% |
| Ted Derouin | Assembly District 75 | Status | Yes | 8.89% |
| Cara Pavalock-D'Amato | Assembly District 77 | Status | Yes | 2.81% |
| Whit Betts | Assembly District 78 | Status | Yes | 2.98% |
| David Rackliffe | Assembly District 79 | Status | Yes | 2.52% |
| Gale Mastrofrancesco | Assembly District 80 | Status | Yes | 2.68% |
| John Fusco | Assembly District 81 | Status | Yes | 2.63% |
| Ernestine Holloway | Assembly District 82 | Petitioned Didn't Qualify | | |
| Louis Arata | Assembly District 83 | Petitioned | Yes | 2.13% |
| Don Crouch | Assembly District 85 | Status | Yes | 2.12% |
| Vincent Candelora | Assembly District 86 | Status | Yes | 2.66% |
| David Yaccarino | Assembly District 87 | Status | Yes | 2.85% |
| Lezlye Zupkus | Assembly District 89 | Status | Yes | 2.29% |
| Craig Fishbein | Assembly District 90 | Status | Yes | 2.22% |
| Robert Parente | Assembly District 99 | Status | Yes | 1.27% |
| Noreen Kokoruda | Assembly District 101 | Status | Yes | 2.00% |
| Robert Imperato | Assembly District 102 | Petitioned | Yes | 2.08% |
| Diane Pagano | Assembly District 103 | Status | Yes | 1.92% |
| Joseph Jaumann | Assembly District 104 | Status | Yes | 1.67% |
| Nicole Klarides-Ditria | Assembly District 105 | Status | Yes | 3.26% |
| Stephen Harding | Assembly District 107 | Status | Yes | 2.87% |

| | | | | |
|---|---|---|---|---|
| Veasna Roeun | Assembly District 109 | Status | Yes | 1.64% |
| Erin Domenech | Assembly District 110 | Status | Yes | 1.55% |
| John Frey | Assembly District 111 | Petitioned | Yes | 2.28% |
| JP Sredzinski | Assembly District 112 | Status | Yes | 13.27% |
| Themis Klaridis | Assembly District 114 | Status | Yes | 1.97% |
| Shawn Brown | Assembly District 116 | Petitioned Didn't Qualify | | |
| Charles Ferraro | Assembly District 117 | Status | Yes | 1.97% |
| Kim Rose | Assembly District 118 | Status | Yes | 2.89% |
| Kathy Kennedy & Pam Staneski | Assembly District 119 | Petitioned Didn't Qualify | | |
| Jim Feehan | Assembly District 120 Special Election 2/27/18 | Status | Yes | 1.73% |
| Robert Mitchell | Assembly District 121 | Petitioned | Yes | 1.44% |
| David Rutigliano | Assembly District 123 | Status | Yes | 1.91% |
| Brenda Kupchick | Assembly District 132 | Status | Yes | 2.90% |
| Sally Connolly | Assembly District 133 | Status | Yes | 2.13% |
| Laura Devlin | Assembly District 134 | Status | Yes | 1.94% |
| Adam Dunsby | Assembly District 135 | Status | Yes | 1.50% |
| Greg Kraut | Assembly District 136 | Status | Yes | 2.35% |
| Frank Page | Assembly District 137 | Status | Yes | 1.51% |
| Michael Ferguson | Assembly District 138 | Status | Yes | 2.54% |
| Nickolas Delucia | Assembly District 139 | Petitioned | Yes | 2.97% |
| John Flynn | Assembly District 140 | Petitioned | Yes | 1.78% |

| Terri E Wood | Assembly District 141 | Status | Yes | 13.14% |
|---|---|---|---|---|
| Fred Wilms | Assembly District 142 | Status | Yes | 1.81% |
| Gail Lavielle | Assembly District 143 | Petitioned | Yes | 2.21% |
| No Candidate | Assembly District 144 | Lost Status | | |
| No Candidate | Assembly District 145 | Lost Status | | |
| Anzelmo Graziosi | Assembly District 147 | Petitioned | Yes | 1.65% |
| Michael Bocchino | Assembly District 150 | Petitioned | Yes | 2.06% |
| Fred Camillo | Assembly District 151 | Petitioned | Yes | 2.08% |
| No Candidate | Probate District 6 (2014) | Lost Status | | |
| No Candidate | Probate District 24 | Lost Status | | |
| Carolanne Rowe | Probate District 27 | Petitioned Didn't Qualify | | |
| T.R. Rowe | Probate District 46 (2014) | Status | Yes | 2.03% |
| Kurt Ahlberg | Probate District 47 | Petitioned | Yes | 2.85% |
| Bryan LeClerc | Probate District 49 | Petitioned | Yes | 1.98% |
| Lisa Wexler | Probate District 50 | Petitioned Didn't Qualify | | |
| Lawrence Cafero, Jr. | Probate District 51 | Petitioned | Yes | 2.53% |

| 2016 Candidates | Office | Petition or Status | Qualified | % of Vote |
|---|---|---|---|---|
| Matthew Corey | Congressional District 1 | Petitioned Didn't Qualify | | |
| Daria Novak | Congressional District 2 | Petitioned Didn't Qualify | | |
| John Shaban | Congressional District 4 | Status | Yes | 1.62% |
| Clay Cope | Congressional District 5 | Status | Yes | 1.59% |
| Theresa L. Tillett | Senatorial District 2 | Petitioned Didn't Qualify | | |
| Carolyn Streeter Mirek | Senatorial District 3 | Petitioned | Yes | 3.27% |
| Lorraine Marchetti | Senatorial District 4 | Status | Yes | 3.00% |
| Mark A. Merritt | Senatorial District 5 | Status | Yes | 2.01% |
| John A. Kissel | Senatorial District 7 | Petitioned | Yes | 4.03% |
| Kevin Witkos | Senatorial District 8 | Status | Yes | 4.22% |
| Bruce Wilson Jr. | Senatorial District 12 | Status | Yes | 1.46% |
| Len Suzio | Senatorial District 13 | Status | Yes | 3.39% |
| Gayle Slossberg | Senatorial District 14 | Status | Yes | 4.51% |
| James Russell | Senatorial District 15 | Status | Yes | 17.83% |
| Joseph C. Markley | Senatorial District 16 | Petitioned | Yes | 3.14% |
| George Logan | Senatorial District 17 | Status | Yes | 4.66% |

| Heather Somers | Senatorial District 18 | Petitioned | Yes | 4.37% |
|---|---|---|---|---|
| Barbatra Richardson Crouch | Senatorial District 19 | Status | Yes | 2.87% |
| Paul Formica | Senatorial District 20 | Status | Yes | 4.73% |
| Elaine A. Hammers | Senatorial District 22 | Petitioned | Yes | 1.88% |
| Michael McLachlan | Senatorial District 24 | Status | Yes | 2.56% |
| Gregory Ehlers | Senatorial District 25 | Petitoned | Yes | 2.13% |
| Gino Bottino | Senatorial District 27 | Status | Yes | 1.49% |
| Tony Hwang | Senatorial District 28 | Status | Yes | 3.09% |
| John French | Senatorial District 29 | Status | Yes | 3.86% |
| Craig Miner | Senatorial District 30 | Status | Yes | 2.89% |
| Henri Martin | Senatorial District 31 | Status | Yes | 3.44% |
| Art Linares | Senatorial District 33 | Status | Yes | 3.22% |
| Len Fasano | Senatorial District 34 | Status | Yes | 13.51% |
| William Duff | Assembly District 2 | Status | Yes | 2.43% |
| John D. Topping | Assembly District 12 | Petitioned | Yes | 3.12% |
| Mark Tweedie | Assembly District 13 | Petitioned | Yes | 3.56% |
| Tom Delnicki | Assembly District 14 | Status | Yes | 3.06% |
| Lydia Tedone | Assembly District 16 | Status | Yes | 2.59% |
| Robert Levine | Assembly District 18 | Petitioned | Yes | 2.77% |
| Chris Barnes | Assembly District 19 | Petitioned | Yes | 1.83% |
| Christopher David Forster | Assembly District 21 | Petitioned | Yes | 1.92% |

| | | | | |
|---|---|---|---|---|
| William A. Petit, Jr. | Assembly District 22 | Status | Yes | 5.61% |
| Devin Carney | Assembly District 23 | Status | Yes | 12.52% |
| James Edward Sanders, JR. | Assembly District 24 | Petitioned Didn't Qualify | | |
| Richard H. Gadomski | Assembly District 25 | Petitioned Didn't Qualify | | |
| Gary Byron | Assembly District 27 | Petitoned | Yes | 4.03% |
| Mike J. Hurley | Assembly District 28 | Petitioned | Yes | 1.47% |
| Christopher Morelli | Assembly District 30 | Petitioned Didn't Qualify | | |
| Prasad Srinivasan | Assembly District 31 | Status | Yes | 3.46% |
| Christie Carpino | Assembly District 32 | Petitioned | Yes | 4.78% |
| Linda J. Szynkowicz | Assembly District 33 | Petitioned | Yes | 3.26% |
| Melissa Ziobron | Assembly District 34 | Status | Yes | 13.64% |
| Jesse MacLachlan | Assembly District 35 | Status | Yes | 2.60% |
| Robert William Siegrist, III | Assembly District 36 | Petitioned | Yes | 2.93% |
| Holly H. Cheeseman | Assembly District 37 | Petitioned | Yes | 3.57% |
| Kathleen McCarty | Assembly District 38 | Status | Yes | 3.97% |
| John Scott | Assembly District 40 | Petitioned | Yes | 3.09% |
| Aundre Bumgardner | Assembly District 41 | Status | Yes | 3.01% |

| | | | | |
|---|---|---|---|---|
| Mike France | Assembly District 42 | Status | Yes | 14.55% |
| Nicholas H. Mullane, II | Assembly District 43 | Petitioned Didn't Qualify | | |
| Anne Dubay Dauphnais | Assembly District 44 | Petitioned | Yes | 5.91% |
| Kevin A. Skulczyck | Assembly District 45 | Petitioned | Yes | 5.58% |
| Rob Dempsky | Assembly District 46 | Status | Yes | 3.87% |
| Doug Dubitsky | Assembly District 47 | Status | Yes | 3.84% |
| Tony R. Fantoli | Assembly District 49 | Petitioned | Yes | 2.92% |
| Kurt Vail | Assembly District 52 | Status | Yes | 2.56% |
| Sam Belsito | Assembly District 53 | Status | Yes | 1.88% |
| Mark Sargent | Assembly District 54 | Petitioned | Yes | 2.25% |
| Jim Tedford | Assembly District 56 | Status | Yes | 2.73% |
| Greg stokes | Assembly District 58 | Status | Yes | 4.08% |
| Carol Hall | Assembly District 59 | Status | Yes | 3.95% |
| Scott Storms | Assembly District 60 | Status | Yes | 4.43% |
| Tami Zawistowski | Assembly District 61 | Status | Yes | 4.02% |
| Jay Case | Assembly District 63 | Status | Yes | 8.57% |
| Brian Ohler | Assembly District 64 | Status | Yes | 4.12% |
| William Buckbee | Assembly District 67 | Status | Yes | 5.61% |
| Danielle Albert | Assembly District 71 | Status | Yes | 20.13% |
| Vernon  Matthews | Assembly District 72 | Status | Yes | 12.74% |
| Steven Giacomi | Assembly District 73 | Status | Yes | 4.44% |

| Stephanie Cummings | Assembly District 74 | Status | Yes | 6.64% |
|---|---|---|---|---|
| Ted Derouin | Assembly District 75 | Status | Yes | 4.12% |
| Cara Pavalock | Assembly District 77 | Status | Yes | 3.14% |
| Whit Betts | Assembly District 78 | Status | Yes | 3.22% |
| Pete Del Mastro | Assembly District 79 | Status | Yes | 2.87% |
| Rob Sampson | Assembly District 80 | Status | Yes | 10.69% |
| John P. Fusco | Assembly District 81 | Petitioned | Yes | 2.81% |
| Serge Mihaly | Assembly District 85 | Status | Yes | 3.31% |
| Vincent Candelora | Assembly District 86 | Status | Yes | 9.65% |
| David Yaccarino | Assembly District 87 | Status | Yes | 5.70% |
| Lezlye Zuokus | Assembly District 89 | Status | Yes | 11.64% |
| Craig C. Fishbein | Assembly District 90 | Petitioned | Yes | 3.43% |
| Big Steve Tracey | Assembly District 99 | Status | Yes | 3.42% |
| Anthony R.J. Moran | Assembly District 100 | Petitioned Didn't Qualify | | |
| Noreen Kokoruda | Assembly District 101 | Status | Yes | 13.24% |
| Andrew Falvey | Assembly District 103 | Status | Yes | 1.89% |
| Joseph A. Jaumann | Assembly District 104 | Petitioned | Yes | 2.84% |
| Nicole Klarides-Ditria | Assembly District 105 | Petitioned | Yes | 3.36% |

| | | | | |
|---|---|---|---|---|
| Mitchell Bolinsky | Assembly District 106 | Petitioned | Yes | 2.51% |
| Stephen Harding | Assembly District 107 Special 2/24/15 | Status | Yes | 13.61% |
| Veasna Roeun | Assembly District 109 | Status | Yes | 1.86% |
| Emanuela Palmares | Assembly District 110 | Petitioned | Yes | 5.36% |
| JP Sredzinski | Assembly District 112 | Status | Yes | 12.15% |
| Themis Klaridis | Assembly District 114 | Status | Yes | 8.78% |
| Charles Ferraro | Assembly District 117 | Status | Yes | 3.53% |
| Kim Rose | Assembly District 118 | Status | Yes | 3.44% |
| Laura Hoydick | Assembly District 120 | Status | Yes | 3.90% |
| David Rutigliano | Assembly District 123 | Status | Yes | 2.82% |
| Brenda Kupchick | Assembly District 132 | Status | Yes | 2.99% |
| Raymond Neuberger | Assembly District 133 | Petitioned | Yes | 2.16% |
| Laura Devlin | Assembly District | Status | Yes | 2.51% |

| | 134 | | | |
|---|---|---|---|---|
| Adam Dunsby | Assembly District 135 | Petitioned | Yes | 1.87% |
| Catherine Walsh | Assembly District 136 | Status | Yes | 2.11% |
| Darlene Perpignan | Assembly District 137 | Petitioned | Yes | 2.80% |
| Michael Ferguson | Assembly District 138 | Status | Yes | 1.79% |
| Joseph Mark C. Taraya | Assembly District 139 | Petitioned Didn't Qualify | | |
| Terrie E. Wood | Assembly District 141 | Petitioned | Yes | 2.36% |
| Fred Wilms | Assembly District 142 | Status | Yes | 9.45% |
| Steven Kolenberg | Assembly District 144 | Petitioned | Yes | 1.62% |
| Francky Trofort | Assembly District 145 | Petitioned | Yes | 1.48% |