**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| LIBERTARIAN PARTY OF | : | CIVIL CASE NO. |
| CONNECTICUT, ET AL., | : | 3:20-CV-0467 (JCH) |
|     Plaintiffs, | : | |
| | : | |
|   v. | : | |
| | : | |
| DENISE MERRILL, SECRETARY OF | : | JUNE 27, 2020 |
| STATE, ET AL., | : | |
|     Defendants. | : | |

**RULING ON THE LIBERTARIAN PARTY OF CONNECTICUT,**
**DANIEL REALE, AND HAROLD HARRIS'**
**MOTION FOR TEMPORARY RESTRAINING ORDER (DOC. NO. 2);**
**THE LIBERTARIAN PARTY OF CONNECTICUT, DANIEL REALE, AND HAROLD**
**HARRIS' EMERGENCY MOTION TO GRANT**
**MOTION FOR TEMPORARY RESTRAINING ORDER (DOC. NO. 12);**
**THE INDEPENDENT PARTY OF CONNECTICUT AND MICHAEL TELESCA'S**
**MOTION FOR PRELIMINARY INJUNCTION (DOC. NO. 43);**
**ETHAN ALCORN'S MOTION TO INTERVENE (DOC. NO. 49); AND**
**THE GREEN PARTY OF CONNECTICUT'S MOTION TO INTERVENE (DOC. NO. 54).**

## I.    INTRODUCTION

The Libertarian Party of Connecticut ("Libertarian Party"), Daniel Reale ("Reale"), and Harold Harris ("Harris") (collectively, the "Libertarian Party plaintiffs") bring this action against Secretary of State Denise Merrill and Governor Ned Lamont ("defendants"), challenging the enforcement of Connecticut's ballot access laws. <u>See</u> Verified Complaint ("LP Compl.") (Doc. No. 1). The Independent Party of Connecticut ("Independent Party") and its Chair, Michael Telesca ("Telesca") (collectively, the "Independent Party plaintiffs") have intervened in this action, along with Kyle Kopitke ("Kopitke"), an unaffiliated candidate running for president.

Pending before the court is the Green Party of Connecticut's ("Green Party") Motion to Intervene (Doc. No. 54) and Ethan Alcorn's ("Alcorn") Motion to Intervene (Doc. No. 49).  These Motions are granted.

Also pending before the court are two Motions for injunctive relief filed by the Libertarian Party plaintiffs (Doc. Nos. 2 & 12)[1] and the Motion for Preliminary Injunction (Doc. No. 43) filed by the Independent Party plaintiffs.  In these Motions, the Libertarian Party plaintiffs and Independent Party plaintiffs (collectively, the "moving plaintiffs") move this court to enjoin the defendants' enforcement of Connecticut's ballot access statues which require certain minor party candidates to petition onto the ballot through the collection of voter signatures.[2]  Specifically, the Libertarian Party plaintiffs request that defendants be ordered "to place any candidate for the Libertarian Party line on the ballot [that] the Libertarian Party of Connecticut reports as their nominee for the

---

[1] These Motions are stylized as Motion for Temporary Restraining Order ("LP Mot.") (Doc. No. 2) and Emergency Motion to Grant Motion for Temporary Restraining Order ("Emergency Mot.") (Doc. No. 12).

[2] The Libertarian Party also seeks the following relief:

That the Defendants be ordered to cease and desist from taking actions to deny the Plaintiffs from access to their rights and remedies sought by State Court, and they be enjoined from preventing the Superior Court from taking any action to remotely or telephonically proceed to resolve any remaining matters in that Action (Misbach v Merril, HHD-CV19-6118097-S).

LP Mot. at 3.  The Libertarian Party plaintiffs have not briefed this due process claim, which is Count One of the Verified Complaint and presumably forms the basis for this relief.  Furthermore, at oral argument, counsel for the Libertarian Party plaintiffs was unable to direct this court's attention to any authority in support of the claim, and, in particular, for this request for a TRO.  This part of the claim for temporary injunctive relief is therefore deemed abandoned, and the court denies the Motion insofar as it requests this relief.  See Rubenstein v. Rubenstein, No. 3:05–CV–73 (RNC), 2007 WL 987534, at *1 n.1 (D. Conn. Mar. 31, 2007) ("The complaint includes federal claims for interference with familial relations but plaintiffs have not briefed these claims, which are therefore deemed abandoned.") (citing cases).

November 2020 General Election." LP Mot. at 3.[3] Originally, the Independent Party plaintiffs requested the same relief for all endorsed candidates of the Independent Party. IP Mot. at 1. At oral argument, however, counsel for the Independent Party plaintiffs represented that his clients now seek more limited relief: an order enjoining the defendants' enforcement of Connecticut's ballot access statutes as against Independent Party endorsed candidates for U.S. Congress and the presidency.

For the reasons that follow, the Libertarian Party plaintiffs' Motion for Temporary Restraining Order (Doc. No. 2), the Libertarian Party plaintiffs' Emergency Motion to Grant Motion for Temporary Restraining Order (Doc. No. 12), and the Independent Party plaintiffs' Motion for Preliminary Injunction (Doc. No. 43) are denied.

## II.    FACTS[4]

### A.    Factual Background

#### 1.    The Parties

The Libertarian Party and Independent Party are two of Connecticut's four statewide minor parties.[5] LP Compl. ¶ 2; Independent Party's Verified Complaint ("IP Compl.") (Doc. No. 41) ¶ 2. The Libertarian Party has 2,895 enrolled members in Connecticut. See Declaration of Theodore Bromley ("Bromley Decl.") (Doc. No. 46-1) ¶

---

[3] In its Emergency Motion (Doc. No. 12), the Libertarian Party plaintiffs request that their Motion for Temporary Restraining Order be granted; it asserts no additional claims for relief. See Emergency Mot. at 3.

[4] Unless otherwise indicated, the court accepts, for purposes of these Motions, the non-conclusory, factual allegations of the Libertarian Party's Verified Complaint (Doc. No. 1), the Independent Party's Verified Complaint (Doc. No. 41), and the testimony in the affidavits recounted herein.

[5] The Green Party, an intervening plaintiff, is another minor party in Connecticut with partial statewide ballot access.

12.  The Independent Party has a broader base of support and presently has about 30,000 registered voters statewide.  IP Compl. ¶ 3.

Both parties have nominated several candidates to run for various national, state, and municipal offices in the 2020 election cycle.  IP Compl. ¶ 4; LP Compl. ¶¶ 1, 3.  As described below, candidates of the Libertarian Party and Independent Party who do not have automatic ballot access based upon previous electoral success must petition onto the ballot by obtaining a certain number of signatures.  See, infra, § II(A)(2).  As of June 19, 2020, the Libertarian Party had requested petition forms for 13 offices.  See Supplemental Declaration of Theodore Bromley ("Bromley Supp. Decl.") (Doc. No. 62), table 5.  The Independent Party had requested petition forms for five offices by this date.  Id.

Also included in this action are several individual plaintiffs associated with the two parties.  Harold Harris was nominated by the Libertarian Party as its candidate for the 4th State Senate District of the Connecticut General Assembly.  LP Compl. ¶ 1.  Daniel Reale is the Libertarian Party's nominated candidate for Connecticut's 2nd congressional district.  Id. ¶ 3.  Harris and Reale allege that Connecticut's ballot access laws make it impossible for them to run for office and jeopardize their health by requiring that they circulate ballot petitions.  Id. ¶¶ 12, 66.  Michael Telesca ("Telesca") is a registered voter in Connecticut and is the Chairman of the Independent Party of Connecticut.  IP Compl. ¶ 12.  Telesca alleges that the exclusion of Independent Party candidates caused by the enforcement of Connecticut's signature requirement would deprive him of an effective choice at the ballot.  Id. ¶ 62.

Intervening plaintiffs Kyle Kopitke and Ethan Alcorn are two individuals running for president.  They are unaffiliated with any party.  They both similarly allege that, in light of the COVID-19 pandemic, Connecticut's ballot access laws unduly restrict their access to the ballot.  See Intervenor Complaint of Kyle Kopitke ("Kopitke Compl.") (Doc. No. 23) ¶ 22; Intervenor Complaint of Ethan Alcorn ("Alcorn Compl.") (Doc. No. 49-1) ¶ 22.

### 2.    Connecticut's Ballot Access Laws

There are presently four statewide minor parties in Connecticut: the Green Party, the Independent Party, the Libertarian Party, and the Working Families Party.  IP Compl. ¶ 20.  Connecticut's ballot access laws provide minor party candidates two avenues to appear on the ballot.  First, minor party candidates have automatic ballot access in races in which a candidate of that minor party received at least 1% of the vote for that particular office in the prior election.[6]  Conn. Gen. Stat. §§ 9-372(6), 9-379.  If a minor party did not have a candidate for that office in the prior election, or if its candidate received less than 1% of the vote, then a minor party candidate can obtain ballot access only by petitioning unto the ballot.  See Conn. Gen. Stat. § 9-453a et seq. The same petitioning requirements also apply to candidates unaffiliated with any political party.  Conn. Gen. Stat. § 9-379.  In this action, plaintiffs challenge this second avenue – Connecticut's petitioning process for unaffiliated candidates and minor party candidates that do not have automatic ballot access.

---

[6] For the 2020 election cycle, the Libertarian Party has automatic ballot access for six offices. Bromley Decl. ¶ 14.  The Independent Party has automatic ballot access for 114 offices.  Telesca Decl. ¶ 7.

Connecticut's petitioning requirements are set forth in sections 9-453a through 9-453u of the Connecticut General Statutes. Section 9-453d provides that minor party and unaffiliated candidates may petition onto the ballot by gathering signatures equal to the amount of 1% of the actual voters in the previous election for that office, or 7,500 signatures, whichever is fewer. This year, the petitioning period began on January 2, 2020, and was scheduled to run until August 5, 2020. IP Compl. ¶ 27; see also Conn. Gen. Stat. §§ 9-453b, 9-453i. During this seven-month window, candidates must collect the required number of valid signatures in order to appear on the ballot. The petition forms must include lines for the voters to provide their name, address, and date of birth. Conn. Gen. Stat. § 9-453a. The person circulating the petition must witness the voter's in-person signature and certify to that on the petition. Conn. Gen. Stat. §§ 9-453j.

The Secretary of State publishes a table of the number of valid signatures required for each office on her website. See Required Signature Table, Ex. C (Doc. No. 44-3). For president, 7,500 signatures would be required in 2020 under the statutory signature requirements. Id. For representatives in Congress, 2,703 to 2,892 signatures would be required. Id. The numbers of required signatures for General Assembly races are much smaller and range from 74 to 528 signatures for the State Senate, and 10 to 130 signatures for the House of Representatives. Id.

3.     The COVID-19 Pandemic

All parties agree that the outbreak of COVID-19 has caused significant disruption to the daily lives of all Connecticut residents, as well as the 2020 election cycle in Connecticut. In response to the pandemic, Governor Lamont declared a public health emergency on March 10, 2020, which will remain in effect until September 9, 2020,

6

unless terminated earlier by the Governor.  See Declaration of Civil Preparedness and Public Health Emergencies ("Emergency Declaration"), available at https://www.cga.ct.gov/ph/tfs/20200311_Public%20Health%20Emergency%20Committee/Declaration-of-civil-preparedness-and-public-health-emergency.pdf (last accessed June 22, 2020).  Governor Lamont also issued a series of Executive Orders aimed at containing the spread of the deadly virus.  Among them, Government Lamont issued a "Stay Safe, Stay Home" Executive Order on March 20, 2020.  See Executive Order 7H (Mar. 20, 2020).  This Order placed restrictions on all workplaces of nonessential businesses.  On March 26, 2020, the Governor prohibited social gathering of six people or more, with limited exceptions.  See Executive Order 7N (Mar. 26, 2020).

Most relevant to this case, on May 11, Governor Lamont issued Executive Order 7LL, which modified the petitioning process and associated deadlines.  The Executive Order extended the deadline to submit petitions by two days, from August 5 to August 7.  See Executive Order 7LL (May 11, 2020) at 1(b).  Furthermore, the Executive Order amended the statutory signature collection process—referred to as a "wet petitioning"—by eliminating the in-person signature requirement.  Id. at 1(c).  Under Executive Order 7LL, a registered voter may submit a signed petition form, without a witness, by mail or electronic means to the candidate.  Id.  Finally, the Executive Order also reduced the number of signatures required by thirty percent.  Id. at 1(a).  As it relates to minor party and unaffiliated candidate ballot access, Executive Order 7LL reduced the number of signatures required from 1% to .70% of the number of voters in the previous election.  Id.  The Executive Order also reduced the maximum number of signatures to 5,250.  Id.

B.    Procedural Background

The Libertarian Party plaintiffs filed their Complaint and Motion for Temporary Restraining Order on April 4, 2020.  On April 20, 2020, the court held a telephonic status conference to ascertain the defendants' position.  See Minute Entry (Doc. No. 19).  After the defendants' unopposed request for a continuance, another status conference was held on May 4, 2020 (Doc. No. 22), wherein the court scheduled briefing, including ordering the Libertarian Party plaintiffs to submit a legal memorandum in support of their Motion, which they had not done.  See D. Conn. L. Civ. R. 7(a)(1) ("Any motion involving disputed issues of law shall be accompanied by a memorandum of law.").  On May 12, 2020, the case was referred to Magistrate Judge Sarah A. L. Merriam for possible settlement.  See Order (Doc. No. 33).

On May 15, 2020, the court granted the Independent Party plaintiffs' Motion to Intervene (Doc. No. 28) and Kyle Kopitke's Motion to Intervene (Doc. No. 22).  The Independent Party plaintiffs subsequently filed a Motion for Preliminary Injunction and Memorandum in Support (Doc. Nos. 43 & 44).[7]  The Independent Party plaintiffs also filed a Motion for Discovery Conference (Doc. No. 47).  The court granted that Motion and held a discovery conference on June 1, 2020, but denied the Independent Party plaintiffs' request for discovery.  See Minute Entry (Doc. No. 53).

On June 22, 2020, the court held a hearing on the Libertarian Party plaintiffs' Motion for Temporary Restraining Order (Doc. No. 2) and the Independent Party plaintiffs' Motion for Preliminary Injunction (Doc. No. 43), utilizing the social medial platform Zoom.

---

[7] Kopitke has not filed a memorandum in support of the pending Motions.

## III.   STANDARD

"Ordinarily to obtain a preliminary injunction against governmental action taken pursuant to a statute, the movant has to 'demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction.'"[8] Yang v. Kosinski, 960 F.3d 119, 127 (2d Cir. 2020) (quoting Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton, 841 F.3d 133, 143 (2d Cir. 2016)).   "The movant also must show that the balance of equities tips in his [or her] favor." Id. (internal quotation marks omitted).

The nature of a preliminary injunction is "an extraordinary and drastic remedy." Sussman v. Crawford, 488 F.3d 136, 139 (2d Cir. 2007) (per curiam).  Such a remedy "should not be granted unless the movant, by a clear showing, carries the burden of persuasion."   Id. (emphasis in original).

And where the movant is seeking to modify the status quo through a "mandatory preliminary injunction", as opposed to seeking a "prohibitory preliminary injunction" to maintain the status quo, "the movant must also: (1) make a strong showing of irreparable harm, and (2) demonstrate a clear or substantial likelihood of success on the merits."  Id. (citing Mastrovincenzo v. City of New York, 435 F.3d 78, 89 (2d Cir. 2006). That heightened standard applies here as the moving plaintiffs request that this court direct the state to place their endorsed candidates on the November ballot without regard to the state's statutory petitioning requirements.

---

[8] The Libertarian Party plaintiffs moved for a temporary restraining order ("TRO").  "It is well established that in this Circuit the standard for an entry of a TRO is the same as for a preliminary injunction." Andino v. Fischer, 555 F.Supp.2d 418, 419 (S.D.N.Y. 2008) (collecting cases). Thus, the same standard applies to the Independent Party plaintiffs' Motion for Preliminary Injunction and the Libertarian Party plaintiffs' Motion for Temporary Restraining Order.

## IV.    DISCUSSION

The moving plaintiffs contend that, because of the restrictions put in place in response to the COVID-19 pandemic, Connecticut's ballot access laws impose an unconstitutional burden, even as amended by Executive Order 7LL.[9]  See Independent Party plaintiffs' Memorandum in Support ("IP Mem.") (Doc. No. 44) at 1; Libertarian Party plaintiffs' Memorandum in Support ("LP Mem.") (Doc. No. 30) at 8.  The moving plaintiffs therefore move this court to enter an order directing the defendants to place the endorsed candidates of the Libertarian Party and Independent Party on the November ballot without regard to the state's statutory petitioning requirements.  See LP Mot. at 3; IP Mot. at 1.  At oral argument, counsel for the Independent Party plaintiffs modified the relief they sought to only Independent Party candidates for U.S. Congress and president.

Because the moving plaintiffs fail to demonstrate a clear or substantial likelihood of success on the merits, they have failed to demonstrate that they are entitled to the extraordinary relief they seek.

---

[9] In its Memorandum, the Libertarian Party plaintiffs also appeared to challenge Connecticut's ballot access requirements as facially unconstitutional.  See Libertarian Party plaintiffs' Memorandum in Support ("LP Mem.") (Doc. No. 30) at 9; see also Libertarian Party plaintiffs' Reply ("LP Reply") (Doc. No. 51) at 14.  However, counsel for the Libertarian Party plaintiffs specified at oral argument that the Motion is not a facial challenge of the election laws.  Rather, the Libertarian Party plaintiffs' claim is that the ballot access laws, as amended by Executive Order 7LL, are unconstitutional as applied.

A.     Claimed Constitutional Violations

1.     First Amendment

Although "administration of the electoral process is a matter that the Constitution largely entrusts to the States,"[10] the Supreme Court has long recognized that "unduly restrictive state election laws may so impinge upon freedom of association as to run afoul of the First and Fourteenth Amendments." Kusper v. Pontikes, 414 U.S. 51, 57 (1973). Regulations on petitioning, which has been recognized by the Supreme Court as "core political speech," see Meyer v. Grant, 486 U.S. 414, 422 (1988), can be so burdensome as to violate an individual candidate's First Amendment rights or the First Amendment rights of a political party, see, e.g., Lerman v. Bd. of Elections in City of New York, 232 F.3d 135, 153 (2d Cir. 2000) (invalidating requirement that witnesses for primary ballot petitions reside in particular congressional district); Libertarian Party of Ohio v. Blackwell, 462 F.3d 579, 582–83 (6th Cir. 2006) (striking down Ohio regulatory scheme where minor political parties could gain general-election ballot access only if they both participated in the March primary and—120 days prior to the March primary— filed a petition with signatures equal to 1% of the votes cast in the previous statewide election).

These ballot access laws "place burdens on two different, although overlapping, kinds of rights – the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast

_____

[10] Article 1, Section 4 of the Constitution provides: "The times, places and manner of holding elections for Senators and Representatives, shall be prescribed in each state by the legislature thereof; but the Congress may at any time by law make or alter such regulations, except as to the places of choosing Senators." Art. I, § 4, cl. 1. This "power is matched by state control over the election process for state offices." Clingman v. Beaver, 544 U.S. 581, 586 (2005).

their votes effectively." Williams v. Rhodes, 393 U.S. 23, 30-31 (1968); see also id. at 31 ("The right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win vote"). In this case, the moving plaintiffs contend that Connecticut's election laws severely burden the minor party candidates' right to access the ballot and the voter-plaintiff's right to select from an adequate field of candidates.   These rights asserted by the candidate-plaintiffs and the voter-plaintiff "do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters." Anderson, 460 U.S. at 786.  In either context, "[o]ur primary concern is with the tendency of ballot access restrictions to limit the field of candidates from which voters might choose."  Id.

      2.    Fourteenth Amendment

The Libertarian Party plaintiffs also contend that Connecticut's ballot access laws violate the Equal Protection Clause of the Fourteenth Amendment.  LP Compl. ¶¶ 75–77.   The Supreme Court has said that, if state law grants "established parties a decided advantage over any new parties struggling for existence and thus place[s] substantially unequal burdens on both the right to vote and the right to associate," the constitution has been violated, absent a showing of a compelling state interest. Williams, 393 U.S. at 31.  In this case, the alleged violations of plaintiffs' First Amendment rights form the basis of both the First Amendment and Fourteenth Amendment claims.  Because the Libertarian Party plaintiffs' First Amendment claim substantially overlaps with their equal protection claims, "the analyses of plaintiffs' claims under the two amendments also substantially overlap."  Green Party of New York

State v. Bd. of Elections, 389 F.3d 411, 420 (2d Cir. 2004); see also Rogers v. Corbett, 468 F.3d 188, 194 (3rd Cir. 2006) ("[W]e conclude that Anderson sets out the proper method for balancing both associational and equal protection concerns and the burdens that the challenged law creates on these protections as weighed against the proffered state interests.").

B.      The *Anderson-Burdick* Framework

The mere fact that an election statute burdens First Amendment or Fourteenth Amendment rights does not render that statute unconstitutional.  See Lopez Torres v. New York State Bd. of Elections, 462 F.3d 161, 184 (2d Cir. 2006), rev'd on other grounds, 552 U.S. 196 (2008).  In resolving challenges to ballot access laws, "courts cannot resort to any litmus-paper test that will separate valid from invalid restrictions." Id. (internal quotation marks omitted).  Instead, courts "conduct a two-step inquiry" that derives from Anderson v. Celebrezze, 460 U.S. 780 (1983) and Burdick v. Takushi, 504 U.S. 428 (1992).  See Yang v. Kosinski, 960 F.3d 119, 127 (2d Cir. 2020).  The Second Circuit has very recently described this two-step inquiry as follows:

> First, we ascertain the extent to which the challenged restriction burdens the exercise of the speech and associational rights at stake.  The restriction could qualify as reasonable [and] nondiscriminatory or as severe. Once we have resolved this first question, we proceed to the second step, in which we apply one or another pertinent legal standard to the restriction.
>
> If the restriction is reasonable [and] nondiscriminatory, we apply the standard that has come to be known as the Anderson-Burdick balancing test: we must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate, and then . . . identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule.  In passing judgment under this more flexible standard, we must determine [both] the legitimacy and strength of each of

those interests and the extent to which those interests make it necessary to burden the plaintiff's rights.

If the restriction is severe, then we are required to apply the more familiar test of strict scrutiny: whether the challenged restriction is narrowly drawn to advance a state interest of compelling importance. It follows then that the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged [restriction] burdens First and Fourteenth Amendment rights.

Yang, 960 F.3d at 129 (internal quotation marks omitted) (alterations in original).

1.    Petitioning as "Core Political Speech"

Courts applying Anderson-Burdick's framework typically first analyze the burden on plaintiffs' rights and then, depending upon the severity of the burden, apply the appropriate level of scrutiny. "However, in those cases in which the regulation clearly and directly restricts core political speech . . . it may make little difference whether we determine burden first, since restrictions on core political speech so plainly impose a severe burden that application of strict scrutiny clearly will be necessary." Lerman, 232 F.3d at 146 (internal quotations and citations omitted); see also McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 345 (1995) (declining to apply severe/lesser burdens balancing test to direct regulation of "pure speech").

The Independent Party plaintiffs contend that "the restrictions on door to door canvassing (mask wearing, social distancing, stay at home orders) are themselves the severe restriction on a core first amendment right." Independent Party plaintiffs' Reply ("IP Reply") (Doc. No. 52) at 2 (emphasis in original); see also IP Mem. at 15–16 (citing Meyer v. Grant, 486 U.S. 414, 422 (1988) and Buckley v. Am. Constitutional Law Found., Inc., 525 U.S. 182, 186 (1999)). The court first considers whether the state has restricted plaintiffs' "core political speech" so as to warrant strict scrutiny review.

The Supreme Court, in Meyer v. Grant, 486 U.S. 414, 422 (1988), and Buckley v. American Constitutional Law Foundation, Inc., 525 U.S. 182, 186 (1999), addressed restrictions on petitioning and clearly held that petitioning falls within "core political speech." Id. at 186.  In Meyer, the Supreme Court struck down Colorado's prohibition against paying circulators of voter initiative petitions.  See 486 U.S. at 415–16. Similarly, the Supreme Court in Buckley held unconstitutional each of the following three conditions that Colorado placed on the ballot-initiative process: "(1) the requirement that initiative-petition circulators be registered voters; (2) the requirement that they wear an identification badge bearing the[ir] . . . name; and (3) the requirement that proponents of an initiative report the names and addresses of all paid circulators and the amount paid to each circulator." 525 U.S. at 186 (citations omitted).

Here, plaintiffs' "core political speech" is not restricted in the same manner in which plaintiffs' speech was restricted in Meyer and Buckley.  The Independent Party plaintiffs contend that, because the Governor has not identified petitioning as an essential business, "working as a petitioner has been unlawful for a significant portion of the petitioning period for petitioning candidates and is likely to continue to be for the foreseeable future."  IP Mem. 17.  This assertion misunderstands the scope of the Governor's COVID-19-related Executive Orders, none of which prohibit in-person petitioning.  Executive Order 7H, which the Independent Party plaintiffs cite in support, ordered all non-essential employees to work from home.  See Executive Order 7H (Mar. 20, 2020).  Admittedly, paid petitioning was not identified as "essential" work.  The Governor also prohibited social gatherings of six people or more, see Executive Order 7N (Mar. 26, 2020), and required face coverings in public, see Executive Order 7BB

15

(Apr. 17, 2020).  Although these Executive Orders impact in-person petitioning, none expressly prohibits or restricts it, certainly not by the candidate or volunteer petitioners.

If Governor Lamont's "Stay Home, Stay Safe" Executive Order 7H prohibited in-person petitioning by paid petitioners, this court would likely conclude that plaintiffs' core political speech had been restricted.  However, under the facts of this case, this conclusion would still be insufficient to warrant the relief that the moving plaintiffs seek.[11]  The Independent Party plaintiffs repeatedly note that their candidates do not begin petitioning until late spring.  See IP Reply at 3–4.  This year, defendants had clarified by mid-May that "[p]etitions may be circulated in person consistent with social distancing protocols."[12]  Nominating Petition Ballot Access Guidance (Doc. No. 44-6) at 2; see also Executive Order 7LL (May 11, 2020) at 1(c) ("Nothing in this Order shall preclude petitioning by any other means set forth in section 9-453a to 9-453o of the General Statutes.").  Therefore, even if Executive Order 7H is read to prohibit in-person paid petitioning from March 20 through May 11, the Independent Party plaintiffs have failed to show a continuing First Amendment injury to warrant the injunctive relief it seeks.[13]  See Treistman v. McGinty, 804 Fed. Appx. 98, 99 (2d Cir. 2020) ("[T]he

---

[11] The moving plaintiffs do not move the court to enjoin the state's prohibition on in-person petitioning.  Indeed, no such prohibition exists.  See Nominating Petition Ballot Access Guidance (Doc. No. 44-6) at 2.

[12] The Guidance is undated.  However, counsel for the defendants represented at oral argument that the Guidance was issued no more than two days after Executive Order 7LL, which was issued on May 11, 2020.

[13] Even after Executive Order 7LL and its Guidance was issued, the Independent Party plaintiffs continued to maintain that in-person petitioning is unlawful.  See IP Mem. at 17.  Nonetheless, Independent Party candidates and circulators recognize that they remain free to conduct in-person petitioning.  See Declaration of Ernestine Holloway ("Holloway Decl.") (Doc. No. 52-4) ¶ 10; Telesca Decl. ¶ 13; Supplemental Declaration of Michael Telesca ("Telesca Supp. Decl.") (Doc. No. 52-2) ¶ 7.  At oral argument, counsel for the Independent Party plaintiffs acknowledged that in-person petitioning is allowed, albeit complicated by social distancing and face covering requirements.

Eleventh Amendment barred the injunctions Treistman sought because there was no ongoing violation of federal law.").

No executive order or state law prohibits or otherwise restricts plaintiffs' right to circulate petitions.  Thus, the Independent Party plaintiffs can only claim that the various social distancing and face covering requirements make their petitioning efforts less effective.[14]  In Molinari v. Bloomberg, the Second Circuit clearly held that such a claim cannot sustain a First Amendment challenge:

> At bottom, there is a crucial difference between a law that has the inevitable effect of reducing speech because it restricts or regulates speech, [as in Meyer and Buckley,] and a law that has the inevitable effect of reducing speech because it makes particular speech less likely to succeed. . . .The former implicates the First Amendment and the latter does not.

564 F.3d 587, 600 (2d. Cir. 2009) (internal quotation marks and citations omitted) (bracketed text in original).  Because the social distancing, face covering, and stay at home orders do not now "clearly and directly restrict[ ] core political speech," Lerman, 232 F.3d at 146, they fall into the latter category.  Thus, Myers and Buckley do not require that the court apply strict scrutiny in this case based on the Independent Party

---

[14] Affiants for the Independent Party have indeed testified to the difficulty of garnering signatures and recruiting volunteer circulators during this election year.  See Holloway Decl. ¶¶ 10; Telesca Suppl. Decl. ¶ 7.  Potential petition circulators are hesitant to talk with strangers, see id., and potential supporters are hesitant to speak with the circulators, see Holloway Decl. ¶¶ 14–16.  These difficulties are caused, to a significant extent, by the COVID-19 pandemic.  This observation has served as the basis for some courts' rulings denying relief similar to that sought by the plaintiffs here.  See, e.g., Morgan v. White, No. 20-CV-2189, 2020 WL 2526484, at *6 (N.D. Ill. May 18, 2020) ("These circumstances are caused by the virus itself, however, not by state law.  It is only when state law prevents certain individuals from circulating petitions that First Amendment harms are implicated."); see also Arizonans for Fair Elections v. Hobbs, No. 20-CV-00658, 2020 WL 1905747, at *9 (D. Ariz. Apr. 17, 2020) ("To the extent Plaintiffs aren't currently able to engage in face-to-face interaction with qualified electors, that's the fault of the COVID-19 pandemic, not the [Arizona's petitioning requirements].  It's only when a state law bars certain individuals from serving as petition circulators that the first category of First Amendment harm might arise.") (citing Meyer, 486 U.S. at 422-23); Thomas v. Dewine, 959 F.3d 804, 810 (6th Cir. 2020) ("[W]e cannot hold private citizens' decisions to stay home for their own safety against the State.").

plaintiff's core political speech argument.   Instead, the court proceeds to the first step of the Anderson-Burdick analysis.

> 2.      Severity of the Burden

At the first step of Anderson-Burdick, the court must analyze the burden on the moving plaintiffs' rights.  "The hallmark of a severe burden is exclusion or virtual exclusion from the ballot." Libertarian Party of Kentucky v. Grimes, 835 F.3d 570, 574 (6th Cir. 2016) (comparing Lubin v. Panish, 415 U.S. 709, 719 (1974) (striking $701.60 filing fee for ballot-access petition because it excluded indigent candidates from running for office with no reasonable alternative means of access), and Williams v. Rhodes, 393 U.S. 23, 24 (1968) (striking election laws that "made it virtually impossible" for independent parties to gain ballot access), with Jenness v. Fortson, 403 U.S. 431, 438 (1970) (upholding petition signature requirement of five percent of all registered Georgia voters and noting that such a requirement does not "freeze the political status quo")); see also Lopez Torres v. New York State Bd. of Elections, 462 F.3d 161, 188 (2d Cir. 2006), rev'd on other grounds, 552 U.S. 196 (2008) ("These cases establish that the First Amendment prohibits a state from maintaining an electoral scheme that in practice excludes candidates, and thus voters, from participating in the electoral process, unless the exclusionary regulations are necessary to further a compelling state interest.") (citing Bullock v. Carter, 405 U.S. 134, 143 (1972); Williams, 393 U.S. at 35; and Anderson, 460 U.S. at 793).

Under Connecticut's petitioning scheme, as modified by Executive Order 7LL, candidates for minor parties and unaffiliated candidates can petition onto the ballot for political office with the signatures equal to the amount of .70% of actual voters in the previous election for that office or 5,250 signatures, whichever is less.   See Conn. Gen.

Stat. § 9-453d; Executive Order 7LL.  Candidates have seven months to collect these signatures and must submit them to the town clerks by August 7, 2020.  The vast majority of the Independent Party and Libertarian Party candidates will require far fewer than the maximum requirement of 5,250 signatures, which applies only to candidates running for president.[15]  See Required Signature Table, Ex. C (Doc. No. 44-3).  Candidates for U.S. Congress will need to obtain between 1,893 and 2,025 signatures.  Id.  The numbers of required signatures to petition onto the ballot for General Assembly races are much smaller and range from 52 to 370 signatures for the State Senate and 10 to 91 signatures for the House of Representatives.  Id.

On the record before it, the court concludes that the moving plaintiffs have failed to make a clear showing that Connecticut's petitioning requirements, as modified by Executive Order 7LL, severely burden plaintiffs' rights.  As the figures above demonstrate, in no race is the number of signatures required so high as to virtually exclude a candidate from the ballot.  See LaRouche, 990 F.2d at 40 (describing a Connecticut ballot access provision requiring signatures from 1% of registered voters as

---

[15] As of June 19, the Libertarian Party had requested petition forms for 13 offices.  Bromley Supp. Decl., table 5.  All but two of those candidates are running for offices which require fewer than 301 signatures for ballot access.  Id.  The most signatures required is 1930, for a U.S. congressional district seat.  Id.

The Independent Party had requested petition forms for five offices by this date.  See id.  Three individuals have requested petition forms for offices in Connecticut's House of Representatives; no more than 83 valid signatures are required for those races.  Id.  Two candidates are running for U.S. Congress.  Those candidates must submit approximately 2,000 valid signatures.  Id.

"lenient").[16]   Notably, candidates have had nearly six months to collect these signatures and have more than one month remaining.[17]   See, e.g., Libertarian Party of Maine v. Dunlap, 659 F. Supp. 2d 215, 221 (D. Me. 2009) (finding Maine's ballot access laws to be "not burdensome" where candidates have seven and one-half months to gather 4,000 signatures).   Even with the challenges that COVID-19 presents, the court cannot conclude, based on the record before it, that Connecticut's petitioning requirements would exclude or virtually exclude a reasonably diligent candidate from the ballot.   The signature requirement—.70% of last election's voters—is not excessive, and the petitioning period—seven months—is substantial.

---

[16] The petitioning laws at issue in this case require a percentage of the number of voters in the previous election, a figure that is significantly smaller than a percentage of registered voters. For example, in the 2018 election, 274,140 votes were cast in the election for Connecticut's 1st congressional district. See Statistics of the Congressional Election, available at https://history.house.gov/Institution/Election-Statistics/2018election/ (last accessed June 24, 2020). That same year there were approximately 490,000 registered voters in that district. See Registration and Party Enrollment Statistics, available at https://portal.ct.gov/-/media/SOTS/ElectionServices/Registration_and_Enrollment_Stats/Copy-of-Nov18RE.pdf (last accessed June 24, 2020).

[17] The Independent Party plaintiffs contend that the court should not give great weight to the statute's seven-month window because minor party candidates typically begin petitioning in late spring, creating a shorter petitioning period that has been severely impacted by the COVID-19 pandemic. See IP Mem. at 5; see also IP Reply at 3–7. The court disagrees. The burdens of a statutory scheme restricting ballot access are judged from the viewpoint of a "reasonably diligent candidate." Lopez Torres, 462 F.3d at 195–96; see also Storer v. Brown, 415 U.S. 724, 742 (1974) ("[T]here will arise the inevitable question for judgment: in the context of California politics, could a reasonably diligent independent candidate be expected to satisfy the signature requirements, or will it be only rarely that the unaffiliated candidate will succeed in getting on the ballot?"). A reasonably diligent candidate would not have waited until the final month(s) of the seven-month window to begin collecting signatures.

The court agrees that the Independent Party plaintiffs could not have anticipated the onset of the COVID-19 pandemic, nor the extent to which this unpredictable pandemic would impact Connecticut. IP Reply at 4. However, in considering the "state's overall scheme of election regulations," Lerman, 232 F.3d at 145, the statute's seven-month window is a factor, and one that counsels against a finding of severe burden. See Sinner v. Jaeger, 3:20-CV-00076, 2020 WL 3244143, at *6 (D.N.D. June 15, 2020) ("North Dakota's in-person petition requirements—considered in totality—cannot impose a severe burden on First Amendment rights as applied to [the plaintiff] when the pandemic will present an obstacle for, at most, one-third of the time statutorily available for signature collection."); Arizonans for Fair Elections, 2020 WL 1905747, at *12 ("[H]ad Plaintiffs simply started gathering signatures earlier, they could have gathered more than enough to qualify for the ballot before the COVID-19 pandemic started interfering with their efforts.").

The moving plaintiffs contend that the COVID-19 pandemic, and the Governor's various stay at home and social distancing orders in response to the pandemic, created a new reality which renders Connecticut's petitioning requirements impossible to meet. This contention fails for several reasons. First, this contention assumes that traditional, "wet petitioning" is impossible. Both moving plaintiffs base this assumption, in part, on a March 28, 2020 Memorandum in which Secretary Merrill told Governor Lamont that in-person petitioning was "not feasible on the timeline required by statute." Ex. D (Doc. No. 44-4) at 2. This statement, however, does not support the conclusion that in-person petition remains "not feasible" now. Secretary Merrill made this statement at a time of great uncertainty, just as the state was beginning to face the COVID-19 pandemic and only one week after the Governor issued the "Stay Home, Stay Safe" Executive Order. See Executive Order 7H (Mar. 20, 2020). In the three months since Secretary Merrill's statement, the Governor has significantly modified Connecticut's ballot access laws, the pandemic in Connecticut has abated, and the state has begun the process of reopening. Secretary Merrill's view on March 28 has little bearing on the issue of the feasibility of traditional, in-person petitioning today.

The moving plaintiffs' proffered evidence similarly fails to show the impossibility of traditional, in-person petitioning. The Libertarian Party plaintiffs, for example, provide this court with only two affidavits from its candidates averring how the state's modified petitioning laws severely burden ballot access. The first, the Declaration of Daniel Reale ("Reale Decl.") (Doc. No. 51-7), does not discuss in-person petitioning and focuses exclusively on prior mail-in ballot drives and electronic ballot drives. The second, the Declaration of Harold Harris ("Harris Decl.") (Doc. No. 61-1), is similarly

insufficient.  Harris is the Libertarian Party's endorsed candidate for Connecticut's 4th Senate District and needs 301 valid signatures to qualify for that ballot.  See Bromley Supp. Decl., table 5.  In his Declaration, Harris avers that, on the date he received petition forms, he spent 45 minutes going door to door and failed to garner any signatures.  Harris Decl. ¶ 6.  This very limited experience is insufficient to persuade the court that in-person petitioning is impossible, particularly in light of the evidence before the court of successful in-person petitioning.  See, infra, n.18.

The Independent Party plaintiffs go a step further and suggest that, because the Governor has not identified petitioning as an essential business, in-person petitioning is not just impossible, but unlawful, as well.  IP Mem. at 17 (citing Executive Order 7H (Mar. 20, 2020)).  But as noted above, this conclusion misunderstands the scope of the Governor's various Executive Orders, none of which prohibit in-person petition circulation, certainly not after May 13.  See Nominating Petition Ballot Access Guidance (Doc. No. 44-6) at 2 (noting that "[p]etitions may be circulated in person consistent with social distancing protocols").  Evidence adduced by the Independent Party plaintiffs demonstrate that its own candidates and circulators do not consider in-person to be unlawful.  See Holloway Decl. ¶¶ 10; Telesca Supp. Decl. ¶ 7.  This evidence also demonstrates that in-person petitioning, while more difficult this year than previous election years, is not impossible.  Indeed, Rev. Ernestine Holloway, the Independent Party's candidate for Connecticut's 82nd House District, has already petitioned onto the ballot by door-to-door petitioning.  See Holloway Decl. ¶¶ 10; see also Bromley Supp. Decl., table 5 (noting that Holloway had submitted enough valid signatures and qualified for the ballot).

The Independent Party plaintiffs also draw on the experience of Philip Fuehrer ("Fuehrer"), a party member in Minnesota, as further evidence that in-person petitioning is not feasible during this election cycle. Fuehrer reports that his petitioning success rate is 40%-50% of normal. Declaration of Philip Fuehrer ("Fuehrer Decl.") (Doc. No. 52-5) ¶ 14. The Independent Party plaintiffs contend that this figure would be lower in Connecticut as COVID-19 has impacted this state more severely than it has impacted Minnesota. IP Reply at 7 n.7. While this may be true, COVID-19 hospitalizations in this state have consistently declined over the past several months, and the state has moved into Phase 2 of reopening. See Reopen Connecticut: Sector Rules for June 17th Reopen, available at https://portal.ct.gov/-/media/DECD/Covid_Business_Recovery-Phase-2/0617CTReopens_IndoorDining__C4_V1.pdf (last accessed June 22, 2020). At oral argument, counsel for the defendants represented that the state is on track for Phase 3 of reopening, which will occur in July. As restaurants, stores, and other public spaces reopen, circulators will continue to have increased opportunities to obtain signatures. See Thomas v. Dewine, 959 F.3d 804, 810 (6th Cir. 2020) (declining to find a severe burden on plaintiffs' rights when Ohio had begun to lift its stay-at-home restrictions by the time the petitioning period began). Admittedly, the threat of COVID-19 will pose difficulties for circulators, even as the state continues the process of reopening. But whether plaintiffs' success rate is 40%-50% of normal, or some lower

23

number, in-person petition circulation has been and remains an option for all candidates.[18]

Furthermore, although COVID-19 has undoubtedly made plaintiffs' in-person "wet petitioning" efforts more difficult, these challenges have been lessened by Executive Order 7LL, which made several important modifications to Connecticut's petitioning process.[19]  Executive Order 7LL, which was issued on May 11, reduced the number of signatures required by 30%, and extended the deadline by two days.  In addition, the Executive Order modified the signature collection process by eliminating the in-person signature requirement, thus permitting a registered voter to mail or email a signed petition form to the candidate.  See Executive Order 7LL.  The Executive Order thus eliminated the requirement that circulators personally witness each signature.[20] Guidance issued by the Secretary of State made clear that the Governor's Executive Order allowed candidates to distribute petition forms to voters in a variety of ways that were previously not permitted: mailing or emailing petition forms directly to voters,

---

[18] Eleven candidates successfully petitioned onto the 2020 primary election ballot, at least some using a combination of in-person petitioning and electronic petitioning.  See Bromley Supp. Decl. ¶ 6. The petitioning success of these candidates further illustrates that in-person petitioning is not impossible. Notably, these candidates had only 17 days to collect signatures, a fraction of the seven-month window available to the plaintiffs.  Id.  In that short period, many of these successful candidates gathered more signatures than those required of Libertarian Party and Independent Party candidates for the General Assembly.  Compare id., table 6 (listing four candidates that qualified for the primary election by submitting more than 310 signatures) with table 5 (showing that no Libertarian or Independent Party candidate for the General Assembly requires more than 310 signatures).

[19] That the Governor modified Connecticut's petitioning requirements distinguishes this case from those in which the state insisted on strict application of existing election regulations.  See e.g., Esshaki v. Whitmer, No. 20-1336, 2020 WL 2185553, at *1 (6th Cir. May 5, 2020); see also Libertarian Party of Illinois v. Pritzker, No. 20-CV-2112, 2020 WL 1951687, at *5 (N.D. Ill., Apr. 23, 2020).  Under those circumstances, each of these courts found a severe burden.

[20] Witness requirements, in other contexts, have been heavily litigated in this Circuit as burdens on the petitioning process.  See, e.g., Lerman, 232 F.3d at 139 (2d Cir. 2000) (holding that New York's witness residence requirement severely burdened plaintiffs' First Amendment rights); Maslow v. Bd. of Elections, 658 F.3d 291, 298 (2d Cir. 2011) (holding that New York's party witness rule did not severely burden plaintiffs' First Amendment rights).

posting the petition form on campaign websites, or posting the form on social media. See Nominating Petition Ballot Access Guidance (Doc. No. 44-6) at 2. As discussed above, these new methods are in addition to in-person petitioning consistent with social distancing restrictions. Id.

Despite the myriad of changes Executive Order 7LL made to the petitioning requirements, the moving plaintiffs contend that Connecticut's election laws nonetheless continue to severely burden their access to the ballot. Both moving plaintiffs contend that petitioning via mail, email, and social media is prohibitively expensive and highly inefficient. However, their evidence is unconvincing. The Libertarian Party plaintiffs, for example, adduce very little evidence based on the actual experiences of its candidates during the current election cycle. Daniel Reale, the Chair of the Libertarian Party of Connecticut, avers that, based on the Libertarian Party's past experiences with mail-in ballot drives, such an effort would be prohibitively expensive this year. Reale Decl. ¶ 2(b). He further describes the difficulties that would be associated with "[c]onducting an entirely online ballot drive under Executive Order 7LL." Id. ¶ 2(e). However, Reale does not aver that he, or any other member of the Libertarian Party, has taken any steps during this election cycle to attempt to gain signatures through these means. Furthermore, petitioning under Executive Order 7LL does not require candidates to "conduct[ ] an entirely online ballot drive," id., an entirely mail-in ballot drive, or an entirely in-person ballot drive. Instead, a reasonably diligent candidate would likely employ a combination of all of these methods. Based on the foregoing, the court is not persuaded that the Libertarian Party plaintiffs have shown a clear likelihood of success on the issue of severe burden.

Evidence adduced by the Independent Party plaintiffs is similarly insufficient to demonstrate a clear likelihood of success on the issue that their rights have been severely burdened.  Like the Libertarian Party plaintiffs, much of the Independent Party plaintiffs' evidence is in the nature of predictive opinions, with little support based on actual experience in this election cycle or from any previous election.  See, e.g., Telesca Decl. ¶ 14 ("There is no Connecticut experience with petitioning by mail or electronically, as it has never been allowed. However, it is highly unlikely to be successful . . .").  The Independent Party plaintiffs provide only two affidavits that describe actual petitioning experiences during the current Connecticut election season. One of those affiants, Rev. Holloway, subsequently qualified for the ballot.[21]  See Brumley Supp. Decl., table 5.  The other is Dr. John Mertens, the Independent Party's candidate for the 1st Congressional District, an office which requires 1,920 valid signatures for ballot access.  See Supplemental Declaration of John Mertens ("Mertens Supp. Decl.") (Doc. No. 59); Bromley Supp. Decl., table 5.  Mertens' Declaration focuses largely on his unsuccessful efforts to garner signatures by petitioning via telephone during one four-hour period on June 7.  Mertens Supp. Decl. ¶¶ 8–10. However, Mertens does not describe his efforts petitioning via email.  See id. ¶ 6.  Nor does Mertens aver that he has petitioned via social media, created a web page, or engaged in traditional, in-person petitioning.  Indeed, despite the Guidance issued more than one month ago, Mertens states that in-person petitioning "is precluded by social

---

[21] This result undermines the predictive "evidence" proffered by the Independent Party plaintiffs. See, e.g., Telesca Decl. ¶ 28 ("If this plan is allowed to remain in place, I strongly doubt that any minor party candidates will be able to qualify for any offices."); see also Declaration of Timothy Cotton ("Cotton Decl.") (Doc. No. 44-2) ("I believe that under the present circumstances the petition requirements for minor party candidates will lead to no candidates affiliated with the Independent Party of Connecticut qualifying for the November ballot by petition.").

distancing rules [and] the need to wear masks." Id. ¶ 5. As noted above, this position misunderstands the effect of the Governor's Executive Orders. Mertens' Affidavit fails to accurately convey the burden imposed on a reasonably diligent candidate running for U.S. Congress.

The court recognizes that COVID-19 presents challenges to candidates attempting to petition onto the ballot.[22] As noted above, the collection of wet petitions, however, is not impossible; indeed, it has been shown to be quite possible. Further, the Governor's response to those challenges opened new petitioning options which can reach more voters. A reasonably diligent candidate would utilize all these various petitioning methods: those allowed under Executive Order 7LL along with traditional, in-person petitioning. However, neither the Independent Party plaintiffs nor the Libertarian Party plaintiffs have provided the court with any evidence as to its candidates' experience doing so. See, e.g., Holloway Decl. (discussing door-knocking only); see also Mertens Decl. (discussing phone petitioning only); Harris Decl. (focusing largely on mail-in petitioning); Reale Decl. (not averring as to any petitioning efforts taken during this election season); Supplemental Declaration of Daniel Reale[23] ("Reale Supp. Decl.") (Doc. No. 61-2) ¶ 4 (averring that the "Libertarian Party of Connecticut has diligently

---

[22] The challenges are likely greater for candidates running for U.S. Congress and the president, as these offices require significantly more signatures. Nonetheless, the statute applies the same percentage requirement to all minor party candidates; the greater number of signatures required for these candidates reflects the larger voter pool. A reasonably diligent candidate running for these offices—which are among the most important in the country—would combine the petitioning efforts allowed under Executive Order 7LL with traditional, in-person petitioning. The moving plaintiffs provide the court with no evidence of its candidates doing so.

[23] The title of this Declaration appears to be a typographical error as the affiant is clearly Daniel Reale, not Harold Harris.

attempted to work around resource limitations" but not describing the nature of those attempts).

Based on the record before the court, the moving plaintiffs have failed to clearly show that the challenged statutes severely burden their rights. Although a finding of severe burden may be made by a preponderance of the evidence on a fuller record, after a trial on the merits, the moving plaintiffs have not now made a clear showing that there is a likelihood of success on the merits of this aspect of their claim.

3.    The State's Asserted Interests

Because Connecticut's ballot access laws, as modified by Executive 7LL, have not been clearly shown, on this record, to impose a severe burden on plaintiffs' rights, the court proceeds, using the Anderson-Burdick framework, to balance plaintiffs' asserted First Amendment injuries against the "precise interests put forward by the State as justifications for the burden imposed by its rule." Yang, 960 F3.d at 129. "Under this balancing test, the State's reasonable and nondiscriminatory restrictions will generally be sufficient to uphold the statute if they serve important state interests." Price v. Bd. of Elections, 540 F.3d 101, 109 (2008) (citing Burdick, 504 U.S. at 435).

It is well-settled that the state has an important interest in ensuring that candidates appearing on the ballot have a "significant modicum of support." See Jenness v. Fortson, 403 U.S. 431, 442 (1971); American Party of Texas v. White, 415 U.S. 767, 782 (1974); see also Munro v. Socialist Workers Party, 479 U.S. 189, 194 (1986) ("Jenness and American Party establish with unmistakable clarity that States have an undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot."). The state's signature

requirement undoubtedly serves this state interest.[24]   See Prestia v. O'Connor, 178 F.3d 86, 88–89 (2d Cir. 1999) (upholding the constitutionality of a 5% signature ballot access requirement as a reasonable requirement that furthered the important state interest in assuring that a candidate has a significant modicum of support before appearing on the primary election ballot).   The reduction reasonably reflects the difficultly of petitioning during the COVID-19 pandemic, the state's judgment being that, under the circumstances of the COVID-19 pandemic, a petitioning requirement of .70% of the actual voters in the previous election for that office, with signatures collected under the modified requirements of Executive Order 7LL, will be evidence of the existence of a significant modicum of support.[25]

The state also has an important interest in ensuring that all minor parties are treated fairly.   See Timmons v. Twin Cities Area New Party, 520 U.S. 351, 364 (1997) ("States certainly have an interest in protecting the integrity [and] fairness . . . of their ballots and election processes as means for electing public officials."); see also Stein v. Alabama Secretary of State, 774 F.3d 689, 691 (11th Cir. 2014) ("Thus, the State's

---

[24] The Independent Party plaintiffs argue that the Secretary of State, by recommending that the party-plaintiffs be granted automatic ballot access, has effectively disavowed "significant modicum of support" as an important state interest.   See Ex. D (Doc. No. 44-4), at 2–3.   The court disagrees.   This recommendation was made on March 28, 2020 – just one week after the Governor issued the "Stay Home, Stay Safe" Order and well before the Governor had significantly modified Connecticut's petitioning requirements.

Of course, it was the Governor's decision to make, not the Secretary of State's.   The moving plaintiffs urge the court to substitute the Secretary's view for the Governor's decision to reject the recommendation.   However, because the challenged statutes, as modified by Executive Order 7LL, are reasonable and nondiscriminatory, and because they serve important state interests, the court declines to do so.

[25] In Massachusetts, the signature requirement for primary petitions was reduced by 50%.   See Goldstein v. Secretary of the Commonwealth, 484 Mass. 516, 530 (Sup. Jud. Ct. Apr. 17, 2020). However, in that case, the period for collecting signatures was 83 days, in contrast to the 218 days in this case.

interests in treating all political parties fairly . . . outweigh[s] the burden to the Plaintiffs' associational rights."). Enforcing the same signature requirement on all minor parties and requiring that their candidates make the same threshold showing of support for ballot access serves this important interest.

As counsel for the defendants noted during oral argument, the moving plaintiffs essentially request an order that grants them preferential treatment compared to other minor parties and unaffiliated candidates. By rejecting the Secretary of State's recommendation, the Governor has decided that the state will continue to treat all minor parties equally by continuing to require that their candidates have a significant modicum of support before appearing on a ballot line for a particular office. The signature requirement undoubtedly imposes burdens on plaintiffs' rights. However, it also imposes burdens on candidates of the Emancipation Party, Reclaim Party, and any of the 30 minor parties in Connecticut. See Bromley Supp. Decl., table 5 (listing candidates from several other minor parties beyond the parties present in this case). The moving plaintiffs have failed to show that these burdens—which apply to all minor party candidates—are "severe." See, supra, § IV(B)(2). To the contrary, based on the record before the court, the restrictions appear to be both reasonable and nondiscriminatory. The regulations are nondiscriminatory in that they "[do] not differentiate among Republicans, Democrats, and Libertarians."[26] Werme v. Merrill, 84

---

[26] In Jenness v. Fortson, the Supreme Court held that a Georgia statute granting automatic ballot access to major party candidates while requiring candidates of minor parties (referred to as "political bodies") to petition onto the ballot was not invidiously discriminatory:

(cont.)

F.3d 479, 484 (1st Cir.1996).  Instead, they condition the right of automatic ballot

access on past electoral success.  Candidates of any minor party that lack this electoral

success must make a showing of a "significant modicum of support," the enforcement of

which advances the state's interest in the fair treatment of all minor party candidates.

See Timmons, 520 U.S. at 354.

The Independent Party plaintiffs contend that, because its endorsed candidates

attained at least 1% of the vote in the 2018 election for all five statewide offices, it has

demonstrated that their candidates have a significant modicum of support.  IP Mem. at

33.  In support of this position, the Independent Party plaintiffs largely rely on Green

Party of New York State v. New York Board of Elections, 389 F.3d at 422.  In Green

Party, the Second Circuit considered an election statute that provided, if a party failed to

receive at least 50,000 votes in the prior gubernatorial election, the Board of Elections

was required to remove the party's name from the voter registration form and convert

the party's voters to non-enrolled voters.  389 F.3d at 415.  The District Court found for

the plaintiff and entered a preliminary injunction ordering defendants to keep the Green

Party on the state's voter registration forms, and to ensure that the local boards of

elections maintained the enrollment status of voters who had enrolled in the Green

---

[I]t is true that a 'political party' in Georgia is assured of having the name of its nominee—the primary election winner—printed on the ballot, whereas the name of the nominee of a 'political body' will be printed only if nominating petitions have been filed that contain the requisite number of signatures. . . . The fact is that there are obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization on the other. Georgia has not been guilty of invidious discrimination in recognizing these differences and providing different routes to the printed ballot.

403 U.S. 431, 441–42 (1971); see also Am. Party of Texas, 415 U.S. at 781 (holding that it is not invidious discrimination for a state to grant minor parties official recognition but deny them the right to hold primaries even though the main political parties are so entitled).

Party in the past.  Id. at 417.  The trial court subsequently extended this Order to several intervening plaintiffs.

In affirming the trial court's order, the Second Circuit rejected defendants' contention that there were "many small and undeveloped parties in existence that have yet to show they have any support and therefore do not deserve to have the state maintain their enrollment information, or have such information clutter the enrollment lists."  Id. at 422.  In response, the Court of Appeals noted that the preliminary injunction applies only to the Green Party and intervening plaintiffs and that, "[b]y placing statewide candidates on the ballot in the 2002 election, all of the[se] plaintiffs have demonstrated a 'modicum of support' sufficient to overcome the state's broad latitude in controlling frivolous party registration of tiny fractional interests."  Id.

The Independent Party plaintiffs' reliance on Green Party here is misplaced.  The Green Party case is about voter registration, not ballot access.  In Green Party, each of the parties' recent electoral performance demonstrated a "modicum of interest" sufficient to justify the party's appearance on the state's voter registration forms.  Here, by contrast, the challenged statute requires a modicum of support for an individual candidate to appear on the ballot.  That the Independent Party received 1% in a statewide election in 2018 does not mean that the Independent Party candidates running for other offices, such as president, have similarly demonstrated a modicum of support.  See, e.g., Rogers v. Corbett, 468 F.3d 188, 196 (3rd Cir. 2006) ("The fact that a minor political party has earlier shown a modicum of support by meeting a separate goal, which entails a separate distinction, does not render the burden on plaintiffs an improper one.").  Indeed, the Independent Party did not have a candidate for president

32

in 2016; nor did its candidates in the 1st, 2nd, or 3rd congressional districts demonstrate sufficient support in the 2018 election to permit the Independent Party to nominate a candidate for those offices in 2020. Telesca Decl. ¶ 7. For this reason, the Connecticut election scheme requires that candidates running for those offices must demonstrate a modicum of support by petitioning onto the ballot. The same requirement applies to all other minor party candidates that fail to qualify for automatic ballot access based on previous electoral success. This scheme serves the state's important interest in treating all minor party candidates fairly and in ensuring that candidates appearing on the ballot have demonstrated a significant modicum of support.[27]

Finally, the petitioning requirements serve the state's interest in enforcing its election statutes. As noted above, the Constitution has delegated to states the power to regulate "[t]he times, places and manner of holding elections . . ." Art. I, § 4, cl. 1. States undoubtedly have an interest in the statutory scheme they enact pursuant to this responsibility. See Hunter v. Hamilton Cty. Bd. of Elections, 635 F.3d 219, 243 (6th Cir. 2011) ("States have . . . a strong interest in their ability to enforce state election law requirements."). The moving plaintiffs essentially urge this court to cast aside the statutory scheme's differentiation between major parties and minor parties, see Conn. Gen. Stat. § 9-372(5), and the requirement, in contrast to parties that qualify as major, that minor party candidates show a modicum of support before appearing on the ballot, see id. § 9-453d. The moving plaintiffs invite the court to replace this decades-old statutory scheme by drawing lines that would benefit some minor party candidates,

---

[27] Connecticut permits a minor party to have automatic ballot access when its candidate for Governor achieves 20% of the votes cast in the last-preceding gubernatorial election, and thus becomes a major party. See Conn. Gen. Stat. § 9-372(5).

while excluding others.  But the regulations they challenge burden all minor party candidates and the moving plaintiffs provide no persuasive reason why the same relief should not extend to other minor parties.[28]

The moving plaintiffs maintain that, by achieving statewide ballot access, they have differentiated themselves from less established minor parties.  But using electoral success as a measuring stick, the two parties are far from equal.  This year, for example, the Independent Party qualified for the ballot for 114 offices based on its electoral performance; the Libertarian Party qualified for six.  See Telesca Decl. ¶ 7; Bromley Decl. ¶ 14.  Should automatic ballot access therefore be limited to only Independent Party candidates, or should it also extend to the Libertarian Party, which has automatic ballot access for the presidential election (which the Independent Party does not), but only six General Assembly races?  Similarly, should automatic ballot access extend to the four minor parties with statewide ballot access, or are there other minor parties that have demonstrated some modicum of statewide support who should be included?

The Constitution leaves these questions for elected officials.  See Art. I, § 4, cl. 1. In rejecting the Secretary's recommendation, the Governor considered these difficult questions and declined to provide the relief that the moving plaintiffs request today. While the plaintiffs, or this court, might have made a different decision, it is the Governor's to make, so long as he does so in a manner consistent with the Constitution.

---

[28] Of course, if to avoid this issue, the moving plaintiffs were to urge that all minor party candidates be granted automatic ballot access, then the state's interest in preventing ballot confusion and "laundry list" ballots would be greatly frustrated.  See Jenness, 403 U.S. at 442.

Because the moving plaintiffs have failed to clearly show a likelihood of success on the issue that the ballot access laws, as modified by the Executive Order 7LL, impose a severe burden, the court need not consider whether the regulations are tailored to advance the state's interests in the least restrictive manner.  Cf. Republican Party of State of Conn. v. Tashjian, 770 F.2d 265, 283 (2d Cir. 1985).  Instead, the court considers whether these reasonable and nondiscriminatory restrictions serve important state interest.  See Price, 540 F.3d at 109.  The court concludes that they do.

When weighing plaintiffs' less-than-severe burden against the state interests, the court concludes, on the record before it, that Connecticut's election laws, as modified by Executive Order 7LL, do not unconstitutionally burden plaintiffs' rights.  In reaching this conclusion, the court does not discount the challenges faced by minor party and unaffiliated candidates, particularly the candidates running for U.S. Congress and for president.  However, reasonably diligent candidates running for these offices—which are among the most important in the country—are not "virtually excluded" from the ballot.  Libertarian Party of Kentucky, 835 F.3d at 574 (citing Lubin, 415 U.S. at 719; Williams, 393 U.S. at 24; Jenness, 403 U.S. at 438).  Although the moving plaintiffs have demonstrated that the statutes create challenges for the candidates during these unprecedented times, they have not clearly shown that they are likely to succeed in proving that they impose a severe burden on their First or Fourteenth Amendment rights.

Weighed against this less-than-severe burden is the state's important interest of ensuring that candidates appearing on the ballot have a "significant modicum of support."  Requiring some threshold showing of support from all minor party candidates

allows the state to protect its interest in treating all minor party candidates fairly and in the enforcement of its statutory scheme. The extraordinary remedy that the moving plaintiffs seek—ballot access for their candidates without any showing of support— would eliminate the state's ability to protect these important interests and would result in the discriminatory treatment of other minor parties.

The state's election laws, as modified by Executive Order 7LL, serve important state interests and justify these reasonable, nondiscriminatory restrictions. For this reason, the moving plaintiffs have failed to demonstrate a clear likelihood of success on the merits.[29]

## V.   CONCLUSION

For the reasons stated above, the Libertarian Party plaintiffs' Motion for Temporary Restraining Order (Doc. 2), the Libertarian Party plaintiffs' Emergency Motion to Grant Motion for Temporary Restraining Order (Doc. No. 12), and the Independent Party plaintiffs' Motion for Preliminary Injunction (Doc. No. 43) are denied.[30]

The Green Party's Motion to Intervene (Doc. No. 54) and Alcorn's Motion to Intervene (Doc. No. 49) are granted.

---

[29] Because the moving plaintiffs have failed to demonstrate a clear or substantial likelihood of success on the merits, the court does not consider whether they have satisfied the other requirements for a preliminary injunction.

[30] Neither Kopitke nor Alcorn submitted briefs in support of the moving plaintiffs' Motions. Because the relief the Motions seek relate to automatic ballot access of minor party candidates, the court need not address the issues raised in Kopitke and Alcorn's Intervenor Complaints (Docs. No. 23 & 49-1), which relate to ballot access for unaffiliated candidates.

**SO ORDERED.**

Dated this 27th day of June 2020 at New Haven, Connecticut.


/s/Janet C. Hall
_____
Janet C. Hall
United States District Judge